## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JENNIFER TUNG, Individually and on Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **CLASS ACTION** |
| DYCOM INDUSTRIES, INC., STEVEN E. NIELSEN and ANDREW DEFERRARI, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Jennifer Tung ("Plaintiff"), by her attorneys, except for her own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Dycom Industries, Inc. ("Dycom" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.     This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Dycom common stock between November 20, 2017, and August 10, 2018, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2.     The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

**PARTIES**

5.     Plaintiff purchased Dycom common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing her transactions is attached hereto as Exhibit A.

6.     Defendant Dycom is incorporated in Florida and maintains its principal offices located at 11780 US Highway 1, Suite 600, Palm Beach Gardens, FL 33408. Dycom's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DY."

7.     Defendant Steven E. Nielsen ("Nielsen") was the Company's Chief Executive Officer ("CEO") and President at all relevant times.

8.     Defendant Andrew DeFerrari ("DeFerrari") was the Company's Chief Financial Officer ("CFO") and Senior Vice President at all relevant times.

9.     Defendants in paragraphs 7-8 are collectively referred to herein as the "Individual Defendants."

10.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of the federal securities laws.

11.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Dycom's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.     As officers of a publicly held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Dycom's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

14.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Dycom common stock

by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Dycom's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Dycom securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Background

15.     Dycom provides specialty contracting services through subsidiaries throughout the United States and in Canada. Dycom's services include program management, engineering, construction, maintenance, and installation services for telecommunications providers, underground facility locating services for various utilities, including telecommunications providers, and other construction and maintenance services for electric and gas utilities.

### B.     Material Misstatements and Omissions during the Class Period

16.     The Class Period begins on November 20, 2017, when Dycom issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the first fiscal quarter ended October 28, 2017 ("Q1 2018 Press Release"). Therein, Dycom stated in relevant part:

> Palm Beach Gardens, Florida, November 20, 2017 - Dycom Industries, Inc. (NYSE: DY) announced today its results for the fiscal quarter ended October 28, 2017. This announcement is one day earlier than previously scheduled and the conference call to review the Company's results is now scheduled for Monday, November 20, 2017 at 9:00 a.m. (ET). Specific dial-in and replay information appears below.
>
> The schedule change is a result of the Company's preliminary determination that certain documents containing financial information were subject to unauthorized access after the market closed on Friday, November 17, 2017. The Company's investigation is ongoing and law enforcement authorities have been notified.
>
> • Contract revenues of $756.2 million for the quarter ended October 28, 2017, compared to $799.2 million for the quarter ended October 29, 2016. Contract

revenues for the quarter ended October 28, 2017 decreased 8.4% on an organic basis after excluding $8.6 million of contract revenues from an acquired business that was not owned during the prior year quarter and $15.5 million of contract revenues from storm restoration services in the current period.

• Non-GAAP Adjusted EBITDA of $97.6 million, or 12.9% of contract revenues, for the quarter ended October 28, 2017, compared to $129.2 million, or 16.2% of contract revenues, for the quarter ended October 29, 2016.

• On a GAAP basis, net income was $28.8 million, or $0.90 per common share diluted, for the quarter ended October 28, 2017, compared to net income of $51.0 million, or $1.59 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income was $31.6 million, or $0.99 per common share diluted, for the quarter ended October 28, 2017, compared to Non-GAAP Adjusted Net Income of $53.7 million, or $1.67 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income for the quarters ended October 28, 2017 and October 29, 2016 excludes $4.5 million and $4.3 million, respectively, of pre-tax interest expense incurred for non-cash amortization of the debt discount associated with the Company's 0.75% convertible senior notes due September 2021.

Net income and Non-GAAP Adjusted Net Income for the quarter ended October 28, 2017 include an income tax benefit of approximately $0.9 million for the tax effects of certain share-based award activities as a result of the Company's adoption of Accounting Standards Update No. 2016-09, Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting ("ASU 2016-09"). This tax benefit would have been recorded to additional paid-in-capital under the previous accounting standard.

The Company also announced its outlook for the fiscal quarter ending January 27, 2018. The Company currently expects total contract revenues for the fiscal quarter ending January 27, 2018 to range from $645 million to $675 million. On a GAAP basis, diluted earnings per common share for the fiscal quarter ending January 27, 2018 is expected to range from $0.15 to $0.27. Non-GAAP Adjusted Diluted Earnings per Common Share is expected to range from $0.24 to $0.36. Non-GAAP Adjusted Diluted Earnings per Common Share guidance excludes $4.6 million of pre-tax interest expense for non-cash amortization of debt discount, or $0.09 per common share diluted on an after-tax basis. A reconciliation of Non-GAAP Adjusted Diluted Earnings per Common Share guidance provided for the fiscal quarter ending January 27, 2018, along with reconciliations of other Non-GAAP measures, is included within the press release tables.

