## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JENNIFER TUNG, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DYCOM INDUSTRIES, INC., STEVEN E. NIELSEN and ANDREW DEFERRARI,<br><br>Defendants. | Case No. 9:18-cv-81448-RLR<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................ 2

II.     JURISDICTION AND VENUE ............................................................. 6

III.    PARTIES ............................................................................................. 7

   A.  Lead Plaintiff .................................................................................... 7

   B.  Defendants ........................................................................................ 7

IV.    CONFIDENTIAL WITNESSES ........................................................... 9

V.     STATEMENT OF FACTS ................................................................... 13

   A.  Company Background ..................................................................... 13

   B.  The Majority of Dycom's Revenue is Generated by Seven of its Subsidiaries ................ 14

   C.  Dycom Derives the Majority of its Revenue from Five Customers Pursuant to Master Service Agreements ........................................................ 15

   D.  Amid A Flourishing Industry, Dycom's Top Customers Announce Billion-Dollar Deals for Large-Scale Network Expansions ...................... 17

   E.  Dycom is Unable to Take Advantage of Telecommunication Opportunities Due to Permitting Delays, Understaffing and Inexperienced Personnel ........................... 20

     i.  Dycom fails to obtain permits for its customers' billion-dollar projects, resulting in project delays, contract cancellations, and lost revenue from key customers .............. 21

       1.  Dycom is required to obtain permits for each of its telecommunications projects ............................................. 21

       2.  Dycom fails to obtain required permits for Verizon's One Fiber project, resulting in cancelled contracts and lost revenue ........................ 23

       3.  Dycom violates safety protocols, causing permit delays and missed deadlines for its top customer, AT&T ................................. 34

       4.  Additional customer contracts are cancelled due to permit delays, causing further revenue losses ................................... 38

     ii.  Verizon and AT&T cancel additional contracts due to Dycom's disorganization and project delays ............................................. 41

   F.  The Individual Defendants Were Aware of Customer Project Delays and Delayed Revenue through Direct Control Over Dycom's Subsidiaries, as well as Daily Reports and Weekly and Monthly Meetings ............................ 43

     i.  Dycom manages and controls its subsidiaries ............................. 43

     ii.  Dycom tracked its subsidiaries' projects on a daily basis ................. 46

     iii.  Dycom tracked the Verizon One Fiber project delays through the VTS and other programs ............................................. 51

iv.    The Individual Defendants had monthly, weekly, and daily meetings with the heads of its subsidiaries to discuss the status of Dycom's projects, including permitting issues and finances ........................................................................ 54

VI.    FALSE AND MISLEADING STATEMENTS .......................................................... 58

A.    Materially False and Misleading Statements and Omissions Regarding Permit Delays on Customer Projects ................................................................................ 59

B.    Materially False and Misleading Statements and Omissions Concerning Dycom's Progress and Initiation of Customer Projects ..................................................... 64

C.    Materially False and Misleading Statements and Omissions Concerning The Purported "Acceleration" of Dycom's Customer Projects ................................... 70

D.    Materially False and Misleading Statements and Omissions Regarding Dycom's Ability to Complete its Backlog of Projects ........................................................ 75

E.    Materially False and Misleading Statements and Omissions Concerning Dycom's Purported "Strong" Customer Relationships ....................................................... 79

F.    Materially False and Misleading Statements and Omissions Regarding Factors Impacting Dycom's Operations, Revenue Growth, and Margins ....................... 83

VII.    THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES ..................... 90

A.    The May 22, 2018 Partial Corrective Disclosure That Dycom Experienced Significant Margin Pressure in Q1 and Would Be Reducing Future Forecasts as a Direct Result of Previously Undisclosed Permitting Issues ......................................................... 90

B.    The August 13, 2018 Second Partially Corrective Disclosure Revealing for the First Time the Permitting Issues Were Far Worse Than Previously Represented and Were Not Temporary ...................................................................................... 97

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 100

A.    The Individual Defendants knowingly and/or recklessly made material misstatements and/or omitted material facts ................................................................................ 101

i.    The Individual Defendants had knowledge of Dycom's project delays and revenue shortfalls through monthly meetings ............................................................ 101

ii.    The Individual Defendants had knowledge of Dycom's project delays and revenue shortfalls through daily and weekly meetings ............................................ 103

iii.    The Individual Defendants had knowledge of Dycom's project delays and revenue shortfalls through daily reports ...................................................................... 108

iv.    The Individual Defendants had knowledge of Dycom's delays and revenue shortfalls through the Verizon Tracking System ....................................................... 112

v.    The Individual Defendants Had Knowledge of Dycom's Project Delays and Revenue Shortfalls because Dycom's Telecommunications Business Was A Highly Material Aspect of Its Business and Concerned Dycom's Largest Customers .......... 113

vi.    The Individual Knowledge Had Knowledge of Dycom's Project Delays and
       Revenue Shortfalls Because They Had Exclusive Control Over Revenue
       Recognition and Customer Invoicing ........................................................ 114

IX.    CLASS ACTION ALLEGATIONS ..................................................... 117

X.     LOSS CAUSATION ............................................................................. 119

XI.    FRAUD-ON-THE-MARKET ............................................................ 121

XII.   NO SAFE HARBOR ............................................................................ 123

XIII.  CAUSES OF ACTION ........................................................................ 124

COUNT I ................................................................................................... 124

COUNT II .................................................................................................. 126

PRAYER FOR RELIEF ........................................................................... 127

JURY DEMAND ....................................................................................... 128

Lead Plaintiff the Boston Retirement System ("Lead Plaintiff") brings this action against Dycom Industries, Inc. ("Dycom" or the "Company"), Chief Executive Officer Steven Nielsen ("Nielsen"), and Chief Financial Officer Andrew DeFerrari ("DeFerrari") pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of itself and all other persons similarly situated who purchased or otherwise acquired Dycom common stock between November 20, 2017 and August 10, 2018, inclusive (the "Class Period"), and were damaged thereby. In this Amended Complaint, Nielsen and DeFerrari are referred to as the "Individual Defendants." Dycom and the Individual Defendants are referred to as "Defendants."

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation of its undersigned Lead Counsel, which included, among other things, review and analysis of: (i) Dycom's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Dycom's other public statements, including press releases; (iii) interviews with former employees of Dycom and its subsidiaries; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Dycom and the industry in which it operates; and (v) court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.      Dycom provides specialty contracting services throughout the United States and Canada. The Company generates over ninety-percent (90%) of its revenue from its telecommunications business through which it services five primary customers—Comcast Corporation ("Comcast"), AT&T Inc. ("AT&T"), CenturyLink, Inc. ("CenturyLink"), Verizon Communications, Inc. ("Verizon"), and Charter Communications, Inc. ("Charter")—that make up 75% of Dycom's telecommunications revenue.

2.      With the proliferation of smart phones and other mobile data devices, prior to and throughout the Class Period, telecommunications companies, such as those identified above, have been upgrading and increasingly deploying fiber optic cable technology deeper into their networks to respond to consumer demand. When discussing the developments and deployments in the telecommunications industry, Dycom repeatedly touted that "[t]hese trends are driving demand for the type of services we provide" and "it's the biggest thing that's happened in the last seventeen years."

3.      As a result of the explosive growth in the telecommunications business, Dycom entered into multi-year billion-dollar contracts with its largest customers. Among other contracts, in 2017, Verizon awarded Dycom a contract to build 3,000 miles of fiber cable in Georgia as part of its One Fiber project (the "Verizon One Fiber" project") and a $55 million dollar 10-year One Fiber project contract in Texas. In 2018, Dycom was also awarded a contract to install 200 miles for the Verizon One Fiber projects in Louisville, Kentucky, as well as additional Verizon One Fiber project contracts in Indianapolis and Cincinnati, Ohio. Around the same time, Dycom was awarded AT&T's "LightGig" FTTX residential upgrade contract (the "FTTX Project"). In Florida,

alone, this project was estimated to generate an average of $2 million, and as much as $7 million, in monthly revenue for Dycom during the Class Period.

4.       While this influx in business should have been a time for Dycom to reap substantial profits, Dycom was in a freefall and Defendants hid this reality from the market. Former Dycom employees confirm that Dycom was not able to keep up with the billion-dollar customer project deployments and the Company was actually *losing* customer contracts.  Unbeknownst to investors, Dycom was experiencing substantial delays in deploying Verizon's One Fiber Project and AT&T's FTTX Project (among numerous others) as a result of the Company's failure to: (i) obtain crucial utility and work permits needed to commence projects; (ii) provide permitting authorities with the necessary documentation and information needed to support permit applications that were filed; and (iii) hire a sufficient and competent workforce to complete customer projects according to the projected timeline. Further, Dycom's relationships with local permit authorities were strained due to the Company's failure to abide by local safety and operating laws.

5.       As a result, unbeknownst to investors, Dycom's top customers, including Verizon and AT&T, cancelled millions of dollars' worth of contracts with the Company during the Class Period, costing Dycom millions of dollars in lost revenue and critical business relationships with key customers and permitting authorities. Indeed, during the Class Period, due to the magnitude of the project delays, Verizon eventually cancelled two-thirds of the Verizon One Fiber Project in Atlanta, Georgia as well as its $55 million, 10-year contract in Texas, among many other material projects. The loss of Verizon's business, alone, is material, as Dycom derives 20% of its revenue from Verizon.

6.       Moreover, One Stream cancelled its contract with Dycom in October of 2017, which generated $5-$10 million worth of yearly contract revenue, after experiencing permit

delays, and Spectrum cancelled its $10 million-dollar contract with Dycom that same month. Dycom further lost $20-$30 million as a result of AT&T withholding jobs from Dycom due to missed deadlines. The loss of AT&T contracts is material, as AT&T has consistently been Dycom's top revenue-generating customer, accounting for over 26% of Dycom's revenue in fiscal year 2017.

7.     The Individual Defendants knew that Dycom was losing revenue hand over fist and experiencing significant pressure on operating margins as a result of project delays and cancellations throughout the Class Period because each subsidiary provided the Individual Defendants with a daily report of its operations ("Dailies"), which the Individual Defendants accessed directly on their computers, that informed them of the progress of each project, the amount of installation completed, billable line items, and which jobs were active.

8.      Defendants also received and could directly access on their computers an additional report regarding any Verizon projects through the Verizon Tracking System ("VTS"), a program that every subsidiary used. The VTS contained project completion dates for fielding and engineering, and payments, which showed that, throughout the Class Period, Dycom was experiencing significant project delays, delayed revenue recognition, and cancelled contracts, among other metrics.  Not only did Defendants have direct access to each of these programs, but confidential sources confirm that each subsidiary would also directly send Dycom daily reports from these internal programs.

9.     Defendants were further aware of project delays and cancellations through monthly calls that Defendant Nielsen held with the president of each of Dycom's subsidiaries. During these calls, permit issues and the loss of contracts were explicitly discussed, among other updates concerning Dycom's customer contracts.

10.     Despite full knowledge of Dycom's permit and project delays and lost revenue, Defendants downplayed the delays as typical delays by the permitting authorities claiming they were nothing more than routine because with "large programs" it "always takes the permitting authorities a little bit of time to gear up." Defendants also consistently assured investors that "[w]e were not experiencing any material project delays" and Dycom was "actively working on a number of converged wireless/wireline multi-use networks" and that fiber deployments were "accelerating."

11.     Similarly, despite the fact that Dycom's top revenue-generating customers were cancelling and withholding future contracts from Dycom as a result of Dycom's delays and insufficient staffing, the Company nevertheless omitted this information and represented instead that it had "[s]olid demand from several large customers," and "maintained strong customer relationships throughout our markets. We continue to win and extend contracts at attractive pricing."

12.     The truth began to emerge on May 22, 2018, when Dycom issued a press release reporting its first quarter fiscal 2019 results. For the first time, Dycom acknowledged that it was experiencing some project delays, material enough to revise its guidance downward due to "the anticipated timing of activity on large customer programs and the related impacts on revenues and margins."

13.     During an investor call that same day, Defendants revealed that "[t]his margin pressure resulted from the under-absorption of labor and field costs as large customer programs mobilized" and that there were "*some* permitting issues," blaming them entirely on "substantial buildup in activities *from the permitting authorities*" when, in fact, as would later be revealed, the permitting delays were "unique to Dycom."

5

14.     The truth finally emerged on August 13, 2018, when Dycom disclosed that its revenues and results for the quarter ended July 28, 2018 were well below previous guidance and, accordingly the Company was, again, revising its financial guidance for 2019 downward. to reflect "large-scale deployments that were slower than expected during the quarter due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs at a lower revenue level." In other words, delays in Dycom's large customer contracts were far worse than represented and had caused significant pressure on the Company's margins as a result of incurred by unrecouped costs and delayed or lost revenues from project delays and/or cancellations.

15.     Upon this news, Dycom's stock fell ***more than 24%*** from a closing price of $89.71 per share on August 10, 2018 to a closing price of $68.09 per share on August 13, 2018.

16.     Analysts reacted negatively, commenting that "***management was evasive***," the Company "seem[s] to miss on quite a few numbers by a long shot," and that these problems were ***unique to Dycom***, stating "it doesn't seem like others are seeing the same kinds of delays or to the magnitude, perhaps."

17.     Lead Plaintiff seeks to recover hundreds of millions of dollars in damages on behalf of itself and the putative Class as a result of Defendants' materially misleading statements and omissions alleged herein.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

6

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court has jurisdiction over Defendants named herein because each Defendant is an individual who has sufficient minimum contacts with this District, particularly since Dycom's principal place of business is located at 11780 U.S. Highway 1, Suite 600, Palm Beach Gardens, Florida 33408.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because a substantial part of the conduct complained of herein, including the dissemination of materially false and misleading information to the investing public and the omission of material information, occurred in this District.

## III.    PARTIES

### A.  Lead Plaintiff

21.     Lead Plaintiff, the Boston Retirement System, as previously set forth in its lead plaintiff certification (Dkt. No. 10-3), incorporated by reference herein, purchased Dycom common stock during the Class Period at artificially inflated prices and was damaged upon the revelation of the alleged corrective disclosure.

### B.  Defendants

22.     Defendant Dycom is a corporation incorporated in Florida with its principal executive offices located at 11780 U.S. Highway 1, Suite 600, Palm Beach Gardens, Florida 33408. Dycom is a leading provider of specialty contracting services throughout the United States.

23.     Defendant Steven E. Nielsen has been President and Chief Executive Officer ("CEO") of the Company since March 1999 and a member of the board of directors (the "Board") since 1996. Nielsen was previously President and Chief Operating Officer ("COO") of Dycom from August 1996 to March 1999, and Vice President from February 1996 to August 1996.

7

24.     Dycom emphasized Nielsen's intimate knowledge of the Company's daily operations as CEO in SEC filings throughout the Class Period. For example, Dycom's April 12, 2018 Schedule 14A Definitive Proxy Statement confirmed that Nielsen "possesses an intimate knowledge of the daily operations of the Company and its relationships with customers and employees," has "primary responsibility for managing the Company's day-to-day operations," and his role as CEO and other positions within the Company "bring to the Board of Directors a deep insight into the operations, challenges and complex issues facing the Company itself and the Company's industry in general." Dycom's September 1, 2017 Annual Report on Form 10-K admitted that management of Dycom's operating segments, or subsidiaries, report to the Company's COO, who reports to the CEO, "the chief operating decision maker."

25.     Defendant Andrew DeFerrari has been the Senior Vice President and Chief Financial Officer ("CFO") since April 2008. DeFerrari was previously Vice President and Chief Accounting Officer of Dycom from November 2005 to April 2008, and was the Company's Financial Controller from July 2004 to November 2005.

26.     The Individual Defendants, by virtue of their high-level positions at Dycom, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at its highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

27.     As senior executives at a publicly held company with common stock registered with the SEC and traded on the New York Stock Exchange ("NYSE"), the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's

business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Dycom's publicly traded common stock would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

28.     As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the SEC filings, press releases, and other public statements issued by Dycom during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed in this amended complaint.

29.     As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about Dycom's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Dycom materially false and misleading.

## IV.   CONFIDENTIAL WITNESSES

30.     In connection with its investigation of this matter, Co-Lead Counsel interviewed a number of former Dycom employees identified herein as confidential witnesses ("CW_"). All confidential witnesses are referred to in the masculine to protect their identities.

31.     CW1 was formerly employed as a Senior Accountant at Star Construction ("Star"), one of Dycom's subsidiaries, from September 2016 until August 2018. CW1 was based in the Knoxville, Tennessee office and was involved in all aspects of accounting for Star, focusing

primarily on revenue and accounts receivable. CW1 reported to Tony Sook, the Principal Accounting Officer at Star, and Christine Brew, Senior Controller of Star, both of whom reported to the director of accounting at Dycom as well as Rebecca Brightly Roach, the current Vice President of Business Process and the former Chief Accounting Officer at Dycom.

32.     CW2 was formerly employed as an OSP/Drop Manager and Field Supervisor at Star from August 2017 until December 2017. CW2 was based out of Star's Waterloo, Iowa office and was in charge of a region of construction in Waterloo as well as managing subcontractors and internal employees. CW2's boss reported to Tom Bones, the Vice President of Star, who reported to Dycom.

33.     CW3 was formerly employed as a Regional Vice President at Ansco & Associates ("Ansco"), one of Dycom's subsidiaries, from January 2015 until November 2017. CW3 was based out of the Houston, Texas office and was responsible for running all projects around the Houston area that were not related to Ansco's AT&T contract. CW3 reported to the Vice President of Wireless Operations, Dubi Kazula, who reported to George Summers, the President of Ansco. George Summers was also a member of Dycom and reported directly to the Individual Defendants.

34.     CW4 was formerly employed as a Project Manager at Engineering Associates LLC ("Engineering Associates"), one of Dycom's subsidiaries, from May 2017 until August 2018. CW4 was based out of Atlanta, Georgia and was responsible for managing the Verizon One Fiber project in the Atlanta market. CW4 reported to Marshall Lance.

35.     CW5 was formerly employed as a Project Manager at Star in Louisville, Kentucky from August 2018 until mid-October of 2018. CW5 was responsible for managing the Verizon One Fiber project in Louisville. CW5 reported to the Project Manager Organizer, Dave Hamlin, who reported to Tom Bones. Bones reported to Andy Jaco at Dycom.

36.     CW6 was formerly employed as a District Manager at Ivy H. Smith Co. ("Ivy"), one of Dycom's subsidiaries, from October 2017 until February of 2018. CW6 was based out of Orlando, Florida and was responsible for managing FTTX Wireline Operations and four district offices in Florida (Orlando, Melbourne, Fort Pierce, and West Palm Beach). CW6 reported to Ivy's District Manager, Chris Shaddock, and Ivy's Vice President, Cevin Ferguson. During CW6's employment, Shaddock was in the process of transitioning to a senior level operations and software integration position within Dycom. Both Shaddock and Ferguson reported to George Summers, the President of Ansco, as the two companies were "sister companies." Summers was a member of Dycom and reported directly to the Individual Defendants.

37.     CW7 was formerly employed as a Supervisor at Texstar Enterprises ("Texstar"), one of Dycom's subsidiaries acquired in March 2017, from November 2014 until May 2018. CW7 was based out of San Antonio, Texas and was responsible for supervising the directional drilling department. CW7 reported to Texstar's president, Chris Howard, and Vice President, Pete Espinoza, who reported to the Individual Defendants.

38.     CW8 was formerly employed as an Area Light Gig Manager at Texstar from August 2012 until August 2018. CW8 was based out of Austin, Texas and was the head of the AT&T Light Gig department for San Antonio, Texas. Pursuant to the contract with AT&T, CW8 was responsible for installing fiber lines in residential neighborhoods throughout San Antonio. CW8 reported to Texstar's president, Chris Howard, and Senior Vice President of Operations, Larry Rucker, both of whom reported to the Individual Defendants.

39.     CW9 was formerly the Vice President of Internal Audit at Dycom from November 2007 until December 2017.  CW9 was responsible for financial and Sarbanes-Oxley compliance testing and reported directly to Defendant DeFerrari.

11

40.     CW10 was formerly a Project Supervisor at Ervin Cable Construction ("Ervin"), one of Dycom's subsidiaries, from October 2015 until approximately November 2017. CW10 was also a supervisor at Texstar from approximately December 2017 until March 2018. CW10 was responsible for overseeing permitting for the Google fiber cable project in San Antonio, Texas. CW10 reported to Brian Carvey.

41.     CW11 was formerly a Project Manager at Ansco from October 2016 until November 2018. CW11 managed AT&T cell towers once construction was complete to ensure the site was optimized to perform properly and meet customer specifications. CW11 reported to Ansco's project directors, Ryan Abbott and Eddie Velez, who each managed territories for Ansco. Abbott and Velez reported to Dubi Kazula, Ansco's VP of Wireless Operations, who reported to George Summers. According to CW11, while Summers was the President of Ansco, he worked in the Ansco headquarters office in Norcross, Georgia with other Dycom employees and was "corporate," meaning he worked directly for the Individual Defendants. Summers reported to the Individual Defendants

42.     CW12 was a Telcom Permit Engineer at Tesinc, one of Dycom's subsidiaries, from December 2016 until June 2018. CW12 was responsible for obtaining permits for two of Dycom's largest customer accounts: (i) the CenturyLink account in Cape Coral, Florida, and (ii) the Verizon One Project in Cincinnati, Ohio. CW12 reported to Phil Brandt, Permitting Manager, on both the Verizon and CenturyLink accounts. CW12 also reported to Steve Foxx, an Engineer, for the CenturyLink account. Both Brandt and Foxx reported to Dycom.

## V.    STATEMENT OF FACTS

### A.  Company Background

43.     Dycom provides specialty contracting services throughout the United States and Canada, with the vast majority of revenue generated from services within the United States. The Company trades on the NYSE under the symbol "DY."

44.     Dycom provides: (i) program management, engineering, construction, maintenance, and installation services for telecommunications providers; (ii) underground facility locating services for various utilities, including telecommunications providers; and (iii) other construction and maintenance services for electric gas utilities. In connection with these services, Dycom provides the labor, tools, and equipment necessary to design, engineer, locate, maintain, expand, install, and upgrade its customers' telecommunications infrastructure.

45.     *Engineering Services*: Dycom's engineering services include the design of aerial, underground, and buried fiber optic, copper, and coaxial cable systems that extend from the telephone company central office, or cable operator headend, to the consumer's home or business. Before it can provide engineering services, Dycom must obtain rights of way and permits to support its engineering activities and those of its customers from the appropriate authorities. Once the project is complete, Dycom further provides construction management and inspection personnel in conjunction with engineering services or on a standalone basis.

46.     *Construction, Maintenance, and Installation Services*: The Company's construction, maintenance and installation services include the placement and splicing of fiber, copper, and coaxial cables. Dycom excavates trenches in which to place cables; places related structures such as poles, anchors, conduits, manholes, cabinets, and closures; places drop lines from main distribution lines to the consumer's home or business; and maintains and removes these

13

facilities. Dycom provides these services to both telephone companies and cable multiple system operators in connection with the deployment, expansion, or maintenance of new and existing networks.  Dycom further provides tower construction, lines, and antenna installation; foundation and equipment pad construction for wireless carriers; and equipment installation and material fabrication and site testing services.  In order to construct or install these lines, Dycom is required to obtain permits from the appropriate authorities.

47.     _Construction and Maintenance Services for Electric and Gas Utilities_: Dycom also provides an underground facility locating services for a variety of utility companies, including telecommunications providers. Dycom's underground facility locating services include locating telephone, cable television, power, water, sewer, and gas lines.

**B.  The Majority of Dycom's Revenue is Generated by Seven of its Subsidiaries**

48.     Dycom has achieved its growth mainly through the acquisition of small to medium-sized companies that perform services nationwide. Prior to being acquired, these companies operated as local independent companies servicing small clients on local projects.

49.     Currently, Dycom operates forty acquired subsidiaries located throughout the United States. Dycom's subsidiaries vary in size and revenue, ranging from less than ten employees or under $5 million in revenue, to 5,000 employees or $500 million in yearly revenue.