17.     During a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended October 28, 2017 ("Q1 2018 Conf. Call"), Dycom's CEO Defendant Nielsen stated in relevant part:

> Revenue was $756.2 million, a decrease of 5.4%. Organic revenue, excluding $15.5 million of storm restoration services in the quarter declined 8.4%. This quarter reflected an increase in demand from three key customers as we deployed 1 gigabit wireline networks and grew core market share, offset by near-term moderation by a large customer. Gross margins were 20.55% of revenue, reflecting solid operating performance, offset by the impacts of the decline in revenue. General and administrative expenses were 8.54%.

> *          *          *

> ***Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018. Customers are continuing to reveal with specificity new multi-year initiatives that are being planned and managed on a market-by-market basis***.

> Our ability to provide integrated planning, engineering and design, procurement and construction and maintenance services is of particular value to several industry participants.

Emphasis added.

18.     Regarding the timing of the permitting for the new large projects, Dycom's CEO Defendant Nielsen stated in relevant part:

> As with prior initiations of large-scale network deployments, we expect some normal timing volatility and customer spending modulations as network deployment strategies evolve and tactical considerations, primarily permitting impact timing.

19.     During the Q&A session of the call, an analyst inquired about the timing and the permitting. Defendant Nielsen immediately assured investors of the speed of the permitting process in relevant part:

Stifel, Nicolaus & Company, Incorporated, Research Division - VP and Analyst

Okay great, thanks. And then second, you've mentioned some permitting hold ups, is this just a function of the scale of some of these capital plans that your customers -- *or is there something else specific going on?*

**Steven E. Nielsen** - Dycom Industries, Inc. - Chairman, President & CEO

No. It's exactly your point, Noelle, is that when you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. *It is not anything unusual, and unlike other adjacent spaces where you have larger projects, these are typically local municipal permits, they're not federal permits. We're not talking about environmental studies or other types of permitting.* And, in fact, just recently, the FCC passed a rule that actually will speed around small cells, some of the permitting by removing some local reviews that were already occurring. So I think it'll get better, it always does. But at this stage in these projects, it's always something to watch.

Emphasis added.

20.     During the call, Dycom's CEO Defendant Nielsen also disclosed an increase in headcount from 13,236 for the fiscal quarter ended January 28, 2017 to 14,393. During the Q&A session of the call, an analyst inquired about the reasons for said increase, to which Defendant Nielsen responded, in relevant part:

Wells Fargo Securities, LLC, Research Division - MD and Senior Analyst

Two, if I may. *Just on the, excuse me, employee count, it did go up a bit, which seems surprising. I mean, I assume that's just part of the absorption comments that you feel very comfortable hiring more heads, given the line of sight you see coming down the pike. I just wanted to confirm that.*

*            *            *

**Steven E. Nielsen -** Dycom Industries, Inc. - Chairman, President & CEO

*Sure. So with respect to the employee count, as we've talked about on the last call, we certainly are adding engineers, planners, designers, project managers. We're setting up warehouse locations to support these new project initiations. And the core business, is busy. I mean you look at the housing numbers, there are other things that are driving that headcount, but we're getting ready. Well, we're not getting ready, we're doing the engineering work we need to get started*.

Emphasis added.

21.     Regarding the impact of the new large projects on the gross margin, Dycom's CFO Defendant DeFerrari stated in relevant part:

> We expect gross margin percentage to be in line or slightly better compared to the April 2017 quarterly margin, reflecting the expected mix of work activity and improving performance as services for large customer programs begin to accelerate.

22.     During the Q&A session of the call, Defendant Nielsen  in relevant part:

Thompson, Davis & Company, Inc., Research Division - Director of Research

Steve, I wanted to stay with the April guidance. You've guided to gross margins flat to up, year-over-year. ***I'm just curious, what gives you the confidence that gross margins will get back to flat, given the fact there will still be early in some of these large programs?***

Steven E. Nielsen - **Dycom Industries, Inc. - Chairman, President & CEO**

So Adam, if you remember, Drew's comments and Drew can amplify on this, are talking about absorption, right? ***We are incurring some costs in the January quarter that we think we get the benefit of as revenue returns, at least in line and possibly growth.***

Emphasis added.