50.     Dycom's seven largest subsidiaries, accounting for approximately 60% of the Company's annual revenue, are: (i) Ansco & Associates ("Ansco"), located in GA (headquarters), NC, SC, FL, KY, TX, AL, and MS; (ii) Broadband Express, LLC ("Broadband"), located in OH (headquarters), NY, MI, PA, WV; (iii) Ervin Cable Construction LLC ("Ervin"), located in KY (headquarters), MO, IL, TN, AL, NC, OK, TX, AR, and IN; (iv) Star Construction LLC ("Star"), located in TN (headquarters), AL, GA, IN, KY, LA, MS, MO, OH, SC, and VA; (v) Utiliquest,

LLC ("Utiliquest"), located in GA (headquarters), VA, OH, CA, DE, MD, NC, NJ, IN, OR, SC, DC Metro, and PA; (vi) TelCom Construction Inc. ("TelCom"), located in MN (headquarters), IA, NE, SD, TX, KS, and WI; and (vii) Pauley Construction LLC ("Pauley"), located in AZ (headquarters), WY, CO, and CA. According to CW3, Ivy and Star are two of Dycom's largest revenue generating subsidiaries with respect to fiber projects. CW11 stated that Ansco was a "big revenue generator" for Dycom as well.

51.     Most of Dycom's subsidiaries employ 100 employees or less *per state*. Thus, as discussed below, Dycom's subsidiary companies lacked the staffing, skill, and expertise necessary to handle projects from the Company's largest clients, such as Verizon and AT&T, resulting in significant project delays and cancelled contracts and, ultimately, a substantial decline in revenue during the Class Period.

### C. Dycom Derives the Majority of its Revenue from Five Customers Pursuant to Master Service Agreements

52.     Dycom's customer base is highly concentrated, with only five customers accounting for over 75% of the Company's overall revenue: Comcast, AT&T, CenturyLink, Verizon and Charter, all major telecommunications companies.

53.     The following table reflects the percentage of total contract revenues from customers who contributed at least 2.5% to Dycom's total contract revenues for six months ended January 27, 2018 and fiscal years 2015 through 2017:

|  | Six Months Ended | Fiscal Year Ended | | |
|---|---|---|---|---|
|  | January 27, 2018 | July 29, 2017 | July 30, 2016 | July 25, 2015 |
| Comcast Corporation | 21.6% | 17.7% | 13.6% | 12.9% |
| AT&T Inc. | 20.6% | 26.3% | 24.4% | 20.8% |
| CenturyLink, Inc. | 17.5% | 18.2% | 14.7% | 14.5% |
| Verizon Communications Inc. | 12.0% | 9.2% | 11.2% | 7.7% |

| | | | | |
|---|---|---|---|---|
| Charter Communications, Inc. | 4.2% | 3.9% | 6.1% | 8.5% |
| Windstream Corporation | 3.8% | 5.4% | 5.7% | 4.7% |

54.     Most recently, for the fiscal year ended January 26, 2019, Dycom reported that 21.2%, 20.8%, 19.2%, 13.6%, 3.6% and 3.6% of its contract revenues came from AT&T, Comcast, Verizon, CenturyLink, Windstream, and Charter, respectively.

55.     Over 86% of revenue derived from these customers comes from master service agreements and other contracts that contain customer-specified service requirements.

56.     Contract revenue under these agreements is recognized over time as the services are actually performed and customers receive their contracted-for benefits. Output measures, such as units delivered, are utilized to assess Dycom's progress against specific contractual performance obligations for the majority of its services. Thus, unless and until Dycom and its subsidiaries complete portions of their customer contracts, they are not able to recognize revenue.

57.     Notably, Dycom's customer contracts do not guarantee a specific amount or volume of work or services to Dycom and can be cancelled by the customer at any time without penalty. Thus, it is not until a definitive work order is placed with Dycom and the work is completed that revenue is assured.

58.     Because Dycom's customer base is highly concentrated, such customers may cancel their contracts at any time and the loss of one customer could have a devastating impact on Dycom's operations. As Dycom admits, because its revenue is highly concentrated among only five customers, "the highest return investment [Dycom] can make is growing the business that [it] ha[s] for customers that [it] know[s]." Defendant Nielsen has further commented that "We've got to do a really good job with those customers given that concentration, but as long as we're able to do that, our view is that we're happy to grow with those customers."

16

### D. Amid A Flourishing Industry, Dycom's Top Customers Announce Billion-Dollar Deals for Large-Scale Network Expansions

59.     Throughout the Class Period, Defendants touted that significant developments in the telecommunications industry were driving the demand for Dycom's services mainly through its key customers.

60.     Specifically, the proliferation of smartphones and other mobile data devices drove a significant demand for wireless broadband. As developments in consumer and business applications have continued to develop, including advanced digital and video service offerings, the demand for greater capacity and enhanced reliability for wireline and wireless networks has increased exponentially.

61.     To respond to this demand and other advances in technology, wireless carriers, such as AT&T and Verizon, were upgrading their networks and contemplating next generation mobile solutions, such as small cells and 5G technologies. Prior to and throughout the Class Period, telecommunications network operators increasingly deployed fiber optic cable technology deeper into their networks and closer to consumers and businesses in order to respond to consumer demand for wireless broadband, competitive realities, and public policy support.[1]

62.     Wireless carriers have been actively spending on their networks to respond to the significant increase in wireless data traffic by upgrading network technologies to improve performance and efficiency and to consolidate disparate technology platforms. As the demand for mobile broadband has grown, Dycom repeated throughout the Class Period, in SEC filings, presentations and conference calls, that "a significant number of new project initiations will occur in the near-term." Dycom further stated in its quarterly reports prior to and throughout the Class

---

[1] Compared to wired cables, fiber optic cables provide higher bandwidth and can transmit data over longer distances.

Period that it expected an increase in business, because the "[s]ignificant demand for wireless broadband" was generating projects throughout the country, and "*[t]hese trends are driving demand for the type of services we provide.*"

63.     Indeed, Dycom's top customers were announcing billion-dollar deals to implement facility upgrades, particularly in the fiber optics field. Both Dycom and analysts touted these as major opportunities that would provide a decade worth of revenue to the Company.

64.     For instance, in 2017, leading up to the Class Period, Verizon announced that it was launching two key fiber supply deals: (1) in April 2017, Verizon announced it would purchase 1.5 million miles of optical fiber from Corning Inc. over the next three years (2018-2020) for at least $1.05 billion; and (2) in May 2017, Verizon announced that it had a $300 million deal with Prysmian to buy 10.6 million miles of ribbon and loose tube cables over three years in connection with the expansion of its fiber network. Defendant Nielsen told investors during Dycom's fiscal 2017 third-quarter earnings call on May 24, 2017 that these deals were "unprecedented" and a "huge opportunity," further telling analysts and investors that:

> I guess the way I would put that -- the way I would think about it at a high level, Christian, is that they are in the last -- in in the 21st century, there's been no domestic deployment of fiber that was of such magnitude that manufacturers had to add capacity, you know, actually build plants. And so I think that would tell you that ***it's the biggest thing that's happened in the last seventeen years***, if you frame it that way.

65.     Analysts, such as FierceTelecom, noted that same day that these deals represented a "windfall opportunity for network construction companies like Dycom." And it noted that "AT&T and Verizon's aggressive fiber expansion plans to support an array of business, consumer and future 5G wireless deployments will continue to be a key opportunity for telecom construction companies Dycom and MasTec (MTZ), which count these customers as their largest customers."

66.     Deutsche Bank commented that these service providers' focus to spend capital to expand their fiber networks would benefit Dycom:

> Although balance sheets largely limit large scale capex growth by telecom/cable companies, we expect the mix to shift increasingly towards fiber (wireline) from 40% of spend over the last few years and towards 60% of spend through 2019 before returning towards 40% in the 2020+ timeframe . . . . ***In our view, this mix is more beneficial to DY*** than MTZ over the near term, ***given that 80% of DY revenues come from wireline*** vs 12% for MTZ. (emphasis added).

67.     Wells Fargo stated in a November 20, 2017 research note that Dycom was in a good position to be a major construction provider on the proposed fiber build, as it was "well positioned to benefit as telecom carriers and MSOs invest in their networks to keep pace with bandwidth demand."

68.     Verizon was not the only major customer of Dycom's to announce profitable expansion plans. AT&T, which was often reported as Dycom's number one customer in terms of revenue generation, announced in 2017 that it was committed to providing 12.5 million homes with fiber by just past the middle of 2019. As of the start of the Class Period, AT&T had less than 6 million homes with fiber, meaning AT&T intended to double this number in approximately one and a half years. AT&T also announced that it was committed to spending $25 billion in 2018 on capital expenses and was going to be the first to launch mobile 5G service in twelve cities by the end of 2018. During AT&T's third quarter 2017 earnings call on October 24, 2017, its CFO stated that the company planned to expand its high-speed internet deployment and reach more than 50 million customer locations with competitive broadband over the next few years.

69.     Thus, not surprisingly, Dycom reported benefitting from this surge in business, identifying an increase in revenue "primarily from services for customers deploying 1 gigabit networks," among other things, in its Annual Report on Form 10-K filed with the SEC on March

2, 2018 for the transition period from July 30, 2017 to January 27, 2018 (the "March 2, 2018 Transition Report").[2]

### E. Dycom is Unable to Take Advantage of Telecommunication Opportunities Due to Permitting Delays, Understaffing and Inexperienced Personnel

70.    While Dycom touted the numerous opportunities that were resulting from its customers' implementation of fiber optics and emerging technologies, such as those identified in ¶¶62-64, 69. the Company was unable to capitalize on this growing industry. Rather, Dycom was losing contracts with key customers as a result of the Company's: (1) failure to obtain permits; and (2) inability to complete contracted projects on time even when permits were approved. Confidential sources have confirmed that these issues occurred in large projects contracted with Verizon and AT&T, two of Dycom's largest customers, and were prevalent at all of Dycom's largest subsidiaries.

71.    As a result of excessive delays in getting projects off the ground, starting prior to the Class Period and continuing throughout the Class Period, Dycom's customers began cancelling their contracts with Dycom. Such cancellations and delays had a direct impact on Dycom's revenue because, for delayed projects, Dycom could not recognize revenue until the projects were completed, and for cancelled projects, Dycom lost all future revenue on that project. According to CW11, if Dycom and its subsidiaries were performing well, then additional work would be given by a customer. Thus, the fact that customers were cancelling contracts and withholding work is strong evidence of Dycom's underperformance. [3]

---

[2] In September of 2017, Dycom's board of directors approved a change in the fiscal year end from the last Saturday in July to the last Saturday in January. The Transition Report covers the six-month transaction period of July 30, 2017 through January 27, 2018.

[3] Appendixed hereto is a chart setting forth all project delays and contract cancellations that occured during the Class Period as well as Defendants' knowledge of each event.

> ### i. Dycom fails to obtain permits for its customers' billion-dollar projects, resulting in project delays, contract cancellations, and lost revenue from key customers
>
> #### 1. Dycom is required to obtain permits for each of its telecommunications projects

72.     Dycom's work for its customers takes place in the public domain, including installing and repairing utilities on public property. Accordingly, prior to the commencement of any work activity, Dycom is required to submit an application to local or state authorities and apply for permits approving Dycom and/or its subsidiaries' license to place utility facilities on public property and engage in the construction, repair, improvement, maintenance, safe and effective operation, and alteration and relocation of any highway. The permit application must include a detailed description of the project, including, for example, the project's location, expected completion time, facility type, material type, installation type, wire size, and length of installation, among other details. Diagrams and plans illustrating the work to be completed must also be submitted with the permit application and Dycom is required to pay a permit fee based on the amount of work to be completed.

73.     For each project Dycom works on, more than one permit may be required and from multiple permitting authorities. For instance, a separate permit is required each time work is to be performed over a waterway or bridge or through a railroad. Each of these requires a permit to be submitted to the appropriate authority that owns the structure or area that Dycom is working in.

74.     Depending on the type of project and its location, there are additional prerequisites that an applicant must meet and show proof of before a permit will be issued. While these requirements vary by state and municipality, generally speaking, applicants must obtain certain forms of liability insurance demonstrating sufficient coverage for the type of operation the applicant seeks to perform. If work is to be performed within a certain distance of a railroad, for

example, railroad protective liability insurance may be required. Some states also require proof of workers compensation before a permit may be approved. Therefore, it is imperative that all permits are submitted at the start of a project to prevent unnecessary delay.

75.     Overall, the process to obtain a permit may take close to a year. Once a permit application is submitted, it may go through multiple layers of review before obtaining approval. If a permit fails to meet one of the prerequisites for approval, it will be denied. A permit may also be denied if it lacks sufficient detail or necessary documentation. In such instances, the permitting authorities may request additional information from the applicant and the permit is put on hold until that information is received. Generally speaking, a permit may take as little as two weeks to as long as one year from the date of application to receive approval depending on the approving authority and Dycom's relationship with it. If deficiencies are found with the application then the process may take even longer. Dycom, its subsidiaries, and its subcontractors were required to continue to comply with permit requirements throughout a project's pendency.

76.     For those operating in the utilities industry, the requirements and process for obtaining permits is common knowledge and common practice. In order to meet deadlines, it is imperative that permits are submitted well in advance of the start of a project and that the required information and prerequisites be met.

77.     During the Class Period, however, Dycom regularly failed to meet permit deadlines on key customers' projects, resulting in excessive delays, missed project deadlines, and cancelled contracts. Even when customers did not cancel their contracts, there still were substantial delays in the initiation and completion of projects, thereby delaying Dycom's recognition of any revenue. These delays were so substantial, that employees who were not involved in the permit process were aware of them. For instance, although CW11 did not deal with permits, he stated that it was

well known in the office that there were persistent delays in obtaining the necessary permits to initiate projects.

### 2. Dycom fails to obtain required permits for Verizon's One Fiber project, resulting in cancelled contracts and lost revenue

78.     Throughout the country, Dycom was missing project initiation and completion deadlines, ultimately leading Verizon to cancel major contracts with Dycom. These contracts concerned Verizon's One Fiber project, which focused on installing fiber lines throughout the United States in order to connect the Verizon network and create a 5G network.

*Delays in Georgia*

79.     For example, CW4 was a Project Manager from May 2017 until August 2018 for Dycom's subsidiary, Engineering Associates, who was primarily responsible for handling the Verizon One Fiber project in Atlanta, Georgia. According to CW4, Verizon had contracted 3,000 miles of fiber one cable installation with Engineering Associates as part of the Verizon One Fiber project in Atlanta.

80.     CW4 recounted that, throughout the Class Period, there were a large number of permitting issues with the Verizon One Fiber project that were the result of Dycom's lack of adequate staffing and incompetence. According to CW4, during the Class Period, there was only one individual contractor in charge of Verizon's permits, but that contractor did not know what he was doing. CW4 further explained that the permitting department had a "big problem" because people would quit after only a day or week so there was a "huge turnover" in that section." As a result of these issues, CW4, was asked to step in and help the contractor obtain permits from the Department of Transportation ("DOT") for work occurring in Georgia.

81.     Once CW4 became involved, he quickly saw that a lot of permits submitted for approval had been rejected by the DOT, but were sitting untouched and "[n]obody was doing

anything about it." These permits were rejected because the submitted drawings and information were inaccurate, or the DOT had requested information that Dycom had failed to provide. Instead of responding to these deficiencies or requests, the permits sat untouched and the One Fiber project was delayed.

82.     As a result of the permit delays, in March or April of 2018, Verizon only let Engineering Associates install 1,000 miles of cable and cancelled the remaining 2,000 miles of contracted work. Once the contract was cancelled, CW4 said he was in charge of collecting the engineering prints and information on what had been completed so that it could be sent to Dycom and Verizon. With two-thirds of the project cancelled, CW4 reflected that he was "sure there was a lot [of money] lost there." In fact, not only had Dycom lost the contract, but according to CW4, at the time the contract was cancelled, Engineering Associates had already completed 80% of the engineering design work. Thus, "[o]nce they did the carve-out, there were a ton of miles that they had paid to field and engineer [people]," costs Dycom could not recuperate. As would eventually be revealed at the end of the Class Period, these underabsorbed labor costs resulted in significant margin pressure on Dycom that would force the Company to lower forecasts.

*Delays in Kentucky, Ohio, and Indiana*

83.     The problems with the One Fiber Project were not limited to Georgia. Rather, they were Company-wide. For example, CW5, a Project Manager on the One Fiber project in Louisville, Kentucky, witnessed similar permitting issues. CW5 explained that in May 2018 Star was awarded approximately 130 miles of buried lines and 70 miles of aerial lines in Louisville. By June of 2018, it became apparent that the project was experiencing serious problems with obtaining permits so CW5 was brought in to address these permit issues, as well as to manage most of the new work being performed on the Verizon One Fiber project in Louisville and to act

as the liaison between Star and Verizon. According to CW5, when he first started working on this project, he walked into "the middle of a nightmare" where Star was in danger of losing the entire contract with Verizon.

84.     According to CW5, although Star was one of Dycom's largest subsidiaries,[4] it was in "a little over their head" on this project due to permitting issues. At the time, Dycom's Tampa, Florida based subsidiary, Tesinc,[5] was responsible for obtaining permits on the One Fiber Project in Louisville, Indianapolis, and Cincinnati. Tesinc, however, only had one representative in charge of filing permits for each market, meaning one representative for each of Louisville, Indianapolis, and Cincinnati. According to CW5, there was a lot of pressure on the permit department but this one-person department was too small to handle the volume of permits. Tesinc had an attitude that obtaining Star's permits was "not a priority project for them" so it "didn't go all out" to get permits like Star wanted.

85.     CW5 explained that this created a problem because Star kept making "shot calls," which were self-imposed deadlines where Star would assure Verizon that "this is what you can expect on this date" in terms of completed work. However, Star was never able to deliver on those dates, which made Verizon "pretty upset." While CW5 was brought in to fix these discrepancies in timing, Star's management was so focused on basing deadlines off of data trackers that it failed to account for human error and delays that could occur. As a result, the self-imposed schedule was always off. Specifically, CW5 recalled that Tom Bones, David Hamlin, and Mindy Piper would set these unattainable deadlines and not take into account the time it took for municipalities to approve permits or the additional time needed if a permit needed to be resubmitted.

---

[4] Star generates between $50 million to $100 million in yearly revenue for Dycom.
[5] Tesinc generates between $10-$25 million of Dycom's annual revenue.

86.     One of the major problems CW5 highlighted was Tesinc's failure to apply for multiple permits that were needed at the start of the project, in May and June of 2018. Instead of focusing on the permitting issues early in the project, which meant knowing the requirements and dates for the entire project, Star took the path of, "let's do this one line, one section." According to CW5, Star had to cross interstates, bridges, railroad, and waterways as part of the One Fiber project, each of which requires its own permit. Because every permit submitted to the city or municipality had a six-month waiting period before being approved, permit requests should have been submitted at least 180 days ahead of the target start date in order to remain on schedule. This period was less for railroad and interstate permits, which took approximately thirty days and sixty days, respectively, on average. If Star did not submit the permit in advance, the project could be stalled for up to six months while waiting for the permit approval.

87.     Because Tesinc was not at the top of their game with obtaining permits, CW5 stated that it caused the rest of the project team to fall behind. By not planning ahead, upon completion of the first section of the project, Star would then be delayed on the second section because it did not obtain the requisite permit. For instance, if the second half of the project required crossing a river but Star did apply for a permit to cross, Star could not cross and would need to wait six-months before proceeding.

88.     Even if Tesinc submitted all the required permits at once, Tesinc failed to take into account the fact that municipalities could only review a limited number of those permits per day. Moreover, if any of those permits were kicked back, it could be an extra thirty days before the permit was fixed and reviewed on top of that. However, if changes were made to the plan design during the project, those permits had to be resubmitted for approval, a process which could take an additional six months.

89.     These delays became even more problematic because Star was not permitted to do construction during certain events in Kentucky. For example, Star could not perform construction during the Kentucky Derby. Thus, if deadlines were not met, there could be even further delays. CW5 stated that there was always a delay in permits.

90.     According to CW5, by June of 2018, the One Fiber Project was falling so far behind schedule that Star started pushing the city to process the permits faster. The city, however, did not expedite review of those permits and the same six-month waiting period applied as with all other permits. In fact, the city started getting "pissed off" by these requests and retaliated, taking an even longer time than usual to review the permit. For example, if it typically took twenty-one days for the city to approve a permit, the process started taking thirty days or longer. As a result, Star was unable to submit their deliverables on time while it waited for approval.

91.     CW5 explained that when Star first figured out that the One Fiber project was falling behind in June 2018, before CW5 was hired, Dave Hamlin, Star's PMO Manager, and Mindy Piper, Star's Regional Program Controls Manager, created an excel spreadsheet to manage the process. The data collected included every employee's timetable for when they had to submit permits they were in charge of, what they should submit with the application, when they needed to follow-up with permitting office, and other targets. Even with this new spreadsheet, however, Tesinc still did not submit permits on a timely basis because Tesinc had its own way of handling permits and was not interested in Star's input.

92.     When CW5 started in August 2018, he had to attend periodic team meetings with Tesinc, where Star would express to Tesinc that it needed its permits to be submitted on time or else the Verizon One Fiber project would fall behind. CW5 recalled that in September of 2018, Tom Bones, who reported directly to Dycom, called all the departments – construction, project

27

managers, engineers, and designers – into a room to fix the permit delay issue. CW5 attended this meeting along with Bones, Hamlin, Piper, Kirby, and the Verizon Project Manager. Star had to explain to Verizon why Star was not meeting the deadlines. CW5 recalled that a similar meeting had been held in late August with these individuals as well. CW5 stated that Bones reported to Dycom what occurred at these meetings. According to CW5, ultimately, "nothing ever came of these meetings" and the delays continued. Because Tesinc was a subsidiary of Dycom, CW5 said Tesinc was "protected by Dycom" and there was not much Star could do other than a slap on the wrist.

93.     According to CW5, the "Verizon project manager was pretty pissed off at [Star] because [it was] not meeting timelines and schedules or doing the things [it] promised to do." The Verizon project manager would "eat [Star] alive" during daily calls between Star and Verizon, and would call Star out on their "untrue facts because their data was so messed up." CW5 stated that there was a constant threat from Verizon to take away the project due to the missed deadlines and permitting issues.

94.     Although CW5 was brought in to address issues with the One Fiber project, including the permitting issues, he was micromanaged by Star's management to the point where he was unable to resolve any issues. CW5 further commented that these permitting issues were even greater in Cincinnati and Indianapolis. Cincinnati had been awarded the Verizon One Fiber contract in May 2018 and Indianapolis received it around January 2018. CW5 stated that the Project Manager in Indianapolis disclosed to CW5 that he was experiencing the same issues as CW5.

95.     Exacerbating matters, during the Class Period, Dycom also did not have enough workmen to complete the jobs for which it did obtain a permit, including for the Verizon One Fiber

Project. For example, CW5 stated that Star would many times perform a "look-ahead," where Star would estimate its future completion date on the One Fiber project. Star would submit these estimates to the Verizon Project Manager, who was a "tracker guru" and "master of data." The Verizon Project Manager would look at the data and tell Star right off the bat that Star was not going to meet the proposed deadline because he could see that Star did not increase its manpower to meet that estimate. CW5 also stated that the project turnover rate among Project Managers was high. Within six months to a year, Star lost two project managers in Louisville, three in Cincinnati, and three in Indianapolis.

96.     CW12 corroborated CW5's account with respect to the Verizon One Fiber project delays during the Class Period. CW12 was responsible for obtaining permits for Verizon's account in Cincinnati, Ohio at Telcom. CW12 admitted that "nobody [at Tesinc] really knew what they were doing" and they had to figure it out as they were going, and did not have any direction from Phil Brandt, the Permitting Manager. Tesinc would hire people brand new to the industry for minimal pay who had no prior experience in fiber or the industry. After only a few days, these people would then be promoted. This led to chaos and people quitting. As a result, permits were delayed for several reasons.