23.     On this news, the price of the Company's common stock increased $12.82 over the course of three trading days from a close on November 17, 2017 at $90.04 per share of Dycom common stock, to a close on November 22, 2017 at $102.86 per share of Dycom common stock, ***a rise of approximately 14.24%.***

24.     The statements in paragraphs ¶16-23 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (i) Dycom's large projects were highly dependent on permitting and tactical considerations, (ii) Dycom was facing great uncertainties related to permitting issues; (iii) said uncertainties would expose Dycom to near-term

margin pressure and absorption issues, and (iv) as a result of the foregoing, Defendants' statements about Dycom's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## C.     The Truth Begins to Emerge

25.     On May 22, 2018, before the market open, Dycom issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the first fiscal quarter ended April 28, 2018 ("Q1 2019 Press Release") and revising the guidance for the fiscal year 2019. Therein, Dycom stated in relevant part:

**Outlook**

The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the actual results for the quarter ended April 28, 2018 and the anticipated timing of activity on large customer programs and the related impacts on revenues and margins. The Company's previous guidance and its current expectations for fiscal 2019 are as follows:

| | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 |
|---|---|---|
| Contract revenues | $3.30 - $3.50 billion | $3.23 - $3.43 billion |
| Diluted Earnings per Common Share - GAAP | $4.78 - $5.70 | $3.81 - $4.70 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $5.22 - $6.14 | $4.26 - $5.15 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 12.4% - 12.9% |

*For a reconciliation of the prior Fiscal 2019 Diluted Earnings per Common Share guidance to the prior Non-GAAP Adjusted Diluted Earnings per Common Share guidance and a reconciliation of the prior Fiscal 2019 Net income guidance to the prior Non-GAAP Adjusted

26.     During a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended April 28, 2018 ("Q1 2019 Conf. Call"), Dycom's CFO Defendant DeFerrari stated in relevant part:

> Adjusted EBITDA was $73.7 million in Q1 2019, which was at 10.1% of revenue. Gross margins were at 18% and compared to the April quarter last year were impacted by prolonged winter weather conditions and costs incurred on large customer programs.
>
> Gross margins were approximately 100 basis points below our expectations for the quarter. ***This margin pressure resulted from the under-absorption of labor and field costs as large customer programs mobilized. We expect margins to continue to be impacted in the near term with the pressure dissipating as we gain greater momentum on these large programs.*** Accordingly, our outlook has been lowered for the full fiscal year from our prior expectations to reflect the expected margin pressure.

Emphasis added.

27.     During the Q&A session of the call, an analyst inquired about the disappointing margins. Defendant Nielsen then disclosed that, in fact, Dycom did not have enough work in hand to absorb the costs it had already incurred associated with the large projects mainly because Dycom was facing great uncertainties related to permitting issues. In relevant part:

*Analyst, Stephens, Inc.*

***So, Steve, obviously, the big question on everyone's mind this morning is the pressure on margin and a little more specifics around what's causing it.*** And it sounds like you're still expecting a big ramp in the business. The timing has maybe changed a little bit. But I think what we're all trying to get at is a little more specific around the near-term margin pressure and do you believe you can still get this business back to a mid-teens EBITDA margin once things ramp up and you're better absorbing those costs?

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

So, to the second question, Matt, yes. I mean, we have not changed our view on mid-teens EBITDA. With respect to the pressure on the business, we have a number of large programs, some of which require extensive permitting and other governmental authorities. While we've been through this before, the timing of when

11

you build up a cadence in that process that will allow you to efficiently deploy resources, it's hard to forecast. I mean, we understand that and we're disappointed that we didn't get it as right as we would have liked last quarter. But that doesn't change that the projects are there, that we're confident in our ability to execute. ***We've just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management as well as be efficient in the field as we get more permitted backlog that we can really go to work on.*** And it's getting better every day. It's just not getting better as quickly as we would have hoped 91 days ago.

*Analyst, Stephens, Inc.*

***So, is this customer shifting the timing of work or is it simply the permitting process?***

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

We're all working together with our customers, with the permitting authorities. These are large programs. ***In fact, I think they are substantial programs and that means there is a substantial buildup in activities from the permitting authorities and it's taking a little time, but it's getting better.***

Emphasis added.

28.     Later during the call, Defendant Nielsen further disclosed full knowledge of said uncertainties' impact on permitting issues because they were "***always around starting the process.***" Nielsen added that Dycom, in fact "***had similar experiences with large programs 15 years ago***" and was "***still at them***."

29.     On this news, the price of the Company's common stock declined $23.56 from a close on May 21, 2018 at $116.20 per share of Dycom common stock, to a close on May 22, 2018 at $92.64 per share of Dycom common stock, ***a drop of approximately 20.27%.***

30.     On August 13, 2018, before the market open, Dycom issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC revising the Company's guidance for the financial and operating results for the second fiscal quarter and six months ended July 28, 2018

and announcing preliminary revenues and results for the second quarter below the previous guidance ("Q2 2019 Guidance Press Release").