97.     For instance, prior to the Class Period and until CW12's departure in June 2018, Tesinc neglected to research the permit requirements for each permitting authority and state, which resulted in rejected permits and delays on the Verizon One Fiber project. CW12 explained that Tesinc was required to get permits from railroad companies in order to do work in their rail yards. However, Tesinc often applied to the wrong company for a permit. CW12 recalled one instance where Tesinc expedited a permit application to Genesee & Wyoming Railroad ("G&W"), only to later find out from G&W that it should have been submitted to South Ohio Rail Transit Authority

("SORTA") because SORTA owned the property. While G&W returned approximately half of the $3,500 expedited permit fee, Tesinc had to pay the other half on top of SORTA's permit fee. Tesinc would similarly file permits with the wrong municipality or city. According to CW12, these constant mix-ups caused delays and led the permit authorities to think Tesinc were "idiots." According to CW12, these delays could have been avoided if Tesinc hired people who were experienced or knew what they were doing.

98.     This lack of research also caused delays during the Class Period with respect to obtaining aerial permits to run fiber lines on energy companies' telephone poles, including Duke Energy. Duke Energy had a program called Special Permitting and Notification System ("SPANS") that was utilized by Tesinc for obtaining permits for its specific poles. SPANS showed the locations of all of Duke Energy's poles in any given area. CW12 stated, however, that the program was not up to date because poles were often moved or taken down but not reflected in SPANS. CW12 explained that it was "always standard" to have a field team to go out and find the exact location of the poles before submitting a permit application. According to CW12, field teams are necessary when it comes to permitting, yet Tesinc did not have a field team for the Verizon project, which he found surprising. This created problems because when Duke Energy would receive the permit requests, it was often for locations where there were no poles. Because the poles Tesinc needed permits for were nowhere near the requested permit location, Tesinc was not able to obtain permits. CW12 recalls that Duke Energy was frustrated with Tesinc for not sending field teams out to verify locations. CW12 recalled that Brandt and Foxx held discussions "all the time" with Phil Brandt and Steve Foxx about getting field teams to address Tesinc's permit delays, but they never got them.

99.     CW12 also stated that, during the Class Period, the employees at Tesinc did not understand how to use SPANS which caused further problems. In some instances, Tesinc did not have all the information necessary for the permit and had to ask Verizon for that information. In other instances, Tesinc would request a permit for 316 poles, when it was only allowed to request 30 poles at a time. Errors such as this caused the permits to get kicked back from Duke Energy. It further strained the relationship with Duke Energy as Duke Energy became increasingly frustrated with Tesinc.

100.    CW12 further recalled that delays occurred because Tesinc got into an argument with the state of Ohio over whether a franchise agreement was required to perform work. While the agreement was ultimately not required, Tesinc was unprofessional in their dealings with the permitting authorities which led the cities of Norwood and St. Bernard, Ohio to forbid Tesinc from performing work. This occurred sometime between January and March 2018. According to CW12, a "significant [amount of] work" was lost on the fiber contract in Norwood. CW12 also recalled that Tesinc would receive a lot of pushback from smaller towns that did not want the work done. This caused a lot of internal fighting at Tesinc on how to best handle the process which only led to further delays during the Class Period.

101.    Around February or March of 2018, Tesinc experienced delays with obtaining permits from one railroad company, CSX. According to CW12, CSX was inundated and "flooded with emails" from Tesinc about permits and became overwhelmed, upset, and "couldn't deal" with Tesinc anymore.

102.    Further delays were caused during the Class Period because Tesinc did not hire certain personnel that were required. CW12 explained that if Tesinc wanted to perform work close to a structure, such as a bridge, Ohio required that Tesinc have a Project Engineer ("PE") review

the plans and give a PE stamp certifying that the work would not destroy the integrity of the structure. Rather than hire a PE, Tesinc would cut corners by ignoring the request altogether or by finding a less costly way around the requirement. When permits got kicked back for this reason, it "seemed to get thrown under the rug." Tesinc never found a PE or a way around the requirement, however, which delayed the project by a couple of months during the Class Period.

103.     In some instances, CW12 recalled that rejected permits were forgotten about and never addressed during the Class Period. For example, CW12 recalled that one of its permits to Duke Energy was rejected because the fiber line could not be attached to the concrete on the poles. Tesinc said "we'll get back to it" but never followed up.

104.     According to CW12, the delays during the Class Period that occurred from rejected permits varied depending on the permitting authority, ranging from fourteen days to an entire year. CW12 explained that Tesinc was required to reach certain mileage distances on the project otherwise Verizon would impose fees. Because Tesinc was behind on its permits, Brandt instructed employees to "fill out a bunch of permits and ship them. If they get kicked back, it doesn't matter." When Tesinc submitted a large number of permits that were rejected, Tesinc would then need to spend time figuring out which of those permits were incorrect and why.

*Delays in Texas*

105.     CW7 stated that as a result of Texstar's disorganization and failure to hire the correct personnel, in February of 2018 Texstar lost a $55 million dollar, 10-year contract with Verizon regarding the One Fiber project in Texas. CW7 was informed by Vice President, Pete Espinoze, and Senior Vice President of Operations, Larry Rucker, that Verizon terminated the contract because Texstar was "disorganized, didn't have [its] ducks in a row, and didn't hire the correct personnel to kick off the project in time." CW7 stated that Texstar did not meet Verizon's

start date, standards, and guidelines that were required for each week and month of the project. The reason Texstar was unable to meet these deadlines was because Texstar did not have *anyone* hired in its permit department or its engineering department in Austin, Texas. In fact, Texstar leased a space for an office yet had no personnel to fill it. Thus, there was no one to initiate the Verizon One Fiber project. CW7 also stated that Texstar lost contract valued at about $10 million with Spectrum in Corpus Christie, Texas in approximately October of 2017 for these same reasons.

106.    According to CW10, these permit delays and workforce issues permeated Ervin as well, causing Verizon to cancel some of its contracts with Dycom around November 2017. Specifically, CW10 explained that around November 2017 he was sent to Dallas, Texas to work on the Verizon/Tesinc project because the timelines were "very, very backed up." CW10 stated the project was "so far in the tank and so far behind" because Ervin hired friends into management positions that had no experience in the industry. CW10 explained that the individual in charge of running the project had no experience in running projects and the people Ervin staffed its projects with had never done this kind of work before. CW10 also stated these individuals did not receive proper training, which led to further project delays.

107.    CW10 further recalled that Verizon had awarded Texstar a contract; however, when Verizon found out that Dycom had acquired Texstar, it pulled its contract with Texstar in November 2017. CW10 explained that Verizon pulled the contract because it heard Ervin would be responsible for the engineering and permitting. Because Verizon was already dealing with six-month project delays in Dallas on a contract with Ervin, it did not want to experience those same delays again.

33

*Delays in Tennessee*

108.     CW1, a Star employee in Tennessee, recalled that a Verizon contract was awarded to Star in early 2018, yet there was not much activity on the account until the summer of 2018. CW1 explained that activity only happens as parts of the project are completed, meaning the Verizon project was not making any progress or being completed until at least the summer or fall of 2018.

### 3. Dycom violates safety protocols, causing permit delays and missed deadlines for its top customer, AT&T

*Delays in Florida*

109.     Dycom lost substantial revenue as a result of permit issues with its AT&T contract. CW6, the District Manager of subsidiary Ivy,[6] provided managerial oversight across the state of Florida over the multi-million dollar contract that Dycom received for AT&T's "LightGig" FTTX residential upgrade (the "FTTX Project"). According to CW6, the FTTX Project generated an average of $2 million per month for Dycom in productivity and network construction. Depending on the month, this project generated as much as $5-$7 million in one month alone. CW6 was responsible for assessing production goals, project milestones, and current staffing.

110.     According to CW6, when he first joined Ivy in October 2017, the FTTX Project was a "train wreck" and delayed by two months due to permitting and resource allocation issues. CW6 explained that the project timeline for the FTTX Project had been set prior to Hurricane Irma striking in August of 2017. After Irma hit, it devastated operations in much of Florida because approximately half of Ivy's workforce was sent to Puerto Rico to reestablish electrical lines, where that workforce remained for a full year. With half the work force gone, Ivy fell behind on the pre-established deadlines on the AT&T project.

---

[6] Ivy generates approximately $10 to $25 million of Dycom's annual revenue.

111.     In order to make up for lost time, CW6 stated that employees were sent to work in the field for 16 hours straight, would not follow safety protocol (such as filling in hazardous ditches in highly trafficked areas), and would work on days that the city had not approved. According to CW6, if following safety guidelines hindered production, then Ivy would not follow them and would instruct its employees to maximize production instead. CW6 noted that AT&T had such a strong focus on productivity, that instead of adjusting expectations and target dates if delays occurred, Cevin Ferguson, Ivy's Vice President, would cut corners and have people working 24 hours straight and on holidays, which violated local safety rules and strained Ivy's relationships with authorities.

112.     Although CW6 raised these safety concerns to Ferguson throughout his tenure, his response was essentially that productivity was more important than unethical business practices or safety concerns. CW6 explained that when he brought up safety and repair issues, neither Shaddock nor Ferguson would back him up because they were only focused on production. This neglect of city protocols was also intentionally done in order to bypass the inspection process. "If guys are working and the city doesn't know they are out there, they'll never know to go back and inspect it." CW6 stated that there was a "dereliction of duty on behalf of senior management" and a stronger emphasis was placed on production rather than safety.

113.     These actions, however, caused difficulty in maintaining city and county relationships in Florida and obtaining future permits. In fact, the relationship with the city was so strained that, according to CW6, the City of Orlando filed multiple complaints against Ivy for various safety violations, poor workmanship, and damage to city property, among other things. One such lawsuit occurred over a reclaimed water line that was damaged by Ivy, causing the road to flood and buckle and resulting in several thousand dollars-worth of damage. The City of Orlando

sued Ivy, causing that project to halt while the litigation was ongoing. According to CW6, this was a "major roadblock" and "significant impediment" to hitting its project milestones at both the start and close of projects, which were caused by strained relationships with local cities and counties in Florida.

114.     Relationships with the city were also strained during CW6's tenure because Ivy was not performing the necessary work after completing a project. CW6 explained that in addition to obtaining permits to start a project, it was also necessary that the same permit be closed out at the end of a project. To close a permit required a city inspector to approve the completed work and ensure that it met all required standards. After Ivy completed a project, however, it failed to perform restoration and repairs required by the city to close the permit. For example, if damage was done to a sidewalk or road, Ivy was responsible for restoring that property as part of the job. Ivy, however, would finish a project and never repair the damage it caused, creating a backlog of repairs that Ivy was on the hook for. Because Ivy wasn't performing the required restorations, CW6 stated that both the permit approval and closing processes were hindered.

115.     For example, when applying for permits at the start of a project, Ivy's permits were often rejected and necessitated amendments, edits, revisions, and corrections before they could be reviewed by authorities.  Each time a permit was kicked back, it would delay the project anywhere from two days to two weeks. CW6 felt that the city was asking for more detail on the projects than necessary and also believes that many permits were kicked back because Ivy was not performing restoration on the back-end of the projects. CW6 believes this because Orlando's Senior Field Inspector made off-the-cuff comments to CW6 about not approving any more permits until Ivy resolved these issues. CW6 stated that he believed if Ivy played by the rules then the process could have been streamlined.

116.      As a result of the permit delays, both prior to CW6 joining Ivy in October 2017 until CW6 left in February 2018, CW6 stated that productivity was "severe[ly] impact[ed]" and milestones were not met since Ivy hit "roadblocks" before it even got started. CW6 further stated that the permit delays had a "severe negative impact" on Ivy's ability to forecast production and complete mileage in the field. CW6 explained that permit delays were one of the biggest factors in Ivy being unable to hit project deliverables on the FTTX Project prior to and throughout his tenure.

117.      As a consequence of Ivy's missed deadlines, CW6 said there was "always" a threat of "de-scoping," meaning the AT&T contract could be cancelled due to, among other things, Ivy's failure to meet deliverables, deadlines, or timeliness. In fact, because AT&T deadlines were not being met, calls were held twice a week with AT&T, Ferguson, and Shaddock. The area manager from A&T, Adam Dugan, would call Ivy and "literally cuss [them] out on a weekly basis for not meeting guidelines and objectives." In fact, CW6 stated that Ivy would often not tell AT&T the project was falling behind or experiencing delays. Ivy only told AT&T what they wanted to hear. This created a hostile work environment where employees had to "do what they had to do to meet unrealistic dates and timelines."

118.      As with the Verizon One Fiber Project, the AT&T FTTX project experienced delays because Dycom lacked adequate staff. According to CW6, in addition to losing half its workforce after the hurricane, which hit in September 2017, Ivy also had trouble locating qualified boring crews. During CW6's employment, many boring crews left Florida for other markets, such as Texas or the Midwest. Because Ivy could not find crews, it significantly impacted their ability to do the project since they could not obtain the necessary resources to complete its projects.

119.     When CW6 left the Company in February of 2018, he noted that the Company was "bleeding" and "operating in the red" because it was not hitting its target dates and was experiencing significant project delays.

_Delays in Tennessee_

120.     Project delays on AT&T's fiber projects were also experienced in Nashville during the Class Period, which required more permits than many other areas. According to CW1, once it was discovered that the contract manager on this project had not been submitting permits on time in late spring/early summer 2018, Christine Brew created Smartsheets in order to monitor the permit process on the account. The tracker contained information such as the date a permit needed to be submitted, the permit number, the area the permit covered, the fee associated with the permit, and whether the permit was approved. Star would constantly meet with Dycom to discuss the permit tracker.

### 4. Additional customer contracts are cancelled due to permit delays, causing further revenue losses

121.     AT&T and the Verizon One Fiber Project were not the only projects suffering from unnecessary permit delays. For instance, CW12 stated there were permitting issues on the CenturyLink account. Although the permitting process for the CenturyLink account was already occurring when CW12 started in December 2016, a lot of permits were not getting approved because Tesinc sent them out without proper research into the permit requirements. As a result, CW12 and three other individuals formed a team at that time and worked to get all pending permits approved throughout his employment.

122.     According to CW2, an OSP/Drop Manager at Star, Star was experiencing permitting issues in Mississippi from August 2017 until December 2017, as a result of Dycom's failure to obtain worker's compensation insurance, one of the required prerequisites to obtain

38

permits in that state. CW2 explained that he learned of these permit issues through Kelly Harris, an Operations Supervisor who works for Star in Kentucky. Harris told CW2 that Star did not have enough contractors to work on its projects in Mississippi because the state requires contractors to acquire state workman's compensation insurance. While both Dycom and Star wanted to hire subcontractors to work under their logo, CW2 stated that the subcontractors could not afford the insurance, resulting in an employee and contractor shortage. Without the required license and insurance, CW2 stated that Dycom and its subsidiaries and subcontractors could not obtain any permits.

123.     CW2 relayed a similar account that occurred in Iowa during his tenure at Star. CW2 explained that he was hired to run two contracts that Star had with One Stream. One project was a new cable line on highway 30 in Iowa that was 40 miles long. The second project was a line from Dyke, Iowa to the Reinbeck area. At the time he was hired, Star was behind in production and in default on both projects. CW2 commented, "if you don't have the people to do it, you don't obtain the permits, you can't meet the deadline, and [the customer] give [the job] to competitors."

124.     According to CW2, Star subcontracted both of these jobs but "weren't paying attention to what was going on" and the projects were "a mess." CW2 reported that Dycom lost these contracts with One Stream in October 2017 as a result. This loss was significant, as the revenue Star received from its One Stream contracts totaled approximately five to ten million dollars each year.

125.     CW2 further recalled that at the time he joined Star in August 2017, the company was behind on about 30 jobs for One Stream, alone.

126.     CW8 recalled that a contract with Time Warner in Texas was cancelled in the summer of 2018 because Texstar did not have enough people to perform the work. The contract was given to competitor B Comm instead.

127.     According to CW10, throughout 2017 and until his departure in approximately November 2017, Ervin was responsible for the Google fiber cable project in San Antonio, Texas, but due to permit delays the project was delayed by months. CW10 stated that he was brought in to help guide and speed up the permitting process because Ervin was "not in touch" with how permitting was handled in Texas, which was different from other states. For instance, Texas issues individual permits that allow a company a certain amount of linear footage. These permits are typically issued in increments of 1,500 to 2,500 feet at a time and the State of Texas takes 45 days to review each permit. CW10 recalled that it was common for permits to get kicked back initially for various reasons, which meant the company had to wait an additional 45 days after resubmitting the corrected permit. CW10 stated that if the permit was successful after the second review, it would take about three months from the submission date to get approval. According to CW10, Ervin was "off by months" on their project timelines as a result of permit delays and it "drove a log of project timelines down."

128.     As a result of the substantial delays, Google was "not happy." Further, Ervin lost its $500 million contract with Google sometime between August and October 2017, after spending about $25-$30 million on the project. CW10 believes that Google gave the contract to another contractor instead. Ervin was also unable to collect money from Google which ultimately resulted in the closing of the San Antonio location and almost the entire office was laid off in 2017. In addition to San Antonio, CW10 also recalled that a Google contract in Austin, Texas was lost as well because the work Ervin was doing was not up to Austin's standards.

40

### ii. Verizon and AT&T cancel additional contracts due to Dycom's disorganization and project delays

129.     In addition to the contracts that were lost and/or delayed above, confidential sources explain that additional contracts from Verizon and AT&T were lost because of Dycom's disorganization and failure to complete the projects on time.

130.     CW7 recalled that project delays on the AT&T and Zayo accounts occurred in Austin, Texas and San Antonio, Texas throughout 2018. According to CW7, projects were regularly held up because subsidiary Texstar was not doing some of the work correctly and so "the city said no and shut it down." For example, after a permit is obtained, Austin and San Antonio require a pre-construction meeting before work can start on a project. CW7 said that Texstar failed to adhere to these requirements and would not notify the city of certain inspections or would shut down roads that Texstar did not have permission to shut down. The city would provide a warning at first, would shut the project down for one week for a second violation, and would shut the project down for two weeks for every subsequent violation. According to CW7, these violations occurred every four to five weeks.

131.     CW7 also recalled that AT&T withheld work from Texstar throughout 2018 because AT&T felt that Texstar was not prioritizing its work, was unhappy with management, and deadlines were repeatedly missed and extended. According to CW7, AT&T was getting fed up with Texstar not meeting these deadlines and felt that it was due to mismanagement and inappropriate scheduling priorities of jobs. The withheld work pertained to AT&T's LightGig and VAU work, which resulted in approximately $20 to $30 million in lost revenue for Texstar.

132.     CW11 repeated a similar account and stated that Ansco was asked to leave certain markets by AT&T and that Ansco lost "a significant portion [of AT&T cell tower work] in Florida and Texas" at the end of 2017. CW11 believes this was the result of Ansco's performance, meaning

Ansco's inability to meet deadlines, and AT&T's restructuring. Ansco had to meet certain numbers each month on the project. If Ansco repeatedly missed those numbers, it was recorded on a score card. Once Ansco's score cards reflected more negatively than positively, it affected Ansco's ability to keep those markets, which CW11 recalled occurred with the AT&T contract in 2017. CW11 was aware of this loss because he was the manager for warranty, which meant Ansco had to maintain AT&T's tower sites and meet certain guidelines for two years following construction of the site. If sites weren't functioning properly, AT&T would send a ticket to Ansco and CW11 would send a field ops technician to investigate the issues. Once Ansco lost the AT&T contract, Ansco fired the tower crews.

133.     CW11 further stated that Ansco was a turf vendor for AT&T, meaning it managed a territory for AT&T. CW11 and his team were responsible for upgrading and changing equipment, doing structural analysis, expanding bandwidth, and adding carriers to cell towers. CW11 stated that at the end of 2017, AT&T began to bring in other turf vendors in Ansco's place in North Carolina, South Carolina, Georgia, Florida, and Texas. While CW11 is uncertain of the value of those lost contracts, generally speaking, Ansco would bring in between $20 to $30 million in billable revenue each month in Georgia for cell tower work.

134.     CW8 stated that once Dycom acquired Texstar in 2017, many people left Texstar. While CW8 had forty people working under him prior to the acquisition, this dropped to eight by the time he left in 2018. This impacted Texstar's ability to perform on the AT&T LightGig project because there weren't enough in-house crews to perform the work. CW8 stated that Texstar started to lose work as a result and began to subcontract work out.

135.     CW8 further recalled that Texstar lost a huge Verizon contract for 500,000 miles in Austin, Texas in early 2018.

**F. The Individual Defendants Were Aware of Customer Project Delays and Delayed Revenue through Direct Control Over Dycom's Subsidiaries, as well as Daily Reports and Weekly and Monthly Meetings**

**i.  Dycom manages and controls its subsidiaries**

136.    At all relevant times, Dycom controlled each of its subsidiaries, with a reporting structure that flowed directly from Dycom's CEO (Defendant Nielsen) to each subsidiary. While Dycom's subsidiaries performed the work required for each customer contract, Dycom managed and controlled the operations of each subsidiary.

137.    According to the Company's Transition Report, management of each of Dycom's subsidiaries report to the Company's Chief Operating Officer (Estes), who reports to the Chief Executive Officer (Defendant Nielsen), "the chief operating decision maker." Former Dycom employees further explained that each Dycom President reports direct to the Defendants in monthly telephonic meetings where, among other things, the status of all projects and finances were discussed.

138.    Throughout the Class Period, Dycom exercised control over each of its subsidiaries, by dictating which projects each subsidiary could accept, providing only limited information about each project to its subsidiaries, mandating certain policies and internal programs each subsidiary was to use, and handling payroll and customer invoicing for all of its subsidiaries.

139.    According to CW1, Dycom exerted this control over Star as well as all of Dycom's subsidiaries when it came to Verizon contracts. CW1 explained that Dycom determined which work Star could accept and Star had "no choice whatsoever" in that determination. Once a contract was awarded, Dycom possessed the pertinent documents for that contract, including the master contract, and only conveyed limited information to Star.

43

140.     For example, CW1 recalled an instance involving a Verizon contract that Star, through Dycom's instruction, had accepted in early 2018. Star was not given access to any of the contract's primary documents or the master contract, but was instructed by Dycom how to classify revenue from the contract. CW1 explained that Star received its numbers for revenue recognition from a field office in Ohio. Dycom then reviewed the revenue numbers and if it didn't them, then Dycom would tell Star to change them. CW1 recalled that every month Dycom would send Star the revenue that Star should report for that month and Star would accept the numbers as given. CW1 stated that Dycom exercised this same control over its subsidiaries "across the board."

141.     This control was corroborated by CWs 3 and 8. According to CW3, all of Ansco's contract negotiations were handled by Dycom's COO Tim Estes, along with the George Summers, the head of Ansco, and Dubi Kazula, VP of Ansco's Wireless Operations. CW8 similarly stated that approval had to be obtained from Dycom before Texstar could accept a contract. CW8 explained that Texstar couldn't make a move without Dycom there.

142.     CW9 corroborated these accounts, reporting that Defendant Nielsen and COO Estes might become involved in all contract bidding when multiple subsidiaries were dealing with the same customer in order to coordinate each subsidiary's efforts. CW9 stated that Nielsen and Estes stepped in if a large customer was involved, such as Verizon or AT&T, and would provide advice when a relationship with a large customer went sour. Specifically, Defendant Nielsen and Estes consulted with the president of the subsidiary to ascertain what the customer was asking for and what the subsidiary could do to prevent losing that customer.

143.     CW1 also explained that Dycom exercised its control by placing members of Dycom in key positions at Star. For instance, prior to Tom Bones, Star's Vice President, joining

44

Star, he was the General Manager of Risk Management at Dycom from January 2009 until June 2015.

144.    Additional Dycom employees that were placed at its subsidiary companies include: (i) Denise Chiles, former Manager of Financial Projects at Dycom from January 2014 to November 2014, who began work as a Financial Controller at Engineering Associates in November 2014 to the present; (ii) Pamela Lovejoy, former Office Manager at Dycom from 1997-2001, who began work at Fiber Technologies, as the Office Manager from May 2012 to the present; (iii) Tommy Farr, former field supervisor at Dycom from December 2014 until November 2017, who simultaneously worked at Telcom during that period, and subsequently worked as Division Manager at Telcom from November 2017 to the present; (iv) Derek Robbins, who formerly worked as a Senior Manager at Dycom from March 2007 to July 2016, began work at UtilitQuest as the Principal Accounting Officer from July 2016 to the present.