31.     During a conference call to discuss the preliminary results ("Q2 2019 Guidance Conf. Call"), Dycom's CEO Defendant Nielsen justified the disappointing results by iterating absorption issues caused by the uncertainties related to permitting issues. In relevant part:

> **Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*
>
> This morning, we reported preliminary results for the second quarter that were below our prior expectations. Revenue is expected to be approximately $799.5 million with Adjusted Diluted Earnings per Share, expected to range from a $1.05 to $1.08. This range includes approximately $0.9 million of incremental tax benefits. ***These preliminary results were impacted by large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level.***

32.     When asked during the Q&A session of the call about permitting and absorption issues, Defendant Nielsen disclosed that the large projects were not ramping-up as expected due to uncertainties related to permitting issues and that Dycom's core business was in reality not as busy as previously disclosed. In relevant part:

> Analyst**,** B. Riley FBR, Inc.
>
> Steve, your comment with regards to tactical considerations primarily permitting, can you expand upon that just a little bit as it relates to how this tactical consideration due to permitting maybe is different than maybe past FiOS builds or fiber builds in the mid-2000s?
>
> **Steven E. Nielsen**, Chairman, President & Chief Executive Officer, Dycom Industries, Inc.
>
> Yeah, I think Alex as we said in May, these are big programs, they're ramping up broadly, ***they're subject to greater uncertainties and those are the uncertainties that impacted the second quarter***. I mean they will resolve, but there are uncertainties because of the size of the programs.
>
> Analyst**,** B. Riley FBR, Inc.

And then as it relates to cost pressures in the short-term, can you expand upon that a little bit too? And maybe address sort of your thinking on head count in the short-term, do you carry head count in anticipation of the big backlog and how that could come through next year? Just a little bit more detail would be helpful?

**Steven E. Nielsen**, Chairman, President & Chief Executive Officer, Dycom Industries, Inc.

Sure. So, I think as we said in the comments, it's really an absorption question. ***I mean we have to have the staff in place to support the revenue that's embedded in the guidance and we do, but we're not as busy as we had expected to be and so that created an absorption question***. But because the work is there we have to have the people.

Emphasis added.

33. On this news, the price of the Company's common stock declined $21.62 from a close on August 10, 2018 at $89.71 per share of Dycom common stock, to a close on August 13, 2018 at $68.09 per share of Dycom common stock, ***a drop of approximately 24.10%.***

## ADDITIONAL SCIENTER ALLEGATIONS

34. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Dycom, their control over, and/or receipt and/or modification of Dycom's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Dycom, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

35.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Dycom's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Dycom's common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

36.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Dycom's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Dycom's common stock to be artificially inflated. Plaintiff and other

Class members purchased Dycom's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

37.     At all relevant times, the market for Dycom common stock was an efficient market for the following reasons, among others:

    (a) Dycom common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

    (b) During the Class Period, Dycom common stock were actively traded, demonstrating a strong presumption of an efficient market;

    (c) As a regulated issuer, Dycom filed with the SEC periodic public reports during the Class Period;

    (d) Dycom regularly communicated with public investors via established market communication mechanisms;

    (e) Dycom was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

    (f) Unexpected material news about Dycom was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

38.     As a result of the foregoing, the market for Dycom common stock promptly digested current information regarding Dycom from all publicly available sources and reflected such information in Dycom's stock price. Under these circumstances, all purchasers of Dycom common stock during the Class Period suffered similar injury through their purchase of Dycom's

common stock at artificially inflated prices and a presumption of reliance applies.

39.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Dycom.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

40.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

41.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

42.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Dycom who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the

defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Dycom common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

44. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dycom securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Dycom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of August 29, 2018, Dycom had more than 31,235,669 shares of common stock outstanding. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

45. Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

46.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and his retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Dycom securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Dycom common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

51.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Dycom securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Dycom as specified herein.

53.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dycom's value and performance and continued substantial growth, which included the making of, or participation in the making of,

untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Dycom and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Dycom common stock during the Class Period.

54.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

55.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Dycom's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Dycom's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Dycom's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Dycom's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

57.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Dycom's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Dycom securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

58. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

59. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

60. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

### COUNT II
#### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

61. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62. The Individual Defendants acted as controlling persons of Dycom within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

63.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, Dycom, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

65.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

66.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by

law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: October 25, 2018                    **/ Cullin O'Brien Law, P.A.**

/s/ Cullin O'Brien
Cullin O'Brien
6541 NE 21st Way
Ft. Lauderdale, Florida 33308
Tel: (561) 676-6370
Fax: (561) 320-0285
Email: cullin@cullinobrienlaw.com


*Liaison Counsel*

**LEVI & KORSINSKY, LLP (Trial Counsel)**
Eduard Korsinsky
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com
 (*Pro hac vice application forthcoming*)

*Counsel for Plaintiff and Proposed Lead Counsel
for the Class*