145.    Dycom also shared offices with its subsidiaries. According to CW11, there were likely between ten and fifty Dycom employees located at the Ansco headquarter in Norcross, Georgia where they had their "own little area."

146.    Dycom also exerted control through payroll and process requirements. According to CW2, Star's employees' paychecks and benefits were set up directly through Dycom. CW2 also stated that all of Star's personnel, safety, and operational requirements had to meet Dycom's process requirements.

147.    According to CW8, once Dycom acquired Texstar in early 2017, Dycom unilaterally instituted new hiring processes, cut paid time off, and made other administrative changes.

148.     In sum, Dycom controlled and managed all facets of its subsidiaries day-day operations, policies, and procedures at every level.

### ii.  Dycom tracked its subsidiaries' projects on a daily basis

149.     At all relevant times, Dycom oversaw and monitored the projects of each of its subsidiaries through internal programs that were regularly accessed by Defendants. Each of Dycom's subsidiaries created daily reports to which the Individual Defendants had direct access. In some circumstances, these programs were hand selected by Dycom for its subsidiaries to use.

*Star – CPS, The Dailies, and Smartsheets*

150.     CW1 stated that Dycom introduced a new front-end software system to Star called CPS, or the "whip system," in early 2017 that was an accrued revenue system used to track day-to-day transactions and the progress of all projects. While Star did not select this program, Dycom selected it and was "taking more and more control over the different segments of Star."   There was a heavy conversion process of about six to nine months before Star was fully converted to CPS by the fall of 2017. CPS was used by all of Star's hubs.

151.     According to CW1, the information in CPS came from reports called "Dailies," which were the primary source documents in the construction business and used by *all* of Dycom's subsidiaries. CW1 explained that each day, an individual employee or contract laborer from each subsidiary submitted the "Daily" report to Dycom, reporting on their subsidiary's work for the day.  The "Dailies" included information such as the project(s) worked on, labor hours, equipment needed, project delays and other operational metrics. Thus, the Dailies would have included information on how much progress was made each day on a project, which would have alerted Defendants of the delays in the Verizon One Fiber and AT&T projects, as the Dailies failed to

show any activity on the Verizon project failed until late 2018, and permits were not being filed on time for the AT&T project in the spring or summer of 2018.

152.     The Dailies were also the source for billing Dycom's customers during the Class Period. Each day, the Dailies were entered into CPS by Star's Accounts Receivable Clerk, which then flowed into Star's accounting system, Solomon. Dycom had access to both CPS and limited access to Solomon. The CPS program was accessible via an icon on Star and Dycom's desktop and required a login and password. There were tiered levels of access to the program, with Tony Sook and Christine Brew initially holding the highest level of access. CW1 noted that after the program went live, however, Dycom limited both Sook and Brew's access. CW1 stated that the talk within Star was that the purpose of CPS was to limit the control at the local level and assume more of it at the corporate level, i.e. the Individual Defendants.

153.     CW5 confirmed that Bones, on behalf of Star, created "The Daily Report," a google doc which tracked the status of all of Star's projects, including, among other measures, what the construction crews completed, how much manpower they had, how many feet of installation they completed, and how many feet were left to complete. CW5 was familiar with The Daily Report because he had to provide a daily update to Tom Bones using Google Notes, wherein CW5 would answer questions in a template. Tom Bones was required to provide Dycom with The Daily Report on a daily basis. The Daily Report would have shown that the Verizon One Fiber project in Louisville was behind in terms of achieving certain mileage milestones by June of 2018. It also would have shown mileage delays on the Verizon One Fiber project in Cincinnati and Indianapolis.

154.     The Dailies would have further shown that: (i) Star's projects in Mississippi were experiencing delays; and (ii) the One Stream contract in Iowa was cancelled in October 2017.

155.     CW1 further reported that Dycom had access to a "Smartsheetss" that Star used to track its permits on the AT&T fiber project in Nashville, Tennessee. The Smartsheetss were an online spreadsheet updated in real-time that was accessible on an internal Dycom web cloud-based program. CW1 explained that the Smartsheets was created in late spring/early summer of 2018 when it was discovered that the contract manager on the AT&T project was not submitting permits on time so Brew wanted to start tracking everything. The Smartsheets tracked information such as when a permit was submitted, the permit number, the area the permit covered, the permit fee, and whether the permit was approved or rejected. The contract manager entered data on the Smartsheets and CW1 and Brew monitored the data.  CW1 noted that Nashville required a lot more permitting than other areas.

156.     Not only did Dycom executives have access to view the Smartsheets because they were granted access by the document's author, but CW1 recalled that Brew and Sook were constantly meeting with Dycom in management meetings or conference calls where CW1 believes the information from the Smartsheets was discussed. The Smartsheets would have reported any delays with the AT&T fiber project in Nashville throughout 2018.

*Texstar – Logging into Dycom and The Dailies*

157.     CW8 similarly reported that once Dycom acquired Texstar in 2017, Dycom began to micromanage Texstar and instituted a new internal web-based program, described as "logging into Dycom," where work order logs and daily sheets were sent to Dycom every day by 9am for the previous day's work. This acted as a progress tracker for Texstar project. The daily sheets contained information about each project from the prior day and acted as a progress tracker. The information in the daily sheets would be transferred into the work order log, which showed Texstar's progress was on a specific job, how much work remained and whether the job was

completed, and whether the job was invoiced. The work order log also reflected any project delays. Dycom had direct access to the work order log and daily sheets because they were stored in Dycom's internal Company google docs system. To access them, Defendants had to log into the computer program and access the google doc containing them.

158.     CW7 confirmed that during the Class Period, each Texstar crew had a daily report, called "Dailies," that were scanned and e-mailed to Dycom directly on a daily basis. The Dailies were also a google doc which Dycom had direct access to. Field crews at each office would send their daily information to the office assistant, who then sent them to Dycom. Dailies contained information such as what jobs were active, which crew was working, and the billable line items for each day. CW7 stated that the progress of each project, including the mileage completed, could be determined by looking at the Dailies. If there were any errors, Dycom would ask Texstar to make changes to the information.

159.     These Texstar reports would have shown that, among other things: (i) Time Warner cancelled its contract with Texstar in the summer of 2018; (ii) Verizon cancelled its contract for $500,000 in early 2018; (iii) Verizon cancelled its $55 million dollar, 10-year One Fiber contract in February 2018; (vi) Verizon cancelled another contract with Texstar in November 2017; (v) Spectrum cancelled a $10 million contract in October of 2017; (vi) AT&T's LightGig project was experiencing delays throughout 2017-2018, leading to AT&T withholding $20 to $30 million work of work in 2018; and (vii) Texstar lost a 500,000 miles contract with Verizon in early 2018; and Zayo's projects were experiencing delays throughout 2018 in Texas.

*Ivy and Ansco – Quick Base and The Dailies*

160.     CW6 explained that Ivy also had an internal, Company-wide daily report called Quick Base, which was used by Ivy and Ansco. This program was introduced by Dycom and

managed by both Dycom and Ansco. Quickbase was accessed through an active directory by entering a username and password. Employees had different levels of access based on their positions, with district managers holding more access than lower administrative personnel. CW6 stated that he would validate and input information into Quick Base using the "Dailies" and "rig sheets" that came from ground crews.

161.    Quick Base tracked daily operations and included production data as well as financial data, including information regarding damage that occurred at a particular site, productivity, mileage of construction completed for any given week or month, as well as any customer complaints. Users could view what stage of the process a project was in and how much mileage had been completed. Custom reports could also be created for various data points. Thus, reports could be generated detailing the mileage of construction completed for any given project at any period of time. According to CW6, Ansco and likely Dycom employees had direct access to the platform and Quick Base was used to generate all the reports that were provided to Dycom. In fact, both Summers and Ferguson had access to Quickbase and this was used as their primary financial analysis tool. CW6 further stated that all invoices were entered into Quick Base to ensure payment by Dycom. Accordingly, the two-month delays experienced on the FTTX project in Orlando would have been evident from looking at Quick Base.

162.    CW3 confirmed that Ansco entered daily reports into Quickbase, which kept track of projects and the progress made on each one. According to CW3, every cell site would input the POS, cost of materials, vendor selections, bid prices, site closeouts, and the price paid to vendors. This information allowed Ansco to determine revenue and costs at any given time.

163.    Accordingly, the Individual Defendants would have been aware that: (i) the AT&T FTTX project in Florida, which generated an average of $2 million per month, was delayed; and

(ii) a "significant" amount of work on the AT&T projects in Texas, Georgia, Florida, and North and South Carolina were lost.

*Tesinc and Ervin – the Dailies*

164.     As discussed above, all of Dycom's subsidiaries operated by using the Dailies. With respect to delays experienced at Tesinc, the Dailies would have shown that project delays were experienced on the CenturyLink project prior to the Class Period through June of 2018.

165.     Similarly, these would have shown that, with respect to Ervin: (i) Google cancelled a $500 million contract in San Antonio, Texas in August or September of 2017; and (ii) delays were experienced on the Google fiber project in Austin, Texas.

### iii.  Dycom tracked the Verizon One Fiber project delays through the VTS and other programs

166.     With respect to any projects for Verizon, one of Dycom's top customers, throughout the Class Period, Dycom tracked and monitored its subsidiaries through a centralized system called the Verizon Tracking System (VTS). VTS was a series of excel spreadsheets that had information relating to a Verizon project, including project completion dates for fielding and engineering as well as permitting deadlines. VTS was used by all of Dycom's subsidiaries and was updated on a daily basis during the Class Period.

167.     According to CW4, Engineering Associates used the VTS. CW4 recalled that there were "so many trackers that went from Engineering Associates, Dycom, and the client [Verizon]" that had to be reported "every single night." VTS was accessible by Engineering Associates, Verizon, and Dycom employees, and all three companies had constant contact with each other as a result. CW4 stated that Dycom would also access VTS in order to invoice Verizon.

168.     CW5 similarly reported that everyone at Star worked off the VTS. CW5 stated that VTS was a databank where everyone submitted their documentation, timetables, and schedules.

The VTS showed permit status and the progress of every Verizon project. The VTS was based information stored in Star's three internal tracking systems.

169.     According to CW5, the first tracker, the Construction Manager Tracker, contained daily and weekly information about what was physically completed on the projects, including the percentage of work completed. The second tracker, the Project Coordinator tracker, was a real-time tracker fed by the Construction Tracker which contained overall information about project permits, design, construction, and progress. This included information on whether or not a permit was submitted and the expected response date from the permit authority. The Project Coordinator Tracker was used to match the VTS. Third, the Master Tracker, or "Star Tracker," contained a "look ahead" and projected project deadlines, including the shot calls. The Master Tracker reflected whether Star was behind on any of its projected timelines for its projects.

170.     During the Class Period, Dycom had access to both VTS and Star Tracker. Mindy Piper, David Hamlin, Tom Bones, who reported to Dycom, and CW5 had access to the Master Tracker and Nicole Kirby had access to the Project Coordinator Tracker and VTS. All of these trackers were created in Excel and housed in google docs, then inputted into VTS.  According to CW5, everyone used these programs, from the design team, to the construction team, to the foreman. "Everything they do, period, is based on trackers. They are a data mine company."

171.     CW5 recalled that VTS was used to track payouts and the amount of work Dycom was getting. CW5 explained that when information was submitted to VTS, it was also submitted to billing at Star's Cincinnati office, which then submitted the billing information to Dycom. According to CW9, Dycom was involved in budgeting for major capital expenditures of its subsidiaries.

172.     Thus, the VTS would have reflected the project delays for the One Fiber Project in real-time as reflected in missed permitting deadlines, project delays and cancelled projects. This includes: (i) the One Fiber project delays in Louisville, Kentucky and Indianapolis beginning in May 2018, and Tennessee starting in early 2018; (ii) the One Fiber project delays in Cincinnati in 2018, including that Dycom was not allowed to work in two of Ohio's cities; (iii) the Verizon project delays in Tennessee throughout 2018; (iv) the cancelled Verizon contract in Texas in November 2017; (v) the cancelled Verizon $55 million, 10-year One Fiber project in Texas in February of 2018; (vi) the cancelled 2,000 out of 3,000 lines from the Verizon One Fiber project in Atlanta, Georgia in March or April 2018; and (vi) that Dycom lost a 500,000 mile Verizon Contract in early 2018.

173.     According to CW12, beginning in December of 2017, Tesinc also began tracking the progress of each permit through the OOF tracker, which tracked which permits were submitted, the jurisdiction, and the date of submission as part of the Verizon contract. This was created by CW12 and Andrew Kowalsky around December 2017. CW12 and Kowalsky were initially responsible for entering the information into the tracker. Eventually other people at Tesinc became responsible for updating the tracker. It started as a smartsheet, then a google document, similar to Excel, and then became a live document that could be shared internally. It was updated as permits were submitted. Although this started as an internal document, it was eventually made available to Dycom, Star, and Verizon and became known as an OOF tracker. In March 2018, the program was changed so that Verizon could see it as a deliverable. Every two weeks the permit tracker was sent to "a ton of people" at Tesinc, including President Bill Ptak (who reports to Estes) and Brandt, as well as Scott Faith, Duwayne Backens and others. It was also sent every other week to Dycom

and Verizon. Accordingly, the tracker would have shown that Tesinc was experiencing delays on the Verizon One Fiber project in Ohio throughout the entire Class Period.

174.     CW12 also stated that another permit tracker was created for Duke Energy in a google doc and Dycom had direct access to that during the Class Period as well. This would have reflected the number of rejected permits Tesinc received on the Verizon One Fiber project.

175.     Accordingly, the OOF and Duke Energy trackers would have shown the permit delays on the Verizon One Fiber project that were experienced throughout 2018 in Cincinnati.

### iv.  The Individual Defendants had monthly, weekly, and daily meetings with the heads of its subsidiaries to discuss the status of Dycom's projects, including permitting issues and finances

176.     In addition to the daily reports and trackers above, according to CW9, Defendant Nielsen held monthly calls with the president of each subsidiary and COO Tim Estes. According to confidential sources, the presidents of each subsidiary were informed about the permitting and project delays, real-time.

177.     CW9 was aware of these calls because of his conversations with some of the presidents of Dycom's subsidiaries. Based on these conversations, CW9 stated that the monthly calls focused on finances, collecting money owed to the subsidiaries, how certain jobs were progressing, and updates of any significant changes that occurred in the past thirty days, including lost customer contracts and permitting issues. Because there were approximately forty subsidiaries, Dycom combined its subsidiaries that were similar onto one call, resulting in about twenty to twenty-five calls that would take place over three or four days. The average call lasted about thirty minutes to an hour.

178.     Accordingly, by virtue of these monthly meetings, Defendant Nielsen would have discussed and been fully aware of the permitting, underlying staff issues, and project delays that were plaguing the Company, as well as the resulting loss in customer contracts and revenue.

179.     In addition to these monthly meetings, Star held weekly meetings to discuss the status of various projects, including permit issues. According to CW5, he, as well as Tom Bones, participated and at least one attendee on the call was from Dycom, including Andy Jaco from Dycom. CW5 or Hamlin handled the call. Beginning in mid-September 2018, these calls changed from weekly to daily because the permit delays "got so bad." In addition, Tom Bones, who reported directly to Dycom, also called two meetings in August and September of 2018 to discuss the permit delays. CW5 attended this meeting along with Tom Bones, Dave Hamlin, Mindy Piper, Nicole Kirby, and the Verizon Project Manager. Star had to explain to Verizon why Star was not meeting the deadlines. Accordingly, Dycom was aware of the delays and project cancellation discussed in ¶154 above, as well as that Star was getting "pretty upset" with the constant missed project deadlines.

180.     According to CW12, beginning in December of 2017, Tesinc held meetings every Monday and Wednesday morning with Dycom and Star to discuss the status of permitting on the Verizon One Fiber project. CW12 stated that Star was the project manager and leading the team. CW12 recalled that these meetings were held via conference call and attended by Tom Bones, VP of Star, David Hamlin, PMO Manager of Star, Murray Strauss from Star, Scott Faith, Dycom's former Director of Program Management, Duwayne Backens, Program Manager of Tesinc, Tommy Farmer, VP of Tesinc, CW12, Brandt, and Kowalsky. CW12 believes there may have been others on the call as well.

181.    As part of these meetings, Tesinc put together packages, presentations, and excel spreadsheets to show the attendees what was on going with each project, including how many projects were ongoing, the progress of each project, and potential problems, among other things. According to CW12, Dycom "was aware[,] [a]nnoyingly so" of the permit delays by virtue of these meetings. CW12 recalled that Kowalsky told Dycom "what's real" and Dycom, Tesinc, and Star got upset by the realities.  According to CW12, Tesinc began hiring new people who would say whatever they wanted to hear. Accordingly, Dycom was aware of the permit issues in Ohio and Kentucky on the Verizon One Fiber project, including that Norwood and St. Bernard forbade Tesinc from obtaining permits and conducting work sometime between January and March of 2018, resulting in the loss of a "significant" amount of work.

182.    According to CW12, Brandt and Foxx reported to and held meetings with Dycom "all the time," either telephonically or by email. These communications occurred at least on a weekly basis and probably every other day. Brandt and Foxx informed CW12 that "everything we do, we should be connecting with Dycom." CW12 recalled that Scott Faith, the former Director of Program Management at Dycom, David Naro, the current Director of Program Management at Dycom, and Duwayne Backens were a part of these meetings. There were also times there Dycom would "pop into meetings" on the phone or show up at Tesinc's office from time to time. When they showed up at the office, they would be walking with President Bill Ptak (who reports to Estes) and Vice President Tommy Farmer.

183.    CW12 stated that during these meetings Brandt and Foxx informed Dycom of project status updates, including lost access to Norwood and St. Bernard. CW12 stated that Brandt and Foxx were on the phone with Dycom as well as Larry Schwng and Marcus Loof from Verizon discussing issues such as these. Accordingly, not only was Dycom aware of the problems with the

Verizon account, but Dycom was also aware of the project delays in Florida occurring on the CenturyLink account.

184.    In addition to the set meetings above, confidential witnesses also explained that Dycom communicated with each subsidiary on a constant basis. CW1 stated that Dycom was "constantly" having management meeting with both Christine Brew and Tony Sook from Star in person and via teleconference where the statuses of projects were discussed. Accordingly, Dycom was aware of the project delays due to permits on the AT&T account in Nashville, Tennessee as well as the fact no activity was occurring on the Verizon account.

185.    CW8 explained that, during the Class Period, it was an "everyday occurrence" for Dycom to communicate with Texstar.  Howard and Rucker would speak to Dycom about profits and losses and what was being done or not being done on projects. Discussions concerned the loss of both the AT&T and Verizon contracts. CW8 stated that Greg Lacy and Pete Espinoza also regularly consulted with Dycom. CW8 recalled that Howard, Rucker, and Espinoza traveled to Dycom's headquarters "all the time" and Dycom traveled to Texstar's office. Further, if there were any delays or a problem with a project, that information was given directly to Howard and Rucker. Accordingly, Dycom was aware that, in Texas: (i) the Time Warner contract was cancelled in the summer of 2018 due to a lack of personnel; (ii) that AT&T began to withhold work from Dycom as a result of a lack of personnel; and (iii) that Texstar lost a large Verizon contract for 500,000 miles of cable in 2018.

186.    CW3 explained that when Ansco lost a $75 million, 10-year AT&T contract, Estes, Summers and Kazula discussed the matter together. Accordingly, the Individual Defendants was aware of this by virtue of the fact they were in contact with Summers.

187.     CW4 also stated that he raised these permit issues and "a lot of heck" with Mike Martin, the Vice President of Engineering and Operations at Engineering Associates, in closed door meetings. Martin reported to the President who reported to the Individual Defendants. Accordingly, the Individual Defendants were aware that 2,000 of the 3,000 Verizon One Fiber contract in Georgia was cancelled in March or April of 2018.

188.     CW6 explained that because of the delays on the AT&T FTTX project, throughout the Class Period Ivy and AT&T held meetings twice a week to discuss the status of the project. Those participating in these calls included AT&T, CW6, Ferguson, and Shaddock. Ferguson and Shaddock reported to Summers. Summers participated in weekly calls throughout the Class Period with the Vice Presidents and senior district managers of every state and region to discuss Ivy and Ansco's finances. Summers then reported to the Individual Defendants during the monthly meetings. Accordingly, the Individual Defendants were aware that the AT&T FTTX project in Florida was delayed during the Class Period, a project which generated between $2 to $7 million in monthly revenue.

## VI.     FALSE AND MISLEADING STATEMENTS

189.     In order to conceal the Company's true financial condition from investors throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases, and other documents. The material misstatements and omissions suggested that Dycom was actively working on and completing its customer projects according to plan and those projects were generating revenue for the Company when in fact, Dycom was plagued by delay and cancellation of contracts as a result of project delays leading to a significant adverse financial impact on the Company.

190.     Throughout the Class Period, Defendants misstated and omitted material facts concerning: (i) the substantial project delays encountered due to a multitude of ***Dycom's*** errors, including Dycom's failure to obtain permits in a timely manner, failure to provide proper documentation in support of permit application and Dycom's failure to hire a sufficient and competent workforce; (ii) the loss of numerous customers' contracts, including from the Company's largest customers—Verizon and AT&T—as a result of (i); (iii) substantial delayed and/or decreased revenue recognition due to (i)-(ii); and (iv) significant margin pressure due to unrecouped labor and other project start-up costs from delayed or cancelled proejcts.

191.     The alleged materially false and misleading statements and omissions are bolded and italicized below. Nonbolded statements are included for context.

### A.   Materially False and Misleading Statements and Omissions Regarding Permit Delays on Customer Projects

192.     The Class Period begins on November 20, 2017, when Dycom held an earnings call discussing the Company's financial and operating results for the first quarter ended October 28, 2017 and providing guidance for the next fiscal quarter (the "November 20, 2017 Call").   A transcript of the November 20, 2017 Call was attached as an exhibit to a Form 8-K Dycom filed with the SEC on November 21, 2017. Defendants Nielsen and DeFerrari both participated in the call.

193.     During the November 20, 2017 Call, Defendant Nielson misleadingly reassured investors that, despite the Company's lower than expected earnings, the permitting issues Dycom experienced were routine permitting delays that were no cause for concern:

> As with prior initiations of large-scale network deployments, ***we expect some normal timing volatility*** and customer spending modulations as network deployment strategies evolve and tactical considerations, ***primarily permitting impact timing***.

194.     Defendant Nielson repeated this same comment a few months later during a February 28, 2018 investor call ("February 28, 2018 Call"). A transcript of the February 28, 2018 Call was attached as an exhibit to Dycom's Form 8-K filed with the SEC on March 2, 2018. Defendants Nielsen and DeFerarri both participated on the call.

195.     These reassurances led Deutsche Bank to be "encouraged by mgmt's upbeat tone on the broader cycle," despite Dycom's disappointing earnings.

196.     When an analyst inquired as to the reason for permit holdups during the November 20, 2017 Call, Defendant Nielsen denied that the delays were anything other than routine and blamed them on the municipalities:

> **Noelle C. Dilts** - *Stifel, Nicolaus & Company, Incorporated* ("Stifel"):
>
> And then second, you've mentioned some permitting hold-ups, is this just a function of the scale of some of these capital plans that your customers -- or is there something else specific going on?
>
> **Nielsen**:
>
> ***No. It's exactly your point, Noelle, is that when you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. It is not anything unusual***, and unlike other adjacent spaces where you have larger projects, these are typically local municipal permits, they're not federal permits. We're not talking about environmental studies or other types of permitting. And, in fact, just recently, the FCC passed a rule that actually will speed around small cells, some of the permitting by removing some local reviews that were already occurring. ***So I think it'll get better, it always does***. But at this stage in these projects, it's always something to watch.

197.     Similarly, on November 22, 2017, Dycom filed a Form 10-Q for the period ended October 28, 2017 with the SEC ("November 22, 2017 Form 10-Q"), signed by Defendants Nielsen and DeFerrari. The November 22, 2017 Form 10-Q stated that while the Company may theoretically experience permit delays, there were no material project delays to date:

> Our CIEB balances are maintained at a detailed task-specific level or project level and are evaluated regularly for realizability. These amounts are invoiced in the normal course of business according to contract terms that consider the completion

of specific tasks and the passage of time. ***Project delays for commercial issues such as permitting,*** engineering changes, incremental documentation requirements, or difficult job site conditions ***can extend the time needed to complete certain work orders, which may delay invoicing to the customer for work performed. We were not experiencing any material project delays or other circumstances that would impact the realizability of the CIEB balance as of October 28, 2017 or July 29, 2017.***

198.     The November 22, 2017 Form 10-Q also noted that revenue could be recognized at different times as the result of permitting delays; however, as noted above, Dycom represented this was not a concern since there were no material delays to date:

> ***Revenue estimates included in our backlog can be subject to change because of*** project accelerations, contract cancellations, ***or delays due to various factors, including, but not limited to, commercial issues such as permitting,*** engineering changes, incremental documentation requirements, difficult job site conditions, and adverse weather. ***These factors can also cause revenue to be realized in different periods or in different amounts from those originally reflected in backlog.***

199.     The March 2, 2018 Transition report, signed by Defendants Nielsen and DeFerrari, falsely represented that ***"[w]e were not experiencing any material project delays or other circumstances that would impact the realizability of the CIEB balance as of January 27, 2018 or July 29, 2017.***" It also similarly stated:

> In many instances, our customers are not contractually committed to procure specific volumes of services under a contract. Revenue estimates reflected in our backlog can be subject to change due a number of factors, including contract cancellations or changes in the amount of work we estimated to be performed at the time of calculating the backlog amount. In addition, ***revenue reflected in our backlog may be realized in different periods from those previously reported due to these factors as well as project accelerations, or delays due to various reasons, including, but not limited to, commercial issues such as permitting,*** engineering revisions, difficult job site conditions, and adverse weather.

200.     The above statements in ¶¶193-94 and ¶¶196-99 were materially false and misleading when made because Dycom's permit delays were in fact "unusual," not "normal," and were not the result of the "large programs" or municipality delays, rather they were the result of undisclosed **Dycom-specific issues**. Indeed, unbeknownst to investors, Defendants failed to disclose that Dycom was ***already*** experiencing substantial and material nationwide permit delays

61

as a direct result of Dycom's failure to: (i) file necessary permits in advance of commencing customer projects; (ii) provide municipalities with information that was specifically requested in order for the permits to be completed, processed and approved; (iii) obtain the requisite workers compensation insurance for its subcontractors in order to satisfy rudimentary permit requirements; and (iv) hire sufficient and competent staff to file and obtain project permits. Without the proper permits, Dycom was substantially delayed from commencing work on its backlog as well as recognizing revenue in its books.

201.    Dycom further failed to disclose that the delays were so substantial that: (i) according to CW6, Dycom attempted to bypass the permit process by instructing workers to operate during days and for lengths of time that the city had not approved and which violated safety protocol; (ii) according to CW7, Dycom began operating on roads and in areas that it never obtained permission from the city to operate in; and (iii) according to CW5, Dycom began pressuring the city to review the permits in an expedited fashion, which the city could not do. Consequently, these violations resulted in projects being delayed or shut down as well as strained relationships with local authorities which further hindered the permitting process. In fact, according to CW12, these strained relationships caused two cities in Ohio (Norwood and St. Bernard) to essentially forbidTesinc from applying for any permits or operating in their cities on the Verizon One Fiber project. This resulted in the loss of a "significant [amount of] work" in Norwood alone.

202.    Further, according to confidential sources the unnecessary and prolonged delays had a material impact on Dycom's revenue, earnings, and business, culminating in the cancellation of numerous projects by customers, including: (i) Verizon cancelling two-thirds of its One Fiber Project in Atlanta, Georgia in March or April of 2018 (CW4); (ii) the loss of a $55 million, 10-

year contract with Verizon in February 2018 due to permit delays caused by not having a permit or engineering department (CW7);  (iii)  the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (v) the loss of One Stream's Texas contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2); (vi) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (vii) Google cancelling a $500 million contract between August or October of 2017 due to permit delays in Texas (CW10).

203.     Furthermore, if a contract wasn't cancelled, Dycom's revenue was materially impacted as a result of permit delays, since Dycom was unable to recognize revenue until its projects were actually completed. This includes delayed revenue as a result of: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the Verizon One Fiber project in Louisville, Kentucky and Indianapolis from May 2018 until the end of the Class Period (CW5); (iv) delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (v) delays occurring on the AT&T fiber project in Nashville, Tennessee starting in the spring or summer of 2018 (CW1); and (vi) delays occurring in Ohio On the Verizon One Fiber project between January and March of 2018, which resulted in two Ohio cities denying Dycom permits entirely (CW12). Accordingly, not only did Dycom conceal that it was the cause of the permit delays and the extent of the permit delays, but it further failed to disclose that it consequently had already lost projects and revenue as a result.

204.     Defendants also failed to disclose that these delays and cancellations put significant pressure on Dycom's margins from unrecouped labor and other project costs for which it was unable to bill its customers.

###### B. Materially False and Misleading Statements and Omissions Concerning Dycom's Progress and Initiation of Customer Projects

205.     Although Dycom did not timely apply for or obtain the permits required to commence many of its customers' projects, Defendants nevertheless led investors to believe that its customer projects were actively underway and progressing without delay.

206.     During the November 20, 2017 Call, Defendant Nielsen falsely represented that Dycom was experiencing "an increase in demand" and actively deploying networks, stating, in relevant part:

> ***This quarter reflected an increase in demand from three key customers as we deployed 1 gigabit wireline networks*** and grew core market share, offset by near-term moderation by a large customer. Gross margins were 20.55% of revenue, reflecting solid operating performance, offset by the impacts of the decline in revenue.

207.     During this call, Nielsen reinforced that Dycom's deployment of fiber optics projects had begun and were occurring nationwide for multiple customers:

> The industry effort required to deploy these converged networks has and will meaningfully broaden our set of opportunities. Total industry opportunities in aggregate were already without precedent, in our experience, prior to this deployment. ***We are providing program management, planning, engineering and design, aerial and underground construction and fulfillment services for 1 gigabit deployments. These services are being provided across the country in dozens of metropolitan areas to a number of customers.***
>
> In addition, ***we have secured a number of converged wireless/wireline multi-use network deployments. Planning, engineering and limited construction have begun.***

208.     The same materially false and misleading statements above were repeated verbatim by Defendant Nielsen during the February 28, 2018 Call.

209.     After the November 20, 2017 Call, Wells Fargo Securities commented that "[t]he tone of the call was quite optimistic and we think is helping drive shares higher (+8.6% vs. S&P +0.1%) as management discussed a return to revenue growth in its FY2019 and a ramp-up in activity from its largest customers." Detutsche Bank commented that it was "encouraged by mgmt's upbeat tone" and that, among other things, "[k]ey customer spending programs are poised to accelerate."

210.     Wells Fargo further concluded that Dycom "will accelerate organic growth" due to a "'significant' number of new customer deployments to commence in the near-term, including one of its largest customers kicking off a new program that is 'the largest in the Company's history.'"

211.     In response to these November 20, 2017 misrepresentations, the Company's stock price increased approximately 9% from a closing price of $90.04 on November 17, 2017 to a closing price of $98.22 on November 20, 2017.

212.     The above statements in ¶¶206-10 were materially false and misleading when made because, unbeknownst to investors, Dycom's 1 gigabit deployments were not being actively deployed, nor could Dycom commence a "significant number of new project initiations" because it failed to obtain the required permits to commence and complete its customers' jobs. Indeed, customer projects were either not initiated or were substantially delayed because: (i) Dycom failed to file necessary permit applications in advance of commencing customer projects; (ii) Dycom failed to provide municipalities with information that was specifically requested in order for the permits to be completed, processed and approved; and (iii) Dycom failed to obtain the requisite workers compensation insurance for its subcontractors in order to satisfy rudimentary permit requirements. Because permits were required in order for Dycom to operate, and because the

permit process takes 6 months on average, Dycom's customers' projects were experiencing substantial delays and were not underway or being initiated as Defendants represented.

213.    Further, even if Dycom had the requisite permits, it lacked a sufficient number of competent workers required to initiate and complete customer projects on time. Consequently, at the time these statements were made in November 2017 and on February 28, 2018, the unnecessary and prolonged delays had a material impact on Dycom, culminating in the cancellation of numerous projects by customers, including: (i) the loss of a $55 million, 10-year contract with Verizon in February 2018 due to Dycom's disorganization and delayed completion times (CW7); (ii) the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2); (iv) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (v) Google cancelling a $500 million contract between August and October 2017 due to permit delays in Texas (CW10).

214.    Other cancelled contracts include: (i) AT&T withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (ii) Verizon cancelling a contract in Texas in November 2017 due to inadequate staffing (CW10); (iii) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); (iv) losing an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11); (v) AT&T withholding $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); and (vi) losing a Verizon contract in Texas for 500,000 miles in early 2018 (CW8).

215.     Furthermore, Dycom was experiencing additional project delays and, consequently, a delay in its recognition of revenue and pressure on margins from unrecouped costs, because it was not completing its customer projects. This includes: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (iv) delays occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's disorganization (CW7); (v) delays on the Verizon project in Tennessee in early 2018 (CW1); and (vi) delays occurring in Ohio on the Verizon One Fiber project between January and March of 2018, which resulted in two Ohio cities denying Dycom permits entirely (CW12).

216.      On November 20, 2017, Dycom issued a presentation titled "1st Quarter Fiscal 2018: Results Conference Call" attached to a Form 8-K (the "November 20, 2017 Presentation"). Defendants Nielsen and DeFerrari are identified as participants on the presentation.

217.     In the November 20, 2017 Presentation, under a slide entitled "Industry Update," Defendants falsely represented that Dycom was actively deploying its projects:

❖     Delivering valuable service to customers

➢     *Currently providing services for 1 gigabit full deployments across the country in dozens of metropolitan areas to a number of customers*

➢     *Have secured and are actively working on a number of converged wireless/wireline multi-use networks*

➢     Customers are revealing with more specificity multi-year initiatives *that are being implemented and managed locally*

218.      In the November 20, 2017 Presentation, Defendants also fasley claimed that Dycom

was actively deploying fiber and had initiated a "significant number" of new projects":

❖ ***Fiber deployments*** in contemplation of newly emerging wireless technologies
***have begun in many regions of the country. A significant number of new
project initiations will occur in the near term.***

\*      \*      \*

❖ Cable operators continuing to deploy fiber to small and medium businesses and
enterprises with increasing urgency. ***Fiber deep deployments to expand
capacity, new build opportunities and overall cable capital expenditures are
increasing.***

❖ Customers are consolidating supply chains creating opportunities for market
share growth and increasing the long-term value of our maintenance business.
***We are increasingly providing integrated planning, engineering and design,
procurement and construction and maintenance services for our customers.***

219.      In response to Dycom's misleading disclosures, on November 20, 2017, Stephens

issued a research brief commenting that Dycom had "solid demand from several other large

customers (likely Verizon, Comcast, and CenturyLink), continued 1-gig deployments, fiber deep

cable projects and initial phases of fiber deployments for newly emerging wireless technologies

(5G)." Based on these false statements, 2018 was "shaping up to be a significant year of growth

for DY."

220.      On February 28, 2018, Dycom issued a press release announcing second quarter

and six month results for the period ended January 27, 2018 and affirming guidance for fiscal

2019. The press release was attached to Dycom's Form 8-K filed that same day. Dycom also

issued a presentation, titled "2nd Quarter Fiscal 2018: Results Conference Call" attached to the

same Form 8-K (the "February 28, 2018 Presentation"). Defendants Nielsen and DeFerrari are

identified as participants in the presentation.

221.     The February 28, 2018 Presentation contained identical false and misleading representations as those identified in the November 20, 2017 Presentation in ¶¶216-18 above. Also, on March 6, 2018, Dycom filed a Form 8-K with the SEC that attached a presentation titled, "The People Connecting America: Investor Presentation March 2018" (the "March 6, 2018 Presentation"). The March 6, 2018 Presentation contained the same materially false and misleading representation as those in the November 20, 2017 Presentation identified above in ¶¶216-18.

222.     In response to the false representations in the March 6, 2018 Presentation, the Company's stock price increased from a closing price of $109.30 on March 5, 2018 to a closing price of $109.70 on March 6, 2018.

223.     On April 12, 2018, Dycom filed a Definitive Proxy on Schedule 14A with the SEC (the "April 12, 2018 Proxy"). It stated that, during the Transition Period of July 30, 2017 to January 27, 2018, Dycom *"[p]rovided services for 1 gigabit full deployments across the United States to a number of customers in multiple metropolitan areas and grew its core market share"* and "[s]ecured and *worked on a number of converged wireless/wireline multi-use networks*."

224.     The above statements in ¶¶216-18, 220-21, 223, were materially false and misleading when made for the reasons set forth in paragraphs ¶¶212-15 above, including that, unbeknownst to investors, Dycom was not, and could not, provide the services it was touting because it had failed to submit, correct, and/or obtain the permits necessary to commence work and lacked a sufficient competent workforce to complete the jobs according to their specified timelines. Indeed, many projects were either cancelled or at a standstill rather than being "actively work[ed] on" as Defendants claimed.

225.     In addition, the statements in ¶¶216-18, 220-21, 223, above are false and misleading because, as of April 2018, Dycom suffered from further lost or delayed revenue because: (i) in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Georgia which was worth "a lot" of money (CW4); and (ii) in spring or early summer of 2018, the AT&T fiber project in Nashville, Tennessee was delayed because permits were not filed on time (CW1).

**C. Materially False and Misleading Statements and Omissions Concerning The Purported "Acceleration" of Dycom's Customer Projects**

226.     Not only was Dycom not actively working on deployments as it claimed, but it also was consequently not able to accelerate those projects.

227.     Yet, on the November 20, 2017 call, Defendant Nielsen claimed that "***Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018***" and "***Wireless construction activity in support of expanded coverage and capacity is poised to accelerate*** through the deployment of enhanced macro cells and new small cells."

228.     Defendant DeFerrari confirmed Nielsen's false representation as that Dycom was able to "accelerate" projects and that the Company's margins would be improving as a result:

> ***We expect accelerating fiber deployments for newly emerging wireless technologies, increasing wireless services and solid demand from several large customers reflecting 1 gigabit deployments and fiber deep cable capacity projects***.
>
> ***We expect gross margin percentage to be in line or slightly better compared to the April 2017 quarterly margin,*** reflecting the expected mix of work activity and improving performance ***as services for large customer programs begin to accelerate.***

229.     In response to an analyst question about future guidance, Defendant Nielsen confirmed his prior false statements that Dycom was "re-accelerat[ing]" certain projects:

70

**Matt Duncan** - *Stephens Inc.:*

So, Steve, your 12-month backlog had another very big nice step forward this quarter. The April quarter revenue guide, looks to me a little bit bigger the normal sequential increase from that January quarter. Can you give us a little bit of detail about sort of what's happening to drive that? Is it the start backup of some of the AT&T fiber work? Is it Verizon starting to work on One Fiber? Is it all of the above? Just what's driving that, it's sort of a little bit bigger than normal sequential increase?

**Nielsen**:

So I think Matt, your all of the above characterization is accurate. ***So we have re-acceleration of some programs. We have a -- some new programs on the wireless side that are kicking off. And then we have a number of these converged wireless/wireline projects that have been working through planning and design in to engineering, and we've got to get the construction going because we've got work to do.***

230.    Despite not obtaining the requisite permits, the November 20, 2017 Presentation similarly represented that "Wireless construction activity in support of expanded coverage and capacity ***is poised to accelerate***" and that, with respect to the gross margin percentage, "***Margin outlook reflects expected mix of work activity and improving performance as services for large customer programs begin to accelerate***."

231.    The November 20, 2017 Presentation identified "***[a]ccelerating fiber deployments*** for newly emerging wireless technologies" and "***[i]ncreasing wireless services***" as the basis for Dycom's contract revenue and margin improvent expectations.   The February 28, 2018 Presentation and the March 6, 2018 Presentation affirmed this guidance and made the same false and misleading statements as those in ¶230 above.

232.    During the February 28, 2018 Call, Nielsen reiterated that "***Engineering and construction activity is expected to increase and accelerate*** throughout 2018" and that "***Wireless construction activity in support of expanded coverage and capacity is poised to accelerate*** through the deployment of enhanced macro cells and new small cells." He also falsely represented

that "[*w]e expect accelerating fiber deployments for emerging wireless technologies, increasing wireless services and solid demand from several large customers reflecting 1 gigabit deployments and fiber-deep cable capacity projects*."

233.     Defendant Nielsen further represented that Dycom's acceleration of projects would be the key driver of gross margins:

> **Robert J. Burleson** *Canaccord Genuity, Inc.*:
>
> I want to understand a little bit better what the drivers are of gross margin this year. I know you're not giving specific gross margin guidance, but if there are any particular mix issues, large projects that are kind of coming to an end where maybe the margins are better at the tail end, anything besides kind of just seasonality kind of winter patterns that you guys alluded to?
>
> **Nielsen**:
>
> Sure. So Bobby, I guess first thing is *we don't have any major programs coming to an end. Generally, they're going to accelerate through the year*, I mean that's how organic growth is kind of call it 10% in the year, right, so I think we see that. *I think it's particularly when you have a large number of projects under one big program that are starting up all over the country, you've got to spend to build your infrastructure around warehousing and office and yard space, in the ability to handle that growth and we are putting that in place, have put a good portion of it in place, more to go.* And as that revenue comes through, the revenue will certainly grow faster than that, then the support cost will, as we go through the balance of the calendar year, for this fiscal 2019.

234.     During the February 28, 2018 Call, Defendant DeFerrari stated that project deployments would be "accelerating" and that Dycom had "solid demand" from its largest customers:

> For the full year, we currently expect revenues which range from $3.3 billion to $3.5 billion. *We expect accelerating fiber deployments for emerging wireless technologies, increasing wireless services and solid demand from several large customers reflecting 1 gigabit deployments and fiber-deep cable capacity projects*.
>
> […]
>
> [W]e continue to see a broad set of customer opportunities, which are expected to drive meaningful growth. *This guidance reflects the anticipated timing of activity*

72

*on large customer programs and the related impacts on margins* as well as consideration of near-term weather conditions.

235.     Defendant DeFerrari continued:

For the April 2018 quarter, which is Q1 of fiscal 2019, we currently expect total revenue to range from $720 million to $750 million, *which reflects accelerating fiber deployments for emerging wireless technologies, wireless services that begin to ramp and solid demand from several large customers.* Non-GAAP Adjusted Diluted EPS is to range from $0.63 to $0.78 per share, based on estimated diluted shares of approximately 31.8 million and Non-GAAP Adjusted EBITDA percent to range from 10.7% to 11.1%.

The margin outlook for Q1 *2019 reflects the anticipated timing of activity on large customer programs and the related impacts on margins*, as well as consideration of near-term weather conditions.

236.     The statements above in ¶¶227-235 were materially false and misleading because, unbeknownst to investors, Dycom could not "accelerate" any projects because for many, if not most of them, Dycom failed to submit, correct, or obtain the required permits to commence and complete its customers' projects. Indeed, customer projects were either not initiated, let alone "accelerated," or were substantially delayed because: (i) Dycom failed to file necessary permit applications in advance of commencing customer projects; (ii) Dycom failed to provide municipalities with information that was specifically requested in order for the permits to be completed, processed and approved; (iii) Dycom failed to obtain the requisite workers compensation insurance for its subcontractors in order to satisfy rudimentary permit requirements; and (iv) Dycom failed to hire sufficient and competent staff to file and obtain project permits. Because permits were required in order for Dycom to operate, and because the permit process takes 6 months on average, Dycom's customers' projects were experiencing substantial delays and projects could not be accelerated as Defendants represented.

237.     Further, even if Dycom had the requisite permits, it lacked a sufficient number of workers required to initiate and complete customer projects on time, let alone in an accelerated fashion. In fact, according to CW12, two cities in Ohio (Norwood and St. Bernard) forbade Tesinc

from applying for any permits or operating in their cities on the Verizon One Fiber project. This resulted in the loss of a "significant [amount of] work" in Norwood alone.

238.     Consequently, Dycom's projects and expected margins were adversely affected and not increasing. Rather, as explained by confidential sources, the unnecessary and prolonged delays culminated in the cancellation of numerous projects by customers, including: (i) the loss of a $55 million, 10-year contract with Verizon in February 2018 due to Dycom's disorganization and delayed completion times (CW7); (ii) the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2); (iv) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (v) Google cancelling a $500 million contract between August and October of 2017 due to permit delays in Texas (CW10).

239.     Other cancelled contracts include: (i) AT&T withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (ii) Verizon cancelling a contract in Texas in November 2017 due to inadequate staffing (CW10); (iii) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); (iv) losing an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11); (v) AT&T withholding $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); (vi) losing a Verizon contract in Texas for 500,000 miles in early 2018 (CW8); and (vii) in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Georgia which was worth "a lot" of money (CW4).

240.    Furthermore, Dycom was already suffering from a number of undisclosed project delays that forced Dycom to delay revenue recognition and put significant pressure on the Company's margins because it was not completing its customer projects. This includes: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (iv) delays occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's disorganization (CW7); (v) delays on the Verizon project in Tennessee in early 2018 (CW1); (vi) delays occurring in Ohio on the Verizon One Fiber project between January and March of 2018, which resulted in two Ohio cities denying Dycom permits entirely (CW12); and (vii) in spring or early summer of 2018, the AT&T fiber project in Nashville, Tennessee was delayed because permits were not filed on time (CW1).

### D. Materially False and Misleading Statements and Omissions Regarding Dycom's Ability to Complete its Backlog of Projects

241.    While Dycom lacked the necessary permits and workforce to commence or complete its customers' projects, it nevertheless provided investors with unattainable promises that certain percentages of backlogged projects would be completed in the immediate future.

242.    Dycom's November 22, 2017 Form 10-Q, signed by the Individual Defendants, stated that "***We expect to complete 49.0% of the October 28, 2017 total backlog during the next twelve months.***" During the November 20, 2017 Call, Defendant Nielsen added:

> Backlog at the end of the first quarter was $6.198 billion versus $6.016 billion at the end of the fourth quarter of 2017, an increase of approximately $182 million. ***Of this backlog, approximately $3.039 billion is expected to be completed in the next 12 months.*** We are ***particularly*** pleased with the increase in our next 12

months backlog as it clearly signals meaningful organic growth for our fiscal 2019, the 12-month period ending January 2019.

Both *backlog calculations reflect strong performance* as we booked new work and renewed existing work.

243.     During the February 28, 2018 Call, Defendant Nielsen also promised that "approximately $3.047 billion [of Dycom's backlog] is expected to be completed in the next 12 months":

Going to slide 7. Backlog at the end of the second quarter was $5.847 billion versus $6.198 billion at the end of the first quarter of 2018, a decrease of approximately $351 million. Of this backlog, *approximately $3.047 billion is expected to be completed in the next 12 months.* We are pleased with our next 12 months backlog as it clearly signals meaningful organic growth for fiscal 2019, the 12-month period ending January 2019. *Both backlog calculations reflect solid performance as we booked new work and renewed existing work. We continue to anticipate substantial future opportunities across a broad array of our customers.*

244.     The March 2, 2018, Transition Report, signed by Defendants Nielsen and DeFerrari, stated:

Our backlog consists of the estimated uncompleted portion of services to be performed under contractual agreements with our customers and totaled $5.847 billion, $6.016   billion and $6.031   billion at January 27, 2018, July 29, 2017, and July 30, 2016,   respectively.   *We   expect   to   complete 52.1% of the January 27, 2018 total backlog during the next twelve months*.

245.     While Dycom's backlog decreased in January 2018, Stephens Inc., commented in a March 9, 2018 research brief that "[w]e simply aren't worried about total backlog ticking down sequentially for one 3-month period when the secular trend in DY's end markets should be an accelerating growth trend for the next 12-months."

246.     The above statements in ¶¶242-44 were materially false and misleading because, unbeknownst to investors, Dycom was prohibited from commencing, let alone completing, its backlog of projects because it failed on many if not most projects, to obtain the required permits to commence and complete its customers' jobs. Indeed, many customer projects either could not

be initiated or were substantially delayed because: (i) Dycom failed to file necessary permits in advance of commencing customer projects; (ii) Dycom failed to provide municipalities with information that was specifically requested in order for the permits to be completed, processed and approved; and (iii) Dycom failed to obtain the requisite workers compensation insurance for its subcontractors in order to satisfy rudimentary permit requirements. Because permits were required in order for Dycom to operate, and because the permit process takes 6 months on average, Dycom's customers' projects were experiencing substantial delays and were not underway or being initiated as Defendants represented.

247.     Further, even if Dycom had the requisite permits, it lacked the number of qualified workers required to initiate and complete customer projects on time. Consequently, Defendants were not experiencing "strong performance" and lacked the requisite tools to complete its backlog of projects.

248.     The March 2, 2018 Transition Report also represented that Dycom's backlog was subject to change due to several factors:

> In many instances, our customers are not contractually committed to procure specific volumes of services under a contract. Revenue estimates reflected in our backlog can be subject to change due to a number of factors, including contract cancellations or changes in the amount of work we estimated to be performed at the time of calculating the backlog amount. In addition, ***revenue reflected in our backlog may be realized in different periods from those previously reported due to these factors, as well as project accelerations, or delays due to various reasons, including, but not limited to, commercial issues such as permitting, engineering revisions, difficult job site conditions, and adverse weather. The amount or timing of our backlog can also be impacted by the merger or acquisition activity of our customers.*** While ***we did not experience any material cancellations during the 2018 transition period or fiscal 2017, 2016, or 2015***, ***many of our customers may cancel our contracts upon notice regardless of whether or not we are in default***. The amount of backlog related to uncompleted projects in which a provision for estimated losses was recorded is not material.

249.     The above statements in ¶248 were materially false and misleading and omitted material information because, unbeknownst to investors, Dycom's backlog was ***already*** adversely

impacted by several factors, including, as discussed above in ¶¶246-47: (i) Dycom was experiencing substantial nationwide permit delays as a result of Dycom's failure to submit, correct, and/or obtain the required permits to commence and complete its customers' projects; (ii) an insufficient number of qualified workers to initiate and complete customer projects on time; and (iii) disorganization within Dycom that resulted in further project delays.

250.    Moreover, several projects had *already* been cancelled, including: (i) the loss of a $55 million, 10-year contract with Verizon in February 2018 due to Dycom's disorganization and delayed completion times (CW7); (ii) the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2); (iv) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (v) Google cancelling a $500 million contract between August and October of 2017 due to permit delays in Texas (CW10).

251.    Other cancelled contracts include: (i) AT&T withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (ii) Verizon cancelling a contract in Texas in November 2017 due to inadequate staffing (CW10); (iii) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); (iv) losing an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11); (v) AT&T withholding $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); (vi) losing a Verizon contract in Texas for 500,000 miles in early 2018 (CW8); and (vii) in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Georgia which was worth "a lot" of money (CW4).

252.     Furthermore, Dycom was suffering from a number of undisclosed delays that forced it to delay revenue recognition put significant pressure on the Company's margins because it was not completing its customer projects. This includes: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (iv) delays occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's disorganization (CW7); (v) delays on the Verizon project in Tennessee in early 2018 (CW1); (vi) delays occurring in Ohio on the Verizon One Fiber project between January and March of 2018, which resulted in two Ohio cities denying Dycom permits entirely (CW12); and (vii) in spring or early summer of 2018, the AT&T fiber project in Nashville, Tennessee was delayed because permits were not filed on time (CW1).

### E. Materially False and Misleading Statements and Omissions Concerning Dycom's Purported "Strong" Customer Relationships

253.     Throughout the Class Period, Dycom lost numerous customer contracts as a result of its failure to complete customer projects in a timely manner. Despite these lost and cancelled contracts, Dycom nevertheless falsely represented that the Company's relationships with its customers were strong and never once disclosed that a customer cancelled its contract with Dycom.

254.     For example, Defendant Nielsen touted on the November 20, 2017 Call:

> Within the growing economy, we experienced the effects of a strong industry environment and capitalized on our significant strengths. ***First and foremost, we've maintained strong customer relationships throughout our markets. We continue to win and extend contracts at attractive pricing.*** Secondly, ***the strength of those relationships*** and the extensive market presence they have created has ***allowed us to be at the forefront*** of evolving industry opportunities. The end market drivers of these opportunities remain firm and are strengthening.

255.     Defendant Nielsen repeated the same materially false and misleading statements as those above during the February 28, 2018 Call.

256.     In the November 22, 2017 Form 10-Q, Dycom highlighted its purported strong customer relationships:

> ***Customer Relationships and Contractual Arrangements***
>
> ***We have established relationships with many leading telecommunications providers***, including telephone companies, cable television multiple system operators, wireless carriers, telecommunication equipment and infrastructure providers, and electric and gas utilities. Our customer base is highly concentrated, with our top five customers accounting for approximately 74.9% of our total contract revenues during each of the three months ended October 28, 2017 and October 29, 2016.

257.     On November 29, 2017, Dycom filed a Form 8-K with the SEC attaching as an exhibit an investor presentation titled, "The People Connecting America: Investor Presentation November & December 2017" (the "November 29, 2017 Presentation"). The November 29, 2017 Presentation touted Dycom's "***Strong*** revenue base, ***customer relationships*** and profitable results," "***[d]urable [c]ustomer [r]elationships***," and "***[s]olid demand from several large customers*** reflecting 1 gigabit deployments and other fiber deep cable capacity projects." These same false and misleading representations in the November 29, 2017 Presentation also appeared in the March 6, 2018 Presentation.

258.     The November 29, 2017 and February 28, 2018 Presentation similarly cited "***[s]olid demand from several large customers*** reflecting 1 gigabit deployments and other fiber deep cable capacity projects."

259.     When asked about Dycom's concentrated customer base, Defendant Nielsen responded, in part, that there were great opportunities planned for Dycom's top customers:

*So I think we've got great opportunities across all of our top 5 customers as we look out over the next 12 to 24 months,* and we hope every one of them gets larger. But I think we have pretty good revenue diversity, given the concentrated nature of the end market.

260.     With respect to Verizon, during the February 28, 2018 Call, Nielsen represented strong future contracts and visibility:

**Robert J. Burleson** *Canaccord Genuity, Inc.*

And then, just looking at the major areas like some of the 5G spending that's happening this year, maybe FirstNet, if you had to look at different buckets of growth, can you kind of rank where you think the growth is strongest and maybe where there is the most potential for variability versus your expectations?

**Nielsen**:

Yes. *I think we have pretty good visibility across all of the programs*. If you think about Fiber-to-the-Home with AT&T, there's a commitment in 2019. They've indicated that based on tax reform that they're going to spend incremental dollars there. So there's clearly a plan there. There's clearly a plan across FirstNet. *Clearly, with Verizon's stated public goal to deploy a fixed broadband, which is reliant on deep fiber deployments to 25 or 30 million homes and perhaps more over the next three to four years, as well as the cable capacity projects we're involved with to expand network capacity, I think all of those are strong.*

261.     The above statements in ¶¶254-60 were materially false and misleading when made because, unbeknownst to investors, Dycom's customer relationships were not "strong" because Dycom's customers were constantly threatening to cancel and actually cancelling their contracts with Dycom due to Dycom's inability to complete a project on time. Indeed, according to confidential sources, numerous customers cancelled their contracts with Dycom, including: (i) the loss of a $55 million, 10-year contract with Verizon in February 2018 due to Dycom's disorganization and delayed completion times (CW7); (ii) the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly

contract revenue (CW2); (iv) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (v) Google cancelling a $500 million contract between August and October 2017 due to permit delays in Texas (CW10).

262. Other cancelled contracts include: (i) AT&T withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (ii) Verizon cancelling a contract in Texas in November 2017 due to inadequate staffing (CW10); (iii) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); (iv) losing an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11); (v) AT&T withholding $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); (vi) losing a Verizon contract in Texas for 500,000 miles in early 2018 (CW8); and (vii) in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Georgia which was worth "a lot" of money (CW4).

263. Furthermore, Dycom was behind on a number of customer projects, including: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (iv) delays occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's disorganization (CW7); (v) delays on the Verizon project in Tennessee in early 2018 (CW1); (vi) delays occurring in Ohio on the Verizon One Fiber project between January and March of 2018, which resulted in two Ohio cities denying

Dycom permits entirely (CW12); and (vii) in spring or early summer of 2018, the AT&T fiber project in Nashville, Tennessee was delayed because permits were not filed on time (CW1).

### F. Materially False and Misleading Statements and Omissions Regarding Factors Impacting Dycom's Operations, Revenue Growth, and Margins

264.    Throughout the Class Period, Defendants misled investors regarding the basis for Dycom's reported revenue shortfalls and announced future expectations for revenue and margins. The pattern unfolded whereby Dycom would fall short of its revenue guidance, blame it on a one-time only labor cost, and then assure investors that the next quarter was about to mark the initiation of substantial projects that would increase Dycom's revenue. Based on this positive outlook, Dycom would temper any shortfalls by promising investors a future outlook of financial success. At no point did Defendants reveal that its revenue shortfalls and lower margins were the result primarily of Dycom losing customer contracts and experiencing substantial delays in completing its projects, which was adversely impacting its revenue recognition and showed no signs of subsiding.

265.    For instance, during the November 20, 2017 Call, Defendant DeFerrari identified several reasons as the basis for the Company's decreasing operating margins, none of which mention Dycom's permitting issues, contract delays, or loss of contracts:

> Compared to Q1 of last year, gross margin decreased 251 basis points. Three factors proportionately impacted the margins: ***Specifically, approximately one third of margin percentage variance was from labor and subcontractor labor costs***, ***reflecting the mix of work activity and the near-term margin impacts*** as we initiated the new programs; another one third of the negative variance related to ***lower absorption of equipment costs as well as fuel costs***; and lastly, one third of the variance resulted from ***negative leverage on facility expenses and certain field operating costs*** as we operated at a lower revenue level in the quarter.
>
> ***Despite near-term pressures on gross margins, we are confident that our operating leverage will improve as we resume growth in fiscal 2019***. G&A expense increased 100 basis points to 8.5% of revenue in Q1 '18. ***The year-over-***

83

> *year G&A variance, mostly resulted from the impact of labor costs, which are supporting our expanding scale to address growth initiatives.*

266.    Defendant Nielsen assured investors that any softness in its reported revenue would abate in the near term as Dycom's initiatives increased:

> Customers are consolidating supply change, creating opportunities for market share growth and increasing the long-term value of our maintenance business. ***In addition, we are increasingly providing integrated planning, engineering and design, procurement and construction and maintenance services, creating more visibility around future revenue streams.***
>
> Within this context, we believe we are uniquely positioned, managed and capitalized to meaningfully experience an improving industry environment to the benefit of our shareholders. While we are disappointed with some current revenue softness, ***we see that softness abating in the near-term*** and remain encouraged that our major customers possess significant financial strength and are committed to multi-year capital spending initiatives.
>
> ***These initiatives are increasing in number across multiple customers***. An improved regulatory environment is increasingly supportive of these initiatives. We remain confident in our strategies, the prospects for our company, the capabilities of our dedicated employees and the experience of our management team as we grow our business and capitalization.

267.    Defendant Nielsen repeated the same materially false and misleading statements and omissions in ¶266 above during the February 28, 2018 Call.

268.    On November 20, 2017, Wells Fargo concluded that the "slowdown in revenue has clearly been driven by weak activity from AT&T (rev declined -38%+ yoy)" but that "significant customer demand" was increasing Dycom's backlog and to expect "revenue growth [to] begins to ramp."

269.    The above statements in ¶¶265-67 were materially false and misleading when made because, unbeknownst to investors, Dycom's decrease in revenue, margins, and operating performance was the direct result of: (i) Dycom's failure to submit, correct, or obtain the required permits to commence and complete its customers' projects, which resulted in substantial project

delays and/or customers cancelling their contracts with Dycom; and (ii) an insufficient number of workers to commence and complete customer projects on time, which further contributed to customers cancelling their contracts with Dycom.

270.     Further, according to confidential sources the unnecessary and prolonged delays culminated in the cancellation of numerous projects by customers, including: (i) the loss of a $55 million, 10-year contract with Verizon in February 2018 due to Dycom's disorganization and delayed completion times (CW7); (ii) the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2); (iv) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (v) Google cancelling a $500 million contract between August and October 2017 due to permit delays in Texas (CW10).

271.     Other cancelled contracts include: (i) AT&T withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (ii) Verizon cancelling a contract in Texas in November 2017 due to inadequate staffing (CW10); (iii) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); (iv) losing an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11); (v) AT&T withholding $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); and (vi) losing a Verizon contract in Texas for 500,000 miles in early 2018 (CW8).

272.     Furthermore, Dycom was forced to delay revenue recognition that put significant pressure on the Company's margins because it was not completing its customer projects. This

includes delayed revenue as a result of: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (iv) delays occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's disorganization (CW7); (v) delays on the Verizon project in Tennessee in early 2018 (CW1); and (vi) delays occurring in Ohio on the Verizon One Fiber project between January and March of 2018, which resulted in two Ohio cities denying Dycom permits entirely (CW12).

273.    Defendants' representations that Dycom's future outlook was based on increasing initiatives that Defendants were confident about were materially false and misleading for the same reasons specified above, ¶¶269-72.

274.    This pattern of materially false and misleading representations repeated itself only three months later. On February 12, 2018, Dycom issued a press release announcing that it was lowering expectations for second quarter fiscal 2018 and first quarter fiscal 2019 and providing guidance for fiscal 2019 ("February 12, 2018 Press Release"). The February 2018 Press Release was also attached as an exhibit to Dycom's Form 8-K filed with the SEC that same day.

275.    In the February 12, 2018 Press Release, the Company explained that the lowered first quarter guidance was due to *"[w]idespread adverse weather [that] reduced the number of available workdays and negatively impacted productivity and margins during the quarter ended January 27, 2018*." Dycom also stated that margins were "*also impacted by costs incurred in conjunction with the initiation of large customer programs*."

276.     Tempering the Company's declining revenue for the quarter, the February 12, 2018 Press Release disclosed the following guidance for fiscal 2019 and quarter ending April 28, 2018:

|  | Fiscal 2019 | Quarter Ending April 28, 2018 (Q1-19) |
|---|---|---|
| Contract revenues | $3.30 - $3.50 billion | $720 - $750 million |
| Diluted Earnings per Common Share - GAAP[1] | $4.78 - $5.70 | $0.52 - $0.67 |
| Non-GAAP Adjusted Diluted Earnings per Common Share[1] | $5.22 - $6.14 | $0.63 - $0.78 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 10.7% - 11.1% |

277.     Following Dycom's press release, Canaccord Genuity issued a report on February 12, 2018 indicating that the message to investors was received: the Company "came in below guidance" because of "weather, which lowered the available work days and profitability on work." In other words, there was no indication that the shortfall could be due to project delays or customer cancellation of contracts.

278.     Stephens noted in a February 12, 2018 report that Dycom was negatively impacted by weather as well, but stated it was "encouraged by the outlook DY has provided for FY19 that show the widely anticipated ramp in DY's business as the year progresses."

279.     The February 28, 2018 Presentation repeated similar reasons for the second quarter 2018 financial performance:

> *Operating performance impacted by widespread adverse weather and costs incurred in conjunction with the initiation of large customer programs.*

280.     With respect to future outlook, Defendant Nielsen told investors to expect substantial growth during the February 28, 2018 Call:

**Robert J. Burleson** *Canaccord Genuity, Inc.*

87

Great. And then, are there any particular - is there a particular quarter we should be thinking about where those kind of front-end costs might be a little bit more compressed into one quarter? Or is it kind of a linear ramp throughout the year?

**Nielsen**:

No. I think you'll see as Drew's comments indicated, I mean *you're going to see pretty substantial revenue growth to get to our full year guidance in the second, third, and fourth quarters.* And I think at that point, we'll be in a position where we're absorbing those costs based on that increased run rate.

281.     The March 6, 2018 Presentation similarly explained that Dycom's "Margin outlook for Q1-2019 *reflects anticipated timing of activity on large customer programs* and the related impacts on margins as well as *near-term weather impacts*"

282.     Deutsche Bank commented on March 13, 2018 that, after "host[ing] meetings with the CEO of Dycom," its "biggest near-term takeaway was that DY's fiscal 2019 guidance is conservative." Deutsche Bank cited "the roll-out of Fixed Wireless by Verizon" and "DOCSIS Full Duplex" by cable companies were "two significant events in the 5G/fiber cycle that drive the uptick in communications construction spending."

283.     The above statements in ¶¶275-77, 279-81 were materially false and misleading and contained material omissions for the reasons specified in ¶¶269-72 above, as well as because: (i) in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Georgia which was worth "a lot" of money (CW4); and (ii) in spring or early summer of 2018, the AT&T fiber project in Nashville, Tennessee was delayed because permits were not filed on time (CW1).

284.     The March 2, 2018 Transition Report misleadingly identified a decrease in revenue during the six months ended January 27, 2018 as being due to weather conditions, labor and subcontractor costs, and the initiation of customer projects:

*Costs of Earned Revenues.* Costs of earned revenues decreased to $1.141 billion, or 80.9% of contract revenues, during the six months ended January 27, 2018, compared to $1.176 billion, or 78.4% of contract revenues, during the six months ended January 28, 2017. ***The primary components of the decrease were a $34.0 million aggregate decrease in direct labor and subcontractor costs and a $14.1 million decrease in direct material costs, primarily due to a lower level of operations.*** Partially offsetting these decreases, equipment maintenance and fuel costs combined increased $4.8 million and other direct costs increased $8.4 million.

Costs of earned revenues as a percentage of contract revenues increased 2.5% during the six months ended January 27, 2018, compared to the six months ended January 28, 2017. As a percentage of contract revenues, labor and subcontracted labor costs increased 1.3% during the six months ended January 27, 2018. ***The increase in labor and subcontracted labor costs as a percentage of contract revenues primarily resulted from costs incurred as the scale of our operations expanded and from widespread adverse weather*** which reduced the number of available workdays and negatively impacted productivity and margins during the fiscal quarter ended January 27, 2018*.* Equipment maintenance and fuel costs combined increased 0.6% as a percentage of contract revenues from under absorption of equipment costs and increased fuel costs relative to the mix of work. ***Additionally, direct material costs and other direct costs increased 0.5% as a percentage of contract revenues, on a combined basis, reflecting lower operating leverage and the impact of costs associated with the initiation of customer programs, including permitting costs.***

285.     The Transition Report similarly repeated:

Revenues decreased by approximately $153.3 ***million as a result of moderation by a large telecommunications customer*** during the six months ended January 27, 2018. Revenues also decreased by approximately $50.3 million ***for services performed on a customer's fiber network*** and by approximately $35.7 million ***for services performed for a telecommunications customer in connection with rural services.***

286.     The above statements in ¶¶284-85 were materially false and misleading and contained material omissions for the reasons specified in ¶283 above.

## VII.    THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES

### A. The May 22, 2018 Partial Corrective Disclosure That Dycom Experienced Significant Margin Pressure in Q1 and Would Be Reducing Future Forecasts as a Direct Result of Previously Undisclosed Permitting Issues

287.    On May 22, 2018, before the market open, Dycom issued a press release (the "May 2018 Press Release") announcing the Company's first quarter fiscal 2019 results and revealing for the first time that Dycom would be lowering its guidance for the 2019 fiscal year as a result of the "anticipated timing of activity on large customer programs and the related impacts on revenues and margins," stating, in relevant part:

**Outlook**

**The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the actual results for the quarter ended April 28, 2018** and the anticipated timing of activity on large customer programs and the related impacts on revenues and margins. The Company's previous guidance and its current expectations for fiscal 2019 are as follows:

|  | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 |
|---|---|---|
| Contract revenues | $3.30 - $3.50 billion | $3.23 - $3.43 billion |
| Diluted Earnings per Common Share - GAAP | $4.78 - $5.70 | $3.81 - $4.70 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $5.22 - $6.14 | $4.26 - $5.15 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 12.4% - 12.9% |

288.    That same day, also before market open, Dycom held an earnings call to discuss the Company's financial results for the first fiscal quarter ended April 28, 2018 ("May 22, 2018 Call").

289.    During the Q&A session of the call, in response to an analyst inquiry about Dycom's disappointing margins, Defendant Nielsen revealed for the first time that the reason for the pressure on Dycom's margins was because the Company **did not have enough work in hand**

***to absorb the costs it had already incurred on large projects***, mainly because ***Dycom was facing permitting issues***:

> **Charles Matthew Duncan** - *Stephens Inc., Research Division*
>
> So, Steve, obviously the big question on everyone's mind this morning is the pressure on margin and a little more specifics around what's causing it. And it sounds like you're still expecting a big ramp in the business, the timing has maybe changed a little bit. But I think what we're all trying to get at is, a little more specific around the near-term margin pressure, and do you believe you can still get this business back to a mid-teens EBITDA margin, once things ramp up and you are better absorbing those costs?
>
> **Nielsen**:
>
> So to the second question, Matt, yes. I mean, we have not changed our view on mid-teens EBITDA. With respect to the pressure on the business, **we have a number of large programs, some of which require extensive permitting and other governmental authorities. We've been through this before,** the timing of when you build up a cadence in that process will allow you to efficiently deploy resources. . . . . **We just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management, as well as be efficient in the field as we get more permitted backlog that we can really go to work on. And it's getting better every day.** It's just not getting better as quickly as we would have hoped 91 days ago.
>
> **Charles Matthew Duncan**:
>
> So is this customer shifting the timing of work or is it simply the permitting process?
>
> **Nielsen**:
>
> We're all working together with our customers, with the permitting authorities. It's just a -- these are large programs. In fact, I think they're substantial programs and that means **there is a substantial buildup in activities from the permitting authorities. And it's taking a little time, but it's getting better.**

290.    When asked directly about whether permitting issues have "been factored in into that second half ramp," Defendant Nielsen stated that "we did exactly what you're – the way you're thinking about it. "*[C]learly, the permitting issue was more impactful of growth*."

291.     In response to a question about growth from the Verizon fiber project, Defendant

Nielsen alluded to "some" permitting issues but would not elaborate other than to say all customers

are growing:

> **Noelle Christine Dilts**, *Analyst, Stifel, Nicolaus & Co., Inc.*
>
> Okay, great. And then just looking at this 82.7% growth at Verizon, I mean, for me, that was ahead of my expectations. How did that compare to what you guys were expecting internally?
>
> **Nielsen**:
>
> **Well, I mean, we're not going to comment specifically other than to say that we've had a big ramp. There's been some permitting issues and I think we'll all be happy to say we were going faster for every customer, including that one.**

292.     Upon this news regarding Dycom's unfavorable first quarter results and lowered

guidance as a result of permitting issues, the price of the Company's common stock fell $23.56

from a closing price of $116.20 per share on May 21, 2018, to a closing price of $92.64 per share

on May 22, 2018, *a drop of approximately 20.27%.*

293.     Despite the Company's lowered guidance and disclosures, Defendants

simultaneously continued to make materially misleading statements to temper the adverse news.

294.     For instance, during the May 22, 2018 Call, DeFerrari falsely represented that the

Company was "*well positioned*" and "*engaged on a broad range of large customer programs,*

*which are expected to drive meaningful growth in the back half of the fiscal year*." DeFerrari

further misleadingly stated that the Company "*expect[s] accelerating fiber deployments for*

*emerging wireless technologies, increasing wireless services and solid demand from several*

*large customers reflecting 1 gigabit deployments and fiber deep cable capacity projects*." Thus,

according to DeFerrari, the margin "*pressure dissipates as the year goes on*."

295.     Despite that Dycom was experiencing persistent project delays and, as a result, its

largest customers, including Verizon and A&T, as well as others were cancelling contracts,

Defendant Nielsen falsely represented that Dycom still planned to execute on all of its projects:

> It's hard to forecast. I mean, we understand that and we're disappointed that we
> didn't get it as right as you would have liked last quarter. ***But that doesn't change,
> that the projects are there that we're confident in our ability to execute.***

296.     Defendant Nielsen also confirmed DeFerrari's promise of meaningful future

deployments and better second quarter results, and falsely claimed that Dycom's largest customers

were increasing their capital spending resulting in more business for Dycom when, unbeknownst

to investors, the opposite was true and customers were canceling contracts:

> While we are disappointed with current revenue and margin softness and the
> adjustment to our near-term outlook, ***we see that softness abating in the second
> half of the fiscal year and remain encouraged that our major customers possess
> significant financial strength and are committed to multiyear capital spending
> initiatives. These initiatives are increasing in number across multiple customers.***
> And improved regulatory environment is supportive of these initiatives. ***We remain
> confident*** in our strategies, the prospects for our company, the capabilities of our
> dedicated employees and the experience of our management team as we grow our
> business and capitalization.

297.     The statements in ¶¶294-96 above were materially false and misleading when made

because in reality, the permitting issues Dycom alluded to were far worse than represented and, in

fact, were not being caused by municipalities being slow to process permit applications but, rather,

were due to Dycom-specific delays in failing to submit, correct, and/or obtain the required permits

to commence and complete its customers' projects, which resulted in substantial project delays or

customers cancelling their contracts with Dycom.

298.     In fact, at or around the time of Defendants' statements above, Dycom's project

delays caused: (i) Verizon to cancel 2,000 miles of the 3,000 mile contract in March or April of

2018 (CW4); (ii) Time Warner to cancel its contract in Texas in the summer of 2018 (CW8); (iii)

AT&T to withhold $20-$30 million worth of work in Texas throughout 2018 (CW7); and (iv) lost work on the AT&T contract in Texas throughout the Class Period (CW8).

299.     At the time of these statements, Dycom was also experiencing the following project delays: (i) Verizon One Fiber contract in Louisville, Kentucky, Indianapolis, and Ohio, from May 2018 throughout the Class Period (CW5); (ii) AT&T fiber project in Nashville, Tennessee, in spring or early summer 2018; (iii) CenturyLink contract in Cape Coral, Florida, throughout the Class Period until June 2018 (CW12); and (iv) Zayo contract in Texas throughout 2018 (CW7).

300.     Defendants continued to make materially false and misleading statements during the May 22, 2018 Call. For instance, Defendant Nielsen assured investors that project construction was underway and was expected to "accelerate" and that Dycom was positioned to deliver on customer contracts and provide "robust" returns to shareholders:

> In addition, we have secured a number of converged wireless/wireline multi-use network deployments across the country. ***Planning, engineering, and limited construction have begun. Engineering and construction activity is expected to increase and accelerate throughout 2018***. Customers are continuing to reveal with specificity new multi-year initiatives that are being planned and managed on a market-by-market basis. ***Our ability to provide integrated planning, engineering and design, procurement, and construction and maintenance services is of particular value to several industry participants.***
>
> As with prior initiations of large-scale network deployments, we expect some normal timing volatility and customer spending modulations, as network deployment strategies and technologies evolve and tactical considerations, primarily permitting, impact timing. ***We remain confident that our competitively unparalleled scale and market share, as well as our financial strength, position us well to deliver valuable service to our customers and robust returns to our shareholders.***

301.     Nielsen, however, omitted from his statement that there were substantial delays occurring at the outset of these large programs that were preventing Dycom from commencing and completing. Indeed, as Defendants would later admit, permitting issues were causing material delays that would later cause Dycom to lower its guidance once again.

302.     DeFerrari similarly continued to falsely represent that these opportunities were about to take off:

> Going to our outlook on slides 10 and 11, for fiscal 2019, ***we are engaged on a broad range of large customer programs, which are expected to drive meaningful growth in the back half of the fiscal year.*** Based on our Q1 2019 actual results and current expectations of the timing of activity on these programs, we have tempered our annual guidance. And for the full year, we currently expect revenues which range from $3.23 billion to $3.43 billion.
>
> ***We expect accelerating fiber deployments for emerging wireless technologies, increasing wireless services and solid demand from several large customers,*** reflecting 1 gigabit deployments and fiber deep cable capacity projects.

303.     Nielsen further touted that Dycom "maintained ***strong customer relationships*** throughout our markets," that "[f]iber deployments in contemplation of emerging wireless technologies ***have begun*** in many regions of the country," a "significant number of new project initiations ***are occurring***," and that wireless construction acidity "is poised to accelerate." Nielsen assured investors that "we think ***we'll be able to execute on the work that we provided***."

304.     The statements in ¶¶300-03 above were materially false and misleading because, rather than accelerate and begin projects, Dycom's customers were cancelling contracts due to missed deadlines. Further these statements are false and misleading for the same reasons specified in ¶¶297-99 above.

305.     Also, on May 22, 2018, attached as exhibit 99.2 to the May 22, 2018 Press Release, Dycom filed an investor presentation with the SEC, titled "The People Connecting America: 1st Quarter Fiscal 2019 Results Conference Call" (the "May 22, 2018 Presentation"). The May 2018 Presentation identified Defendants Nielsen and DeFerrari as participants. The May 22, 2018 Presentation falsely represented that Dycom had "***Strong*** revenue base, ***customer relationships*** and profitable results," "***Durable Customer Relationships,***" and that "[*a*] ***significant number of new project initiations are occurring***."

306.     Although Dycom lowered its guidance, analysts were convinced by Defendants' tempered statements that the earnings reduction was limited to the first half of the year and that that the second half of the year would be stronger than ever. For example, Canaccord Genuity, wrote on May 22, 2018:

> While management reduced guidance for fiscal 2019 (Jan) during todays Q1 release and conference call, we expect the stock to recover **given the majority of the guidance reduction was weighted to the first half, with a strong second half ramp implying a strong fiscal '20.** Customer spending plans remain robust to support new technologies including 5G and FirstNet in what we expect to be a decade-long investment cycle.

307.     Stephens noted on May 22, 2018 the "disappointing" results, lower profit guidance, and declining backlog, but remarked that "[c]learly there are a number of questions that need to be answered here. That said, **we continue to expect a significant ramp** in DY's business in calendar 2018 and into 2019."

308.     Wells Fargo wrote on May 22, 2018 that "[w]hile we understand the share pressure today, we remain optimistic about DY's overall fiber opportunity **once we get beyond some of these factors outside of its control** (zoning, permitting, weather, etc.)."

309.     Deutsche Bank similarly noted on May 23, 2018 that, despite the disappointing earnings, they believed the "telecoms spending cycle remains intact, although it may kick-off slightly later than expected – **mgmt. cited delays related to permitting that could shift some activity by a quarter or two**."

310.     A May 23, 2018 Wells Fargo reports similarly concluded that "revenue acceleration is coming, but perhaps one quarter later than we expected."

**B. The August 13, 2018 Second Partially Corrective Disclosure Revealing for the First Time the Permitting Issues Were Far Worse Than Previously Represented and Were Not Temporary**

311.     Despite Defendants' prior assurances that the revised guidance fully accounted for permitting delays and that such delays were not Dycom-related, on August 13, 2018, before market open, Dycom issued a press release once again lowering the Company's guidance for second quarter fiscal 2019 and full year 2019 even further (the "August 13, 2018 Press Release"). The press release revealed, for the first time, that the permitting issues were not temporary, were not the result of circumstances out of Dycom's control, would not be overcome in the second half of the year, and were worse than investors expected:

**DYCOM INDUSTRIES, INC. LOWERS EXPECTATIONS FOR FISCAL 2019 SECOND QUARTER RESULTS AND GUIDANCE FOR THE FULL FISCAL YEAR, AND PROVIDES GUIDANCE FOR THE NEXT FISCAL QUARTER**

Palm Beach Gardens, Florida, August 13, 2018 - Dycom Industries, Inc. (NYSE: DY) announced today **that revenues and results for the quarter ended July 28, 2018 will be below previous guidance**. The Company's previous guidance and its preliminary results are as follows:

|  | Previous Guidance Quarter Ended July 28, 2018* | Preliminary Results Quarter Ended July 28, 2018 (a)(b) |
|---|---|---|
| Contract revenues | $830 - $860 million | $799.5 million |
| Diluted Earnings per Common Share - GAAP | $1.02 - $1.17 | $0.94 - $0.97 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $1.13 - $1.28 | $1.05 - $1.08 |
| Non-GAAP Adjusted EBITDA % of contract revenues | 12.4% - 12.8% | 12.0% - 12.2% |

\*          \*          \*

**Outlook**

**The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the preliminary results for the fiscal 2019 second quarter and the current expectations for the remainder of the fiscal year**. The revised financial guidance is preliminary and will be updated, as necessary, in the

97

Company's fiscal 2019 second quarter results release scheduled for Wednesday, August 29, 2018. The Company currently expects the following:

| | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 (a) |
|---|---|---|
| Contract revenues | $3.23 - $3.43 billion | $3.01 - $3.11 billion |
| Diluted Earnings per Common Share - GAAP | $3.81 - $4.70 | $2.17 - $2.62 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $4.26 - $5.15 | $2.62 - $3.07 |
| Non-GAAP Adjusted EBITDA % of contract revenues | 12.4% - 12.9% | 10.7% - 11.1% |

312.     That same day, before market open, Dycom held a conference call to discuss the lowered guidance for second quarter fiscal 2019 and full fiscal year 2019, as well as to discuss the guidance provided for third quarter fiscal 2019 (the "August 13, 2018 Call"). During the August 13, 2018 Call, Defendant Nielsen admitted that "[t]hese preliminary results were impacted by large-scale deployments that were slower than expected during the quarter **due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs at a lower revenue level**." In other words, delays in Dycom's large customer contracts were far worse than represented and had caused significant pressure on the Company's margins as a result of unrecouped costs and delayed or lost revenues from project delays and/or cancellations.

313.     When asked during the Q&A session of the call about permitting and absorption issues, Defendant Nielsen disclosed that the large projects were not ramping-up as investors were told due to "**greater uncertainties**," primarily related to permitting issues, materially impacting Dycom's business:

**Alexander John Rygiel** - *B. Riley FBR, Inc.*:

Steve, your comment with regards to tactical considerations, primarily permitting, can you expand upon that just a little bit as it relates to how this tactical

consideration due to permitting maybe is different than maybe past FiOS builds or fiber builds in the mid-2000s?

**Nielsen**:

Yes. I think, Alex, as we said in May, **these are big programs**. They're ramping up broadly. **They're subject to greater uncertainties, and those are the uncertainties that impacted the second quarter**. I mean, they will resolve, but there are uncertainties because of the size of the programs.

**Alexander John Rygiel**:

And then as it relates to cost pressures in the short term, can you expand upon that a little bit, too, and maybe address sort of your thinking on headcount in the short term? Do you carry headcount in anticipation of the big backlog and how that can come through next year? Just a little bit more detail would be helpful.

**Nielsen**:

Sure. So I think, as we said in the comments, it's really an absorption question. We have to have the staff in place to support the revenue that's embedded in the guidance, and we do, but **we're not as busy as we had expected to be. And so that created an absorption question**, but because the work is there, we have to have the people.

314.     Expressing their frustration, analysts and investors commented that the Company "seem[s] to **miss on quite a few numbers by a long shot** . . . . it seems like the kind of business where it should be fairly predictable and it's not," and "It's getting a little frustrating as an investor, I've just got to say." One analyst commented that **the problems here seemed to be unique to Dycom**, stating "it doesn't seem like others are seeing the same kinds of delays or to the magnitude, perhaps."

315.     In an August 13, 2018 research report, Wells Fargo commented that "DY remains a 'show me' story and will need to show more tangible evidence that customer demand patterns are picking up for the stock to work." Deutsche Bank stated that Dycom "has little visibility."

316.     Craig-Hallum Capital Group LLC commented in an August 14, 2018 research report that Dycom's "**management was evasive** in answering questions regarding its business outlook, timing issues, or even its backlog improvement." Craig-Hallum then lowered its fiscal

year 2020 estimates and noted that "until the company is ready to give investors further clarity on its business outlook" there will be a wide range of analyst expectations.

317.     On this news, the price of Dycom's stock fell $21.62 from a closing price of $89.71 per share on August 10, 2018, to a closing price of $68.09 per share on August 13, 2018, *a drop of approximately 24.10%*.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

318.     As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

319.     The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Dycom and, thus, controlled the information disseminated to the investing public in the Company's press releases, investor conference calls, and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

320.     Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Dycom as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

**A. The Individual Defendants knowingly and/or recklessly made material misstatements and/or omitted material facts**

321.     The Individual Defendants knew that Dycom was experiencing significant project delays, shortfalls in the workforce, cancelled contracts, and revenue shortfalls because: (i) they attended daily, weekly, and monthly meetings discussing the progress of customer projects; (ii) they had access to each subsidiaries' daily reports, which tracked the progress of each ongoing project and which Dycom could directly access; (iii) they had access to the Company-wide Verizon Tracking System, which reported the progress of all Verizon projects; (iv) the telecommunications business was Dycom's "core" business and the project delays pertained to key customers; and (v) Dycom had exclusive control over revenue reporting and customer invoicing, both of which were determined based on how much of a project was completed.

**i. The Individual Defendants had knowledge of Dycom's project delays and revenue shortfalls through monthly meetings**

322.     The Individual Defendants were aware of project delays, cancelled contracts, and lost revenue through regular meetings held with Dycom's subsidiaries.

323.     According to CW9, Defendant Nielsen participated in monthly telephonic meetings with Dycom's COO, Estes, and the president of each of Dycom's subsidiaries that discussed, among other things, how certain jobs were going, customer contracts that were lost as well as permitting issues that were experienced. According to confidential sources, all of the subsidiary presidents were aware of the permit delays, project delays and cancellations and staffing issues at their particular subsidiary because, as discussed below, they had access to various daily reports, attended meetings were such information was discussed, or received reports from subordinates regarding this information. According to Dycom, management from each of Dycom's subsidiaries reports to the Company's COO, Tim Estes, who reports to Defendant Nielsen. Thus, the Individual

Defendants became aware of the issues during these monthly calls based on the reporting structure in Dycom.

324.     Accordingly, by virtue of these monthly meetings, Defendant Nielsen would have discussed and been fully aware of the permitting, work staff, and project delays that were plaguing the Company, as well as the resulting loss in customer contracts and revenue. This includes project and revenue delays or cancellations from key customers, including: (i) the loss of a $55 million, 10-year contract with Verizon in February 2018 due to Dycom's disorganization and delayed completion times (CW7); (ii) the loss of a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2); (iv) the loss of two of One Stream's contracts in Iowa in October 2017 (CW2); and (v) Google cancelling a $500 million contract between August and October 2017 due to permit delays in Texas (CW10); (vi) AT&T withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (vii) Verizon cancelling a contract in Texas in November 2017 due to inadequate staffing (CW10); (viii) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); (ix) losing an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11); (x) AT&T withholding $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); (xi) losing a Verizon contract in Texas for 500,000 miles in early 2018 (CW8); (xii) in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Atlanta, Georgia which was worth "a lot" of money (CW4); and (xiii) Time Warner to cancel its contract in Texas in the summer of 2018 (CW8). *See* attached Appendix.

325.       Furthermore, the Individual Defendants would have been aware of project delays
due to delayed revenue as a result of: (i) delays occurring across all projects in Mississippi from
August 2017 to December 2017 (CW2); (ii) delays occurring on the AT&T FTTX project in
Florida starting prior to the Class Period until at least February 2018, which resulted in delayed
revenue of up to $2-$7 million each month (CW6); (iii) delays occurring on the CenturyLink
project in Cape Coral, Florida starting prior to the Class Period until June 2018 (CW12); (iv) delays
occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's
disorganization (CW7); (v) delays on the Verizon project in Tennessee in early 2018 (CW1); (vi)
delays occurring in Ohio on the Verizon One Fiber project between January and March of 2018,
which resulted in two Ohio cities denying Dycom permits entirely (CW12); (vii) in spring or early
summer of 2018, the AT&T fiber project in Nashville, Tennessee was delayed because permits
were not filed on time (CW1); and (viii) delays on the CenturyLink contract in Cape Coral, Florida,
throughout the Class Period until June 2018 (CW12). *See* attached Appendix.

### ii.  The Individual Defendants had knowledge of Dycom's project delays and revenue shortfalls through daily and weekly meetings

326.       The Individual Defendants were also aware of the pervasive delays and cancelled
contracts because, as confidential sources explain, they were in constant contact with management
of their subsidiaries. *See* Attached Appendix.

*Knowledge of Delays and Cancellations at Star and Tesinc*

327.       The Individual Defendants were aware of delays and project cancellations at Star
and Tesinc because members of Dycom's management frequently held meetings with these
subsidiaries to discuss project status.

328.       According to CW12, starting in December of 2017, Tesinc, Dycom, and Star held
telephonic meetings every Monday and Wednesday morning to discuss the status of the Verizon

One Fiber project and permits. Tesinc distributed packages, presentations, and excel spreadsheets showing, among other things, ongoing projects, the progress of the project, and potential problems. In addition to others, Tom Bones, VP of Star who reported to Dycom, David Hamlin, PMO Manager of Star, Murray Strauss from Star, Scott Faith, Dycom's former Director of Program Management, Duwayne Backens, Program Manager of Tesinc, Tommy Farmer, VP of Tesinc, CW12, Brandt, and Kowalsky all participated in these meetings. CW12 believes there may have been others as well. According to CW12, Dycom "was aware. Annoying so" of the permit delays by virtue of these meetings.

329.     Further, pursuant to Dycom's publicly stated reporting structure, the management level employees who attended these meetings were required to report to the Individual Defendants. Accordingly, Dycom was aware of the permit issues in Ohio and Kentucky on the Verizon One Fiber project, including that Norwood and St. Bernard forbade Tesinc from obtaining permits and conducting work sometime between January and March of 2018, resulting in the loss of a "significant" amount of work. The Individual Defendants were also aware of the delays occurring on the CenturyLink project in Cape Coral, Florida starting prior to the Class Period until June 2018.

330.     CW12 also recalled that Brandt and Foxx from Tesinc were reporting to and holding meetings with Dycom "all the time," either telephonically or by email. According to CW12, Phil Brandt and Steve Foxx informed CW12 that "everything we do, we should be connecting with Dycom." These communications occurred at least on a weekly basis and probably every other day. CW12 recalled that Scott Faith, the former Director of Program Management at Dycom, David Naro, the current Director of Program Management at Dycom, and Duwayne Backens were a part of these meetings. CW12 stated that during these meetings Brandt and Foxx

104

would inform Dycom of project status updates, including the loss of access to Norwood and St. Bernard. CW12 that Brandt and Foxx would be on the phone with Dycom as well as Larry Schwng and Marcus Loof from Verizon discussing issues such as these.

331.     CW12 recalled that there were also times there Dycom would "pop into meetings" on the phone or show up at Tesinc's office from time to time. When they showed up at the office, they would be walking with President Bill Ptak and Vice President Tommy Farmer.

332.     Accordingly, the Individual Defendants were aware of the project delays in Florida occurring on the CenturyLink account beginning prior to the Class Period until June 2018, and were also aware of the permit issues in Ohio and Kentucky on the Verizon One Fiber project, including that Norwood and St. Bernard forbade Tesinc from obtaining permits and conducting work sometime between January and March of 2018, resulting in the loss of a "significant" amount of work.

333.     At Star, according to CW5, he, as well as Tom Bones and at least one attendee from Dycom, including Andy Jaco from Dycom participated in weekly meetings. Beginning in mid-September 2018, these calls changed from weekly to daily because the permit delays "got so bad." In addition, Tom Bones, who reported directly to Dycom, also called two meetings in August and September of 2018 to discuss the permit delays. CW5 attended this meeting along with Tom Bones, Dave Hamlin, Mindy Piper, Nicole Kirby, and the Verizon Project Manager. Accordingly, Dycom was aware of the permit issues in Ohio and Kentucky on the Verizon One Fiber project, including that Norwood and St. Bernard forbade Tesinc from obtaining permits and conducting work sometime between January and March of 2018, resulting in the loss of a "significant" amount of work.

334.      CW1, also a Star employee, stated that Dycom was "constantly" having management meeting with both Christine Brew and Tony Sook from Star in person and via teleconference where the statuses of projects were discussed. Accordingly, Dycom was aware of the project delays due to permits on the AT&T account in Nashville, Tennessee as well as the fact no activity was occurring on the Verizon account in Tennessee.

335.      Upon information and belief, regular meetings were held between Dycom and all of Star's locations, where the Individual Defendants would have known about: (i) delays occurring across all projects in Mississippi from August 2017 to December 2017 (CW2); AND (ii) the loss of One Stream's contract in October of 2017, which generated $5-$10 million worth of yearly contract revenue (CW2).

*Knowledge of Delays and Cancellations at Texstar*

336.      CW8 explained that, during the Class Period, it was an "everyday occurrence" for Dycom to communicate with Texstar.  Chris Howard, Texstar's President, and Larry Rucker, Senior VP of Operations, would speak to Dycom about profits and losses and what was being done or not being done on projects. According to Dycom's public statements, Howard and Rucker would have reported directly to the Individual Defendants.

337.      Discussions during these meetings concerned the loss of both the AT&T and Verizon contracts. CW8 stated that Greg Lacy and Pete Espinoza, VP, also regularly consulted with Dycom as well. CW8 recalled that Howard, Rucker, and Espinoza would travel to Dycom's headquarters "all the time" and Dycom would also come to Texstar's office. Further, if there were any delays or a problem with a project, that information was given directly to Howard and Rucker.

338.      Accordingly, Dycom was aware that: (i) AT&T was withholding work in Texas on the FTTX project throughout the Class Period due to inadequate staffing (CW8); (ii) Texstar lost

a $10 million contract with Spectrum in October of 2017 due to permit delays caused by not having any staff (CW7); (iii) AT&T withheld $20-$30 million worth of work in Texas throughout 2018 as a result of Texstar's disorganization (CW7); (iv) delays were occurring on the Zayo project in Austin and San Antonio, Texas throughout 2018 due to Dycom's disorganization (CW7); (v) Texstar lost a Verizon contract in Texas for 500,000 miles in early 2018 (CW8); (vi) Texstar lost a $55 million, 10-year contract with Verizon in February 2018 due Dycom's disorganization and delayed completion times (CW7); and (vii) Time Warner cancelled its contract in Texas in the summer of 2018 (CW8).

*Knowledge of Delays and Cancellations at Ansco, Ivy, and Engineering Associates*

339.    CW3 explained that Ansco's $75 million AT&T contract was handled by COO Estes, George Summers, President of Ansco, and Dubi Kazula, VP of Wireless Operations, all of whom discussed the matter together. Summers reported to the Individual Defendants. Accordingly, George Summers would have also informed the Individual Defendants that: (i) "a significant portion [of AT&T cell tower work] in Florida and Texas" was lost at the end of 2017 in Florida, Texas, and North and South Carolina (CW11); and (ii) Ansco lost an AT&T project at the end of 2017 in Georgia, worth $20-$30 million in billable revenue each month, due to delays (CW11).

340.    CW6 explained that because of the delays on the AT&T FTTX project, Ivy and AT&T held meetings twice a week to discuss the status of the project. Those participating in these calls included AT&T, CW6, VP Cevin Ferguson, and District Manager Chris Shaddock. Ferguson and Shaddock reported to Summers. Summers participated in weekly calls with the Vice Presidents and senior district managers of every state and region to discuss Ivy and Ansco's finances. Summers would then report to the Individual Defendants during the monthly meetings. Accordingly, the Individual Defendants were aware that there were delays occurring on the AT&T

FTTX project in Florida starting prior to the Class Period until at least February 2018, which resulted in delayed revenue of up to $2-$7 million each month.

341.    CW4 also stated that at Engineering Associates he raised permit issues and "a lot of heck" with Mike Martin, the Vice President of Engineering and Operations at Engineering Associates, in closed door meetings. Martin reported to VP who reported to the Individual Defendants. Accordingly, the Individual Defendants were aware that in March of April of 2018, Verizon cancelled 2,000 of the 3,000 mile contract with Dycom in Georgia which was worth "a lot" of money.

### iii.    The Individual Defendants had knowledge of Dycom's project delays and revenue shortfalls through daily reports

342.    The Individual Defendants were aware or recklessly disregarded that Dycom was experiencing significant and costly project delays, cancelled contracts, and revenue shortfalls throughout the Class Period from the data provided to Dycom on a daily basis from its subsidiaries. These reports contained data outlining the progress of every project of Dycom's subsidiaries as well as financial information. Furthermore, Dycom *mandated* the program that some of its subsidiaries were to use and had direct access to such programs. Collectively, this data was accessible by Dycom or sent to Dycom and showed the substantial project delays and revenue shortfalls that were occurring nationwide. Further, as described by CW5, "Everything they do, period, is based on trackers. They are a data mine company." Accordingly, these reports were highly material to Defendants.

343.    For instance, at Star, Dycom had access to daily reports showing project delays. CW5 explained that Star in Kentucky entered its project data into the Daily Report, which tracked, among other measures, the status of all of Star's projects, the amount of work construction crews completed, how much manpower the crews had, and how many feet of installation Star completed.

CW5 stated that the Daily Report was a Google Notes document that he provided to Tom Bones, the VP of Star Construction, who was required to provide the report to Dycom on a daily basis.

344.     CW5 also stated that Star's had three internal tracking systems.  The first tracker, the Construction Manager Tracker, contained daily and weekly information about what was actually physically done on projects, including the percentage of work completed. The second tracker, the Project Coordinator tracker, was a real-time tracker fed by the Construction Tracker which contained overall information about project permits, design, construction, and progress. This included information on whether or not a permit was submitted and the expected response date from the permit authority. Third, the Master Tracker, or "Star Tracker," contained a "look ahead" and projected project deadlines, including the shot calls. The Master Tracker would reflect whether Star was behind on any of its projected timelines for its projects.

345.     Dycom, Piper, Hamlin, Bones and CW5 had access to the Master Tracker and Kirby had access to the Project Coordinator Tracker. All of these trackers were created in Excel and housed in google docs.  According to CW5, everyone used these programs, from the design team, to construction, to foreman.

346.     CW1 similarly explained that all of Star's hubs were required to use Dycom's CPS program, or the "whip system," starting in early 2017, which recorded all day-to-day transactions and flowed into the accounting software, Solomon. This program was able to track the progress of all projects because the information, like CW5 explained, came from the "dailies," which included information reported daily from each individual employee or contractor, such as the project they worked on, labor hours, and equipment needed. Dycom, as well as Sook and Brew, had access to CPS and Solomon: Defendants simply had to click an icon on their desktop and enter their username and password to view the programs and the status of all projects.

347.     Defendants were also aware of permitting issues at Star regarding the AT&T fiber project in Nashville, Tennessee because they had access to Smartsheetss that tracked the progress of all permits, including information such as when a permit was submitted, the permit number, the area the permit covered, the permit fee, and whether the permit was approved or rejected. The Smartsheets was a cloud-based program that Dycom was invited to view and therefore had access to.

348.     Accordingly, Dycom was aware of any delays or contract cancellations involving Star, including those identified in ¶¶333-35 above. *See* Attached Appendix.

349.     The Individual Defendants also had direct knowledge of delays and contract cancellations as a result of daily reports generated at Texstar. CW8 reported that Dycom instituted its web-based program in 2017 to Texstar, "logging into Dycom," which recorded information about each project from the previous day's work. Dycom received daily sheets and work order logs every day at 9am, which acted as a progress tracker for Dycom. The work order log included where Texstar was on a job, how much work had to be completed, whether the job was completed, and whether the job was invoiced. The work order log reflected any project delays. Dycom had direct access to the work order log and daily sheets because they were stored in Dycom's system. To access them, Defendants had to log into the computer program and access the google doc containing them.

350.     CW7 similarly stated that Texstar had the "Dailies," which were scanned and e-mailed to Dycom directly on a daily basis. The Dailies included information such as what jobs were active, which crew was working, and the billable line items for each day. CW7 stated that the progress of each project, including the mileage completed, could be determined by looking at the Dailies. Field crews at each office would send their daily information to the office assistant,

who then sent them to Dycom. The Dailies were a google doc which Dycom had direct access to. If there were any errors, Dycom would ask Texstar to make changes to the information.

351.     Accordingly, the Dailies would have included information on the project delays and contract cancellations as set forth in ¶338.

352.     CW6 opined that Dycom had direct access Ivy's internal platform, Quick Base, which tracked daily operations, including production data, financial data, damage to a particular site, productivity, mileage of construction completed for any given week or month, as well as customer complaints. Users could view what stage of the process a project was in and how much mileage had been completed. Users could also create customer reports. Thus, Dycom was able to access and see the mileage of construction completed for any given project at any period of time. Dycom also used Quick Base to ensure payment on contracts. Accordingly, Defendants had knowledge of the project delays and cancellations, including those described in ¶340 above.

353.     CW3 stated that Ansco also entered daily reports into Quickbase, which kept track of projects and the progress made on each one. According to CW3, every cell site would input the POS, cost of materials, vendor selections, bid prices, site closeouts, and the price paid to vendors. This information allowed Ansco to determine revenue and costs at any given time. Accordingly, the Individual Defendants were aware of the project delays and cancellations set forth in ¶339 above.

354.     The accounts in ¶¶342-53 above are corroborated by Dycom's own admissions. Pursuant to Dycom's stated policy, "[m]anagement of the operating segments [i.e. subsidiaries] report to the Company's Chief Operating Officer who reports to the Chief Executive Officer." In other words, each of the reports above had to be provided to Timothy Estes, Dycom's Chief Operating Officer, who was then required to provide such reports to Defendant Nielsen, the CEO.

### iv. The Individual Defendants had knowledge of Dycom's delays and revenue shortfalls through the Verizon Tracking System

355.     The Individual Defendants were aware or recklessly disregarded that the Verizon One Fiber Project and other Verizon projects were experiencing significant and costly project delays, cancelled contracts, and revenue shortfalls throughout the Class Period from the data provided to Dycom through the VTS. *See* attached Appendix.

356.     The VTS was updated "every single night" and contained a series of excel spreadsheets that tracked the progress of each Verizon project. The VTS contained all project information, including project completion dates for fielding and engineering, timetables, documentation, and schedules. a databank where everyone submitted their documentation, timetables, and schedules. The VTS shows permit status and the progress of every Verizon project.

357.     According to CWs 4 and 5, Dycom was regularly accessing VTS because Dycom would invoice Verizon through the program and pay the subsidiaries. CW4 recalled that the VTS was accessible by Engineering Associates, Verizon, and Dycom employees, and all three companies had constant contact with each other as a result. Dycom had access to VTS, as did Tom Bones, who reported to Dycom. All of these trackers were created in Excel and housed in google docs, then inputted into VTS.

358.     CW5 stated that VTS was used to track payouts and the amount of work Dycom was getting. CW5 explained that when information was submitted to VTS, it was also submitted to billing at Star's Cincinnati office, which then submitted the billing information to Dycom.

359.     Accordingly, the Individual Defendants were aware of every project delay and contract cancellation involving the Verizon account.

360.     Furthermore, CW12 explained that, beginning in December of 2017, Tesinc began tracking the progress of each permit through OOF, which tracked which permits that were

submitted, the jurisdiction submitted to, the date of submission. Dycom had direct access to the program and the tracker was also sent to Dycom and Verizon, including Scott Faith and David Naro, Dycom's project managers. Every two weeks the permit tracker was sent to "a ton of people" at Tesinc, including President Bill Ptak (who reported to COO Estes) and Brandt, as well as Scott Faith, Duwayne Backens and others. It was also sent every other week to Dycom and Verizon.

> ### v. The Individual Defendants Had Knowledge of Dycom's Project Delays and Revenue Shortfalls because Dycom's Telecommunications Business Was A Highly Material Aspect of Its Business and Concerned Dycom's Largest Customers

361.    As alleged herein, Dycom derives over 90% of its revenue from its telecommunications customers and admits that "We generate the majority of our revenues from customers in the telecommunications industry." Throughout the Class Period, Defendants touted the importance of its telecommunications business, stating that it was "[i]ntensely [f]ocused on [t]elecommunications [m]arket" and that its business strategy was to "Capitalize on Long-Term Growth Drivers," meaning the advancements in the telecommunications industry:

> We are well-positioned to benefit from the increased demand for network bandwidth that is necessary to ensure reliable video, voice, and data services. Significant developments in consumer and business applications within the telecommunications industry, including advanced digital and video service offerings, continue to increase the demand for greater capacity and enhanced reliability from our customers' wireline and wireless networks. Telecommunications network operators are increasingly deploying fiber optic cable technology deeper into their networks and closer to consumers and businesses in order to respond to consumer demand, competitive realities, and public policy support. Additionally, wireless carriers are upgrading their networks and contemplating next generation mobile solutions in response to the significant demand for wireless broadband, driven by the proliferation of smart phones, mobile data devices and other advances in technology. The increasing wireless data traffic and emerging wireless technologies are driving significant incremental wireline deployments in many regions of the United States. Furthermore, significant consolidation and merger activity among telecommunications providers can also provide increased demand for our services as networks are integrated.

362.     Further, the 90% of revenue mentioned above is primarily derived from only six of Dycom's customers: Comcast, AT&T, CenturyLink, Verizon, Charter, and Windstream. Because such a high percentage of revenue is concentrated among only a few customers, Defendant Nielsen has stated that "We've got to do a really good job with those customers given that concentration, but as long as we're able to do that, our view is that we're happy to grow with those customers."

363.     Many of the Company's project delays and cancellations discussed herein involved projects from two of Dycom's key telecommunications customers: AT&T and Verizon, customers that account for 19.4% and 20.5% of Dycom's contract revenue, respectively.

364.     As a result, Dycom's telecommunications business, along with Dycom's top five revenue generating customers, constituted the Company's "core business" and a "vital corporate function" that Dycom's most senior executives are rightly presumed to have knowledge of its performance as a matter of law. The delays and contract cancellations that occurred during the Class Period concerned Dycom's telecommunications top customers and could not have occurred without the Individual Defendants' knowledge or approval.

      **vi.  The Individual Knowledge Had Knowledge of Dycom's Project Delays and Revenue Shortfalls Because They Had Exclusive Control Over Revenue Recognition and Customer Invoicing**

365.     The Individual Defendants had exclusive control over the reporting of project revenue and customer invoices, and therefore had knowledge regarding revenue associated with each customer's project. Because Dycom could only record revenue as a project was completed, the Individual Defendants were aware of revenue shortfalls due to project delays or cancelled contracts. Further, because Dycom invoiced its customers, any delays would prevent or delay invoices from being sent.

366.     As set forth in the Company's Form 10-Qs, revenue was reported as *each portion of a project was completed*. In other words, if a project was delayed or cancelled, Dycom would know right away based on the revenue recognized. Dycom's revenue is recognized as follows:

> *Revenue Recognition*. The Company performs a substantial majority of its services under master service agreements and other contracts that contain customer-specified service requirements. ***These agreements include discrete pricing for individual tasks*** including, for example, the placement of underground or aerial fiber, directional boring, and fiber splicing, each based on a specific unit of measure. Contractual agreements exist when each party involved approves and commits to the agreement, the rights of the parties and payment terms are identified, the agreement has commercial substance, and collectability of consideration is probable. The Company's services are performed for the sole benefit of its customers, whereby the assets being created or maintained are controlled by the customer and the services the Company performs do not have alternative benefits or the Company. ***Revenue is recognized over time as services are performed and customers simultaneously receive and consume the benefits provided by the Company. Output measures such as units delivered are utilized to assess progress against specific contractual performance obligations for the majority of the Company's services.*** The selection of the method to measure progress towards completion requires judgment and is based on the nature of the services to be provided. For the Company***, the output method using units delivered best represents the measure of progress against the performance obligations*** incorporated within the contractual agreements. This method captures the amount of units delivered pursuant to contracts and is used only when the Company's performance does not produce significant amounts of work in process prior to complete satisfaction of the performance obligation. For a portion of contract items, representing approximately 5.0% of contract revenues during the three months ended April 28, 2018, units to be completed consist of multiple tasks. For these items, the transaction price is allocated to each task based on relative standalone measurements, such as similar selling prices for similar tasks, or in the alternative, the cost to perform tasks. ***Revenue is recognized for these items as the tasks are completed*** as a measurement of progress in the satisfaction of the corresponding performance obligation.

367.     According to CW1, Dycom had exclusive control over revenue recognition, even for contracts that a subsidiary was performing work on. CW1 explained that Star was specifically instructed by Dycom as to how to classify revenue on its Verizon contract throughout 2018. Each month, Dycom would "send down" what the revenue should be for that month or would instruct Star to change the revenue numbers and Star would have to accept those numbers. CW1 reported

that Star did not have access to any of the primary documents or the master agreement and had "no choice whatsoever" in the revenue determination. Rather, revenue recording and calculations came directly from Dycom. CW1 believes this control was exercised across all subsidiaries with respect to the Verizon contract.

368.     Accordingly, every time a project was delayed or a contract was cancelled, the Individual Defendants were aware because they controlled revenue recognition that was directly impacted by the progress of customer projects and contracts.

369.     Similarly, Defendants controlled invoicing to its customers, which was directly impacted by project delays and contract completion. As explained by confidential sources, Dycom used the internal daily reports by each subsidiary to invoice customers. Those invoices were based on the amount of work actually completed for each customer's project. By Defendants' own admission, they controlled invoicing and delays in projects "may delay invoicing to the customer":

> Our CIEB balances are maintained at a detailed task-specific level or project level and ***are evaluated regularly for realizability***. These amounts are invoiced in the normal course of business according to contract terms that consider the completion of specific tasks and the passage of time. ***Project delays for commercial issues such as permitting, engineering changes, incremental documentation requirements, or difficult job site conditions can extend the time needed to complete certain work orders, which may delay invoicing to the customer for work performed.*** We were not experiencing any material project delays or other circumstances that would impact the realizability of the CIEB balance as of January 27, 2018 or July 29, 2017. Additionally, there were no material amounts of CIEB related to claims or unapproved change orders as of January 27, 2018 or July 29, 2017. As of January 27, 2018, we believe that none of our significant customers were experiencing financial difficulties that would impact the realizability of our CIEB or the collectability of our trade accounts receivable.

370.     Given the fact that invoices were exclusively the responsibility and control of Defendants, were directly impacted by project delays and cancellations, and could not be sent out

if a project was delayed or cancelled, the Individual Defendants had knowledge of project delays and cancellations, as well as shortfalls in revenue.

## IX.   CLASS ACTION ALLEGATIONS

371.     Lead Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Dycom common stock between November 20, 2017 and August 10, 2018, inclusive, seeking to pursue remedies under the Securities Act and Exchange Act (the "Class"). Excluded from the Class are Dycom and its subsidiaries and affiliates, the Individual Defendants, and any of Defendants' or Dycom's respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

372.     Because Dycom's stock was actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Lead Plaintiff believes that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Dycom or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions, or by other reasonable ways as may be approved by the Court. As of May 21, 2018, there were 31,194,881 shares of common stock outstanding.

373.     Lead Plaintiff's claims are typical of those of the other members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Lead Plaintiff will fairly and adequately protect the interests of the other members of

the Class and has retained counsel competent and experienced in class action and securities litigation.

374.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a.   Whether Defendants violated the federal securities laws as alleged herein;

b.   Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Dycom's business and operations;

c.   Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether the Individual Defendants caused Dycom to issue materially false and misleading SEC filings and public statements during the Class Period;

e.   Whether Defendants acted knowingly or recklessly in issuing materially false and misleading SEC filings and public statements during the Class Period;

f.   Whether the prices of Dycom common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

g.   Whether price of Dycom common stock declined as the market became aware of Company specific news which revealed the truth or began to reveal the truth regarding the materially false and misleading statements made by Defendants; and

h.   Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

375.     A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.   LOSS CAUSATION

376.     During the Class Period, the Individual Defendants materially misled the investing public, thereby inflating Dycom's common stock, by publicly issuing materially false and/or misleading statements and omitting to disclose material facts necessary to make their own statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Dycom's business, operations, and prospects as alleged herein.

377.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and the other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false or misleading statements concerning Dycom's business prospects and the deployment of large-scale network projects. The Individual Defendants' statements were materially false and misleading in that the Company was substantial permit delays which prevented and impeded the initiation of the touted large-scale projects. These material misstatements or omissions had the cause and effect of creating in the market and unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made by Defendants during the Class Period resulted in Lead Plaintiff and other

members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein. For example:

- On November, 20, 2017, prior to market open, the Company held its November 2017 Call, wherein Defendants falsely stated that the permit process was "not anything unusual," that Dycom was "providing . . . services for 1 gigabit deployments" nationwide for "a number of customers," that "a significant number of new project initiations will occur in the near term," "fiber deployments" were expected to accelerate, and Dycom "maintained strong customer relationships." In the November 2017 Presentation, Defendants also repeated that projects "have begun in many regions" and would "accelerate." In response to these misrepresentations, the Company's stock price increased approximately 9% from a closing price of $90.04 on November 17, 2017 to a closing price of $98.22 on November 20, 2017.

- On March 6, 2018, Dycom filed the March 2018 Presentation, which falsely stated that fiber projects "have begun in many regions," a "significant number of new project initiations will occur in the near term," and Dycom was "increasingly providing" its services. On this news, the Company's stock price increased from a closing price of $109.30 on March 5, 2018 to a closing price of $109.70 on March 6, 2018.

  On April 12, 2018, Defendants filed the Definitive Proxy stating that Dycom "[p]rovided services for 1 gigabit full deployments across the United States to a number of customers in multiple metropolitan areas and grew its core market share" and "[s]ecured and worked on a number of converged wireless/wireline multi-use networks." On this news, the Company's stock price increased from a closing price of $103.83 on April 11, 2018 to a closing price of $105.21 on April 12, 2017.

378.    During the Class Period, as detailed herein, the Individual Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of the Dycom shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Dycom shares was removed, and the price of Dycom shares fell. For example:

- In response to the May 2018 Press Release, disclosing that Dycom would be lowering its guidance for the 2019 fiscal year due to actual first quarter results and the "anticipated timing of activity on large customer programs and the related

120

impacts on revenues and margins," Dycom's stock dropped a tremendous 20.27%, or $23.56, from a closing price of $116.20 per share on May 21, 2018 to a closing price of $92.64 per share on May 22, 2018.

- In response to the August 2018 Press Release and August 2018 Investor Call, both issued and held before market open, disclosing that Dycom was lowering the Company's guidance for second quarter fiscal 2019 and full year 2019 "due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs at a lower revenue level," Dycom's stock dropped 24.10%, or $21.62, from a closing price of $89.71 per share on August 10, 2018 to a closing price of $68.09 per share on August 13, 2018.

379.     As a result of its purchase of Dycom common stock during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws when the price of Dycom stock declined as a result of the market obtaining new company specific information that revealed or began to reveal to the market the falsity of the statements Lead Plaintiff alleges to be materially false and misleading. The timing and magnitude of the price decline in Dycom common stock negate any inference that the loss suffered by Lead Plaintiff and Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## XI.    FRAUD-ON-THE-MARKET

380.     Lead Plaintiff is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for the Company's stock was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's stock. Throughout the Class Period:

        a.   Dycom's common stock was actively traded on the NYSE;

b.  The market price of Dycom common stock reacted promptly to the dissemination of public information regarding the Company;

c.  The Company's stock was followed by financial analysts, including those cited in this Complaint;

d.  As a regulated issuer, Dycom filed with the SEC periodic public reports during the Class Period;

e.  Dycom regularly communicated with pubic investors via established market communication mechanisms; and

f.  During the Class Period, the Company's market capitalization was over $3.8 billion on February 1, 2018 and the Company had over 31 million shares outstanding as of May 21, 2018.

381.  Throughout the Class Period, the Company was consistently followed by the market participants, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Dycom and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and its large-scale projects. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's common stock.

382.  As a result of the misconduct alleged herein, including Defendants' materially false and misleading statements and omissions, the market for Dycom's common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

383.     Lead Plaintiff and the other Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of Dycom common stock at artificially inflated prices and the subsequent decline in the price of that common stock when the truth was disclosed.

384.     Lead Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are also predicated upon omissions of material fact for which there was a duty to disclose.

385.     Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Dycom's common stock at artificially inflated prices.

## XII.    NO SAFE HARBOR

386.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

387.     In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

388.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Dycom who knew that the statement was false when made.

## XIII.   CAUSES OF ACTION

### <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against all Defendants**

389.     Lead Plaintiff realleges each allegation as if fully set forth herein.

390.     This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Dycom, Nielsen, and DeFerrari.

391.     The Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

392.     The Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

393.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and

misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, or receipt or modification of the Company's allegedly materially misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

394.    The Individual Defendants, who are the senior officers or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Lead Plaintiff and the other members of the Class.

395.    As a result of the foregoing, the market price of Dycom stock was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above or the integrity of the market price of Dycom stock during the Class Period in purchasing Dycom stock at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

396.    Had Lead Plaintiff and the other members of the Class been aware that the market price of Dycom's stock had been artificially inflated by the Company's and the Individual Defendants' materially misleading statements and by the material adverse information which the

Company's and the Individual Defendants did not disclose, they would not have purchased Dycom's stock at the artificially inflated prices that they did, or at all.

397.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial.

398.    By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Dycom stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Defendants Nielsen and DeFerrari**

399.    Lead Plaintiff realleges each allegation as if fully set forth herein.

400.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants Nielsen and DeFerrari.

401.    The Individual Defendants, by reason of their status as senior executive officers or directors of Dycom, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiff and the Class' investments in Dycom common stock within the meaning of §20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

402.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the

126

Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

403.     The Individual Defendants knew or recklessly disregarded the fact that Dycom's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Defendants did not act in good faith.

404.     By virtue of their high-level positions and their participation in and awareness of Dycom's operations and public statements, the Individual Defendants were able to and did influence and control Dycom's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiff and the Class contend contained materially false and misleading information and on which Lead Plaintiff and the Class relied.

405.     The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

406.     As set forth herein, the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

407.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase of Dycom common stock.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff Boston Retirement System as the Class representative;

B.      Against Defendants, jointly and severally, requiring Defendants to pay damages sustained by Lead Plaintiff and other members of the Class by reason of the acts and transactions alleged herein;

C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such equitable/injunctive or other relief in Lead Plaintiff's favor as the Court may deem just and proper.

## JURY DEMAND

In accordance with Federal rule of Civil Procedure 38(b), Lead Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

DATED: March 13, 2019                     Respectfully submitted,

**CULLIN O'BRIEN LAW, P.A.**

  *s/Cullin O'Brien*
Cullin O'Brien
6541 NE 21st Way
Ft. Lauderdale, Florida 33308
Tel: (561) 676-6370
Fax: (561) 320-0285
Email: cullin@cullinobrienlaw.com

*Liaison Counsel*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Nancy A. Kulesa
Stephanie A. Bartone
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
            nkulesa@zlk.com
            sbartone@zlk.com

**THORNTON LAW FIRM LLP**
Guillaume Buell
1 Lincoln Street
Boston, MA 02111
Tel.: (617) 720-1333
Fax: (617) 720-2445
Email: gbuell@tenlaw.com

*Co-Lead Counsel for Lead Plaintiff and the Class*

**LABATON SUCHAROW LLP**
Jonathan Gardner
Christine M. Fox
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
jgardner@labaton.com
cfox@labaton.com

***Additional Counsel for Lead Plaintiff***

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY certify that on March 13, 2019, I electronically filed the foregoing document

with the Clerk of the Court CM/ECF.

*/s Cullin O'Brien*
Cullin O'Brien