# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## No. 9:18-cv-81448-SINGHAL/MATTHEWMAN

JENNIFER TUNG, Individually and on Behalf )
of All Others Similarly Situated, )
)
      Plaintiff, )
v. )
)
DYCOM INDUSTRIES, INC., STEVEN E. )
NIELSEN and ANDREW DEFERRARI, )
)
      Defendants. )

## DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Scott G. Hawkins
Joanne M. O'Connor
**JONES FOSTER P.A.**
505 South Flagler Drive
Suite 1100
West Palm Beach, FL 33401
Telephone: (561) 659-3000
shawkins@jonesfoster.com
joconnor@jonesfoster.com

Alan S. Goudiss
Brian H. Polovoy
(admitted *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
agoudiss@shearman.com
bpolovoy@shearman.com

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

      A.    Parties And Procedural Background ........................................................... 3

      B.    Dycom's Business ....................................................................................... 5

      C.    Events During The Purported Class Period ............................................... 6

      D.    Plaintiff's Complaint .................................................................................. 8

PLEADING STANDARD ....................................................................................................... 9

ARGUMENT ........................................................................................................................... 9

    I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF
          FAILS TO PLEAD SECURITIES FRAUD UNDER SECTION 10(b) ................. 9

      A.    Defendants' Forward-Looking Statements Are Non-Actionable ............ 10

          1.    Defendants' Forward-Looking Statements Were
              Accompanied By Meaningful Cautionary Language ................... 12

          2.    Plaintiff Fails To Plead That Defendants Had Actual
              Knowledge That The Forward-Looking Statements Were
              False ........................................................................................... 12

              a.    Plaintiff Fails To Allege That The Individual
                    Defendants Had A Motive To Commit Securities
                    Fraud .............................................................................. 13

              b.    Plaintiff's Allegations That The Individual
                      Defendants "Must Have Known" That The
                    Challenged Statements Were False Are Insufficient
                    As A Matter Of Law ....................................................... 13

              c.    Plaintiff's "Confidential Witness" Allegations Do
                      Not Support A Strong Inference That The
                    Individual Defendants Made Any Statements With
                    Actual Knowledge That They Were False ...................... 14

              d.    The Strongest Inference To Be Drawn From The
                      Facts, By Far, Is That The Individual Defendants
                    Had No Scienter .............................................................. 18

B. Defendants' *Non*-Forward-Looking Statements Are Non-Actionable ................................................................................ 19

 1. Defendants' Non-Forward-Looking Statements Are Non-Actionable Statements About Historical Financial Performance And Operations, Statements Of Opinion, And Statements Of Corporate Optimism ............................ 20

  a. Defendants' Statements About Dycom's Historical Financial Performance And Operations Are Non-Actionable .......................................................... 20

  b. Defendants' Statements Of Opinion Are Non-Actionable .......................................................... 20

  c. Defendants' Statements Of Corporate Optimism Are Non-Actionable .......................................... 21

 2. Plaintiff Fails To Plead Any Material Omissions ........................ 21

 3. Plaintiff Fails To Plead Scienter For Any Alleged Non-Forward-Looking Misstatements. ................................. 22

C. Plaintiff Fails To Plead Loss Causation .................................................. 25

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Brophy v. Jiangbo Pharma., Inc.*, 781 F.3d 1296 (11th Cir. 2015)................................23

*Carvelli v. Ocwen Fin. Corp.*, 2018 WL 4941110 (S.D. Fla. Apr. 30, 2018) ................................9

*City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267 (N.D. Ga. 2011) ................................16

*Cole v. Health Mgmt. Assocs., Inc.*, 2009 WL 2713178 (M.D. Fla. July 17, 2009)................14

*Cutsforth v. Renschler,* 235 F. Supp. 2d 1216 (M.D. Fla. 2002)................................24

*Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001) ................................12

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006)................................23

*Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007) ................................3

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)................................12, 22

*Harris v. Ivax Corp.*, 998 F. Supp. 1449 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999)................................10

*IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850 (11th Cir. 2016) ................................22

*Kadel v. Flood*, 427 F. App'x 778 (11th Cir. 2011) ................................18

*Kinnett v. Strayer Educ., Inc.*, 2012 WL 933285 (M.D. Fla. Jan. 3, 2012) ................................16

*In re KLX Inc. Sec. Litig.*, 232 F. Supp. 3d 1269 (S.D. Fla. 2017)................................13, 19, 23, 24

*Maguire Fin., LP v. PowerSecure Int'l., Inc.*, 876 F.3d 541 (4th Cir. 2017) ................................18

*Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667 (M.D. Fla. Mar. 29, 2019) ................................19

*Miyahira v. Vitacost.com, Inc.,* 2012 WL 12895513 (S.D. Fla. June 28, 2012)................................21

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008) ................................ *passim*

*Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191 (M.D. Fla. 2014)................................14, 16, 20

*Next Century Commc'n Corp. v. Ellis*, 318 F.3d 1023 (11th Cir. 2013) ................................21

iii

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) ......................................................................................................20, 21

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002) ............................................9

*In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283 (M.D. Fla. 2008)..............................25

*Plumbers & Pipefitters Local 51 Pension Fund v. Darden Rests., Inc.*, 2009 WL 10670452 (M.D. Fla. July 2, 2009).....................................................................................11

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ................................................................................................15, 16, 17

*In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308 (M.D. Fla. 2002)....................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................3, 9, 13, 23

**Statutes**

15 U.S.C. § 78u-5(c)(1) ...........................................................................................................10, 22

15 U.S.C. § 78u-5(c)(1)(A)(i) .........................................................................................................12

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 .................................. *passim*

Securities Exchange Act of 1934 § 10(b) ..............................................................................4, 9, 10

Securities Exchange Act of 1934 § 20(a) .......................................................................................10

**Other Authorities**

S.E.C. Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) ...........................................................................22

Fed. R. Civ. P. 9(b) ..................................................................................................................1, 5, 9

Fed. R. Civ. P. 12(b)(6)....................................................................................................................1

Local Rule 7.1(b)(2)........................................................................................................................26

Defendants Dycom Industries, Inc. ("Dycom" or the "Company"), Steven E. Nielsen ("Nielsen"), and Andrew DeFerrari ("DeFerrari") (together, the "Individual Defendants" and, with Dycom, "Defendants") respectfully move to dismiss the Second Amended Complaint (DE 71, the "Complaint" or "SAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Dycom provides specialty contracting services—including engineering, construction, maintenance and installation services—to telecommunications providers throughout the United States. The Company, based in Palm Beach Gardens, Florida, has 48 subsidiaries with 15,000 employees, and its annual revenue in the past 25 years has grown from roughly $150 million to over $3 billion, increasing by over $1 billion just since 2015. In February 2018, Dycom issued guidance regarding the financial results it expected for the first quarter of fiscal 2019 and full year fiscal 2019. Issuing financial guidance is commonplace for publicly traded companies, and Dycom's investors understood that this guidance was a prediction (and not a guarantee) of expected performance. Dycom provided extensive warnings about the risks—including permitting, personnel, and contract issues—that could cause the Company to be unable to achieve its guidance.

On May 22, 2018 and August 13, 2018, the Company revised its full year financial guidance downward. These downward revisions were caused by the exact risks that Dycom had identified to its investors. Both times that the Company revised its full year financial guidance downward, its stock price declined.

Based on this thin reed and nothing else, Plaintiff has concocted a securities fraud case. The gravamen of Plaintiff's case is that, starting in November 2017, Defendants failed to fully inform the market about certain permitting, personnel, and contract issues. In essence, Plaintiff argues that Defendants knowingly provided the market with false guidance regarding the Company's anticipated financial results, which was then revealed to be false mere months later when it was revised downward. Plaintiff alleges no motive for this nonsensical theory of fraud, and Plaintiff's claims fail as a matter of law.

*First*, the PSLRA's "safe harbor" provisions affirmatively curtail this exact type of securities fraud claim, recognizing that guidance and other forward-looking information is

important to investors, and companies should not be under a constant threat of litigation when providing such information to the market.  Under those safe harbor provisions, forward-looking statements that are accompanied by meaningful cautionary language, *or* are not made with "actual knowledge" of their falsity, cannot form the basis of a securities fraud claim.  Dycom's financial guidance was forward-looking, and statements regarding the permitting, personnel, and contract issues that accompanied the guidance were forward-looking too.  As to all those statements, Plaintiff has failed to adequately allege that Dycom's risk disclosures were not meaningful, or that the Defendants had actual knowledge, at the time the statements were made, that they were false.

*Second*, the grab-bag of other statements that Plaintiff points to are non-actionable statements of historical fact, opinion, and corporate optimism, and Plaintiff does not state a claim by alleging that these statements did not disclose certain permitting, personnel, and contract issues.  These statements are either accurate on their face or immaterial to investors as a matter of law, and Dycom had previously told its investors that it regularly experienced the exact issues that Plaintiff claims were not disclosed.  Plaintiff tries to suggest otherwise with statements attributed to twelve "confidential witnesses," but there are abundant reasons to be skeptical of those alleged statements, which concern only a handful of Dycom's subsidiaries (seven out of a total of 48) at which the confidential witnesses were employed.  Fatal to Plaintiff's claims, the confidential witnesses say nothing about whether the issues they purport to identify were present at Dycom's 41 other subsidiaries, what portion of Dycom's *overall* work was affected by them (or even what portion of their own subsidiary's work was affected), or whether (and, if so, when) the issues individually, or as a group, had any material effect on Dycom's *overall* financial performance.

*Third*, Plaintiff fails to establish the requisite "strong inference" that either of the Individual Defendants acted with scienter (*i.e.*, fraudulent intent).  Plaintiff again attempts to rely on its confidential witnesses, but none of them support the required inference.  Eleven of the twelve witnesses are alleged to have been employees of Dycom's subsidiaries (*i.e.*, not Dycom itself), were not in senior roles, and are not alleged to have *ever met or even communicated with* the Individual Defendants.  The lone confidential witness who worked at Dycom is not alleged to have any first-hand knowledge of *what* the Individual Defendants knew about any permitting, personnel, or contract issues, or *when* they knew.  That confidential witness does not claim to

have discussed those issues with the Individual Defendants, or to have attended a single meeting with the Individual Defendants about them.  Moreover, Plaintiff does not allege any motive for the Defendants to have engaged in an eight-month-long fraud that provided them with no personal financial benefit.  To the contrary, while the share price was allegedly "inflated" as a result of the supposed fraud, the Individual Defendants did not sell any of their substantial stock holdings—which eviscerates any inference of scienter.  The competing inference that scienter is lacking is far stronger—that when Defendants learned of information that warranted a reduction of Dycom's financial guidance, they affirmatively disclosed the issues, and appropriately reduced the Company's guidance.

*Finally*, Plaintiff fails to adequately plead that the alleged false statements caused investors any loss.  The stock price drops on May 22, 2018 and August 13, 2018 were the result of Dycom lowering its financial guidance, not because of "new news" about permitting, personnel, and contract issues being provided to investors.  Thus, Plaintiff cannot establish loss causation.

The SAC fails to state a securities fraud claim, and after two opportunities to amend, and two rounds of briefing, it should be dismissed *with prejudice*.

## STATEMENT OF FACTS

### A.    Parties And Procedural Background

This action was filed on October 25, 2018, by Jennifer Tung, a purported purchaser of Dycom common stock.[1]  A second class action containing substantively identical allegations was filed days later.  *Possick v. Dycom Industries, Inc.*, No. 9:18-cv-81480 (RLR). On January 10, 2019, the Court consolidated the actions and granted the unopposed motion of Boston Retirement System ("Boston Retirement") to be appointed lead plaintiff.  (DE 29.)  Boston Retirement routinely alleges securities fraud, having served as a plaintiff (or sought to be appointed as lead plaintiff) in at least 32 securities class actions.  Decl. of Brian H. Polovoy dated Jan. 22, 2020 ("Decl.") ¶ 20.  Boston Retirement filed an Amended Complaint (DE 43,

---

[1]   The facts stated here are taken from the Complaint or from documents as to which the Court may take judicial notice, including documents referenced in the Complaint, filed publicly with the Securities and Exchange Commission ("SEC"), or whose authenticity is not subject to reasonable dispute.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Where the allegations in a complaint are contradicted by judicially noticeable documents, the document controls and the court need not credit the allegations in the complaint.  *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

"AC") on March 13, 2019, seeking recovery on behalf of a putative class of all purchasers of Dycom common stock between November 20, 2017 and August 10, 2018 ("Class Period").  AC at 1.  The Amended Complaint asserted claims against Dycom and the Individual Defendants—Steven E. Nielsen, President and Chief Executive Officer (*id.* ¶ 23); and Andrew DeFerrari, Senior Vice President and Chief Financial Officer (*id.* ¶ 25)—under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (*id.* ¶¶ 389–398).

On April 19, 2019, Defendants filed a motion to dismiss the Amended Complaint (DE 55).  On May 6, 2019, this action was reassigned from Judge Robin L. Rosenberg to Judge Rodolfo A. Ruiz (DE 57).  On May 20, 2019, Plaintiff opposed Defendants' motion to dismiss (DE 58), and on June 3, 2019, Defendants filed a reply in support of the motion (DE 61).

On December 11, 2019, while Defendants' motion to dismiss was pending, Plaintiff filed a "Motion to File Corrected Complaint" ("Motion to Amend") (DE 65).  The Motion to Amend stated that, at some undisclosed time after the filing of the Amended Complaint, "Plaintiff's counsel has since become aware of minor clarifications and errors that should be revised." Motion to Amend at 1.  The supposed "minor clarifications and errors" were seven specific factual assertions—contained in dozens of paragraphs of the Amended Complaint—that were attributed to "confidential witnesses" ("CWs").  The Motion to Amend sought to change the substance of each assertion.

On December 26, 2019, Defendants filed a response to the Motion to Amend ("Response") (DE 66.)  Defendants noted that the "corrections" that Plaintiff sought to make involved a number of false statements that Defendants had already identified in a Letter-Motion they submitted *eight months earlier*, on April 4, 2019.  Response at 5.  In their Letter-Motion—which was submitted *in camera* and is not reflected on the Court's docket—Defendants had alerted the Court to the fact that ten of the CWs told Defendants' counsel that they had not made allegations attributed to them in the Amended Complaint.  Plaintiff opposed that Letter-Motion, emphatically denying that its complaint contained any errors, and declaring "the Complaint will not be withdrawn or amended."  Letter-Motion Opp. (DE 47) at 1.  In an abrupt about-face eight months later, Plaintiff acknowledged in its Motion to Amend that its complaint contained false statements, and sought to correct at least some of them.  In responding to Plaintiff's Motion to Amend, Defendants asserted that Plaintiff's proposed corrections went to the integrity of Plaintiff's allegations, the credibility of Plaintiff's prior representations to the Court, and the

substance of Defendants' Letter-Motion and Motion to Dismiss.  *Id.* at 11–13.  Defendants also argued that Plaintiff's corrections were futile, because they would further weaken the Amended Complaint that, as it was, should be dismissed for failure to satisfy the heightened pleading standards of the PSLRA and Rule 9 (b).

On January 6, 2020, Judge Ruiz issued an Order in which he ruled, "Plaintiff's proposed modifications are substantive in nature and permeate dozens of paragraphs in the Amended Complaint. . . .  Accordingly, while the Court will permit Plaintiff to file a Second Amended Complaint, the Court will . . . afford[] Defendants an opportunity to respond to Plaintiff's Second Amended Complaint."  (DE 68.)  The Court also denied "*without prejudice*" the "additional relief sought by Defendants."  Order at 2 n.1 (here, and throughout this brief, all emphases have been added, except where otherwise noted).

On the same date, this case was reassigned to this Court (DE 69), and on January 8, 2020, Plaintiff filed the SAC (DE 71).

### B.     Dycom's Business

Dycom provides specialty contracting services, including, among other things, engineering, construction, maintenance and installation services to telecommunications providers throughout the United States.  SAC ¶¶ 1, 22, 44.  Over 90% of Dycom's revenue comes from its telecommunications business, and approximately 75% of Dycom's revenue is attributable to business from five of its largest customers:  AT&T Inc. ("AT&T"), CenturyLink, Inc. ("CenturyLink"), Charter Communications, Inc. ("Charter"), Comcast Corporation ("Comcast"), and Verizon Communications, Inc. ("Verizon").  *Id.* ¶ 1.

Dycom operates through 48 subsidiaries.  Decl. Ex. 10 at Ex. 21.1.  The overwhelming majority of Dycom's work is performed pursuant to "master service agreements" and other long-term contracts, which identify the service requirements and pricing for an individual customer. *Id.* Ex. 10 at 6, 10.  Revenue from these agreements is unpredictable, and Dycom warns investors that customers can cancel these contracts (whether or not Dycom is in default) and are not required to guarantee Dycom a specific amount of work (or any work at all), making it difficult to estimate demand for Dycom's services by its customers.  *See id.* at 10.  Dycom also warns there is no guarantee it will be able to renew its customer contracts.  *See id.*

When a customer assigns Dycom work pursuant to a master services agreement or other contractual agreement, the estimated value of the services to be performed is known as Dycom's

"backlog." *Id.* at 6.  Dycom's backlog is enormous—it was approximately $6 billion throughout the purported Class Period.  *See* Decl. Exs. 6 at 33, 10 at 7, 15 at 34, 18 at 37.  Dycom warned investors that (a) "Revenues in backlog may be realized in different periods than initially reflected in Dycom's backlog, and Dycom's backlog is subject to reduction or cancellation;" and (b) the factors that could lead to the revenues in backlog being realized in different periods included "project accelerations, or delays due to various reasons, including, but not limited to, commercial issues such as permitting, engineering revisions, difficult job site conditions, and adverse weather."  *See id.* Ex. 10 at 11–12; *see also id.* Exs. 6 at 33, 10 at 7, 15 at 34, 18 at 37.

### C.     Events During The Purported Class Period

Throughout the Class Period, Dycom carefully alerted its investors that its future results were uncertain.  On November 20, 2017, the Company issued a press release (the "November 2017 Release") and an investor presentation (the "November 2017 Presentation").  Decl. Ex. 4.  These materials disclosed that Dycom's revenues had declined 8.4% year-over-year to $756.2 million from the same period the prior year because of "moderation by a large customer" during the quarter.  Decl. Ex. 5 at 2.[2]  Dycom also held an earnings call (the "November 2017 Call") to report its financial results for the first quarter of FY 2018 (*i.e.*, the Transition Period).  *Id.* Ex. 5.[3]

On the call, Nielsen acknowledged that he was disappointed by the revenue decline, but told participants that Dycom was experiencing increased demand for its services, had initiated a number of new projects, expected construction activity to accelerate, and was providing services for "1-gigabit deployments."  *Id.* Ex. 5 at 2.  Nielsen also cautioned that "[a]s with prior initiations of large-scale network deployments, we expect some normal timing volatility and

---

[2] Here, and throughout this brief, pin cites to Dycom's Form 8-Ks are to the page number of the appropriate exhibit to the 8-K, not to the 8-K itself.

[3] The events alleged in the Complaint occurred while Dycom was transitioning between fiscal year ("FY") reporting periods.  Thus, after Dycom's FY 2017 ended on July 29, 2017, it was followed by a six-month transition fiscal year, FY 2018 (the "Transition Period"), which ran from July 30, 2017 through January 27, 2018, which was then followed by a 12-month fiscal year, FY 2019, which ran from January 28, 2018 through January 26, 2019.  *See* Decl. Ex. 10 at 1.  The Dycom annual and quarterly reports filed just before, during and after the purported Class Period alleged in the Complaint (*i.e.*, November 20, 2017 through August 10, 2018 (*see* SAC at 1)) are: the annual report on Form 10-K for FY 2017, filed on September 1, 2017; the quarterly report on Form 10-Q for first quarter of FY 2018, filed on November 22, 2017 ("FY 2018 Q1 10-Q"); the transition report on Form 10-KT for the "full year" FY 2018, filed on March 2, 2018 ("Transition Report"); a quarterly report on Form 10-Q for the first quarter of FY 2019, filed on May 24, 2018 ("FY 2019 Q1 10-Q"); and a quarterly report on Form 10-Q for the second quarter of FY 2019, filed on August 30, 2018 ("FY 2019 Q2 10-Q").

customer spending modulations as network deployment strategies evolve and tactical considerations, ***primarily permitting impact timing***." *Id.* An analyst noted Nielsen's reference to permitting and asked about permitting "hold-ups." *Id.* at 9. Nielsen responded that, "***at this stage in these projects, it's always something to watch***." *Id.*

On February 12, 2018—two weeks in advance of when the Company planned to release earnings for the period—Dycom announced that it was reducing its revenue guidance for Q1 FY 2019 ("February 12 Release"). *See* Decl. Ex. 8 at 1. Dycom also issued earnings guidance for the whole of FY 2019, estimating revenues of $3.3 billion to $3.5 billion. *See id.*

On February 28, 2018, Dycom reported its financial results for the six-month Transition Period, and held an earnings call (the "February 2018 Call").[4] *Id.* Ex. 11. On the call, Nielsen acknowledged disappointment with the "current revenue and margin softness," but repeated that Dycom had initiated and was working on multiple projects and expected activity to "increase and accelerate throughout 2018." *Id.* Ex. 11 at 2. He again cautioned about uncertainties regarding "customer spending modulations as network deployment strategies evolve and tactical considerations, ***primarily permitting, impact timing***." *Id.*

On May 22, 2018, Dycom held an earnings call on its results for the first quarter of FY 2019 (the "May 2018 Call"). *Id.* Ex. 14. While Dycom's revenues for the quarter were within its previously issued guidance, Nielsen acknowledged on the call that the quarter was "difficult," and reiterated that Dycom had initiated and was actively working on a number of projects. *Id.* at 2. He continued to warn investors, however, of risks to Dycom's revenues from customer spending modulations "***as network deployment strategies and technologies evolve and tactical considerations, primarily permitting impact timing***." *Id.* DeFerrari explained that Dycom had "tempered" its previously presented FY 2019 revenue guidance and now estimated that Dycom's FY 2019 revenues would range from $3.23 billion to $3.43 billion. *See id.* at 3. Dycom also issued guidance for Q2 2019, estimating revenues ranging from $830 million to $860 million. *Id.* at 4.

In the wake of the lowering of the annual revenue guidance, a call participant asked about "near-term margin pressure." *Id.* at 5. Nielsen repeated the warnings he had given on the November 2017 and February 2018 Calls, namely that "with respect to the pressure on the

---

[4] On the same day, the Company issued an investor presentation (the "February 2018 Presentation"). Decl. Ex. 9. On March 6, 2018, the Company issued another investor presentation (the "March 2018 Presentation"). *Id.* Ex. 12.

business, we have a number of large programs, ***some of which require extensive permitting and other governmental authorities***." *Id*. He explained that "the timing of when you build up a cadence in that process that will allow you to efficiently deploy resources. ***It's hard to forecast***." *See id*. When an analyst asked how long certain permitting "hurdles" would persist, Nielsen repeated that there was nothing unusual about uncertainties related to permitting because those uncertainties were "***always around starting the process***" of large projects, and that "[o]nce there's a cadence to the process . . . even after the initial kind of 12-month period, ***it just becomes something you manage . . . It's the initiation of the program where the most uncertainty is***." *Id*. at 14. Days later, a Deutsche Bank analyst reported that the Company expected permitting issues to last for a year.[5] After Dycom announced its earnings and revised guidance on the May 2018 Call, its share price fell 20.27% from $116.20 per share on May 21, 2018, to $92.64 per share on May 22, 2018. SAC ¶ 292.

On August 13, 2018, Dycom issued a press release and held an earnings call two weeks in advance of when the Company had planned to release earnings. *See* Decl. Ex. 16 at 1, Ex. 17 at 1. Dycom held this call early to alert the market that it was revising its annual financial guidance downward because of "large scale deployments that were slower than expected during the quarter due to customer timing and tactical considerations and margins that were pressured from under absorption of labor." *See id*. Ex. 16 at 2. In addition, Dycom alerted the market that its Q2 2019 revenues were $799.5 million, below the low end of its previous guidance. *See id*. After the announcement, Dycom's share price fell 24.10% from $89.71 per share on August 10, 2018, to $68.09 per share on August 13, 2018. SAC ¶ 317.

### D.    Plaintiff's Complaint

Plaintiff alleges securities fraud on behalf of itself and a putative class of persons who purchased or otherwise acquired Dycom common stock during the eight-month Class Period.

The Complaint alleges that Defendants made false and misleading statements and omissions regarding:  (i) "permit delays on customer projects" (SAC ¶¶ 192–204); (ii) "progress and initiation of customer projects" (*id*. ¶¶ 205–225); (iii) "purported 'acceleration' of Dycom's customer projects" (*id*. ¶¶ 226–240); (iv) "Dycom's ability to complete its backlog of projects" (*id*. ¶¶ 241–252); (v) "Dycom's purported 'strong' customer relationships" (*id*. ¶¶ 253–263); and

---

[5]   *See* Decl. Ex. 1 at 1. The Court may take judicial notice of this report because Plaintiff specifically references the report in the Complaint. *See* SAC ¶ 309.

(vi) "factors impacting Dycom's operations, revenue growth, and margins" (*id.* ¶¶ 264–296).

Plaintiff alleges those statements fraudulently misrepresented and concealed information concerning (i) "substantial project delays" that Dycom allegedly experienced, which supposedly resulted from (among other things) the "failure to obtain permits in a timely manner" and the "failure to hire a sufficient and competent workforce" (*id.* ¶ 190), and (ii) the loss of customer contracts (and cancellation of projects under those contracts). *Id.* According to Plaintiff, these permitting, personnel (*i.e.*, "workforce"), and contract issues resulted in "substantial delayed and/or decreased revenue recognition," and "significant margin pressure due to unrecouped labor and other project start-up costs." *Id.*

## PLEADING STANDARD

A securities fraud claim under Section 10(b) must be dismissed unless the plaintiff pleads facts establishing: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008).

Under the heightened pleading standards of the PSLRA and Rule 9(b), a securities fraud complaint must specify each alleged misstatement or omission, explain why it is false or misleading, and state with particularity facts giving rise to a "strong inference" that the defendant acted with a fraudulent state of mind that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314, 321 (citing 15 U.S.C. § 78u-4(b)(1)). Although well-pleaded allegations are accepted as true for purposes of this motion, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## ARGUMENT

**I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD SECURITIES FRAUD UNDER SECTION 10(b)**

Plaintiff has failed to plead securities fraud under Section 10(b). As a matter of law, all of Defendants' supposedly false and misleading statements are either (i) forward-looking statements (which, for the Court's convenience, are listed in Exhibit A to this brief[6]),

---

[6]   It is proper for a defendant, on a motion to dismiss, to submit exhibits summarizing a plaintiff's allegations. *See, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 2018 WL 4941110, at *4–*6

(ii) statements about the Company's historical financial performance or operations that are not false (listed in Exhibit B), (iii) statements of opinion (listed in Exhibit C), or (iv) statements of corporate optimism, or "puffery" (listed in Exhibit D).  Not a single statement is an actionable false statement of material fact.

Defendants' forward-looking statements are non-actionable because (i) they were accompanied by meaningful cautionary language, and (ii) Plaintiff fails to allege that the Individual Defendants had actual knowledge, when those statements were made, that they were false.  Defendants' *non*-forward-looking statements are also non-actionable, because they are all either (i) statements about Dycom's historical financial performance or operations that are not adequately alleged by Plaintiff to be false, (ii) statements of opinion that are non-actionable as a matter of law, or (iii) statements of corporate optimism, or "puffery," which are non-actionable as a matter of law.  In addition, Plaintiff fails to plead scienter with regard to any of the statements.  Last, Plaintiff fails to plead loss causation.[7]

### A.     Defendants' Forward-Looking Statements Are Non-Actionable

Plaintiff's claims based on forward-looking statements must be dismissed because the statements are protected under the PSLRA's safe harbor provisions.

There are two safe harbors in the PSLRA that preclude liability for forward-looking statements.  *See Harris v. Ivax Corp.*, 998 F. Supp. 1449, 1452 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999).   The first safe harbor protects forward-looking statements that are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* at 1452 & n.1 (citing 15 U.S.C. § 78u-5(c)(1)).   The second safe harbor protects forward-looking statements unless the plaintiff pleads particularized facts that give rise to a strong inference that the statement was made with "actual knowledge" that it was false or misleading when made, regardless of whether the statement is accompanied by meaningful cautionary statements.   *Id*. Even a cursory review of the statements listed in Exhibit A reveals that they are forward-looking.

*First*, Plaintiff asserts that Defendants' predictions about Dycom's gross margins and anticipated timing of work are false or misleading.  For example, Plaintiff alleges that on the

---

(S.D. Fla. Apr. 30, 2018) (relying upon defendant's charts summarizing allegations).

[7]     Plaintiff's claims under Section 20(a) of the Exchange Act fail because Plaintiff has not pleaded an underlying violation of Section 10(b).  *See Mizzaro*, 544 F.3d at 1237.

November 2017 Call, DeFerrari falsely disclosed that "***We expect gross margin percentage to be in line or slightly better compared to the April 2017 quarterly margin***, reflecting the expected mix of work activity and improving performance ***as services for large customer programs begin to accelerate***."  SAC ¶ 228; *see also id.* ¶¶ 230–231, 234–235.[8]

*Second*, Plaintiff asserts that Defendants' predictions about Dycom's ability to complete certain percentages of its backlog are false or misleading.  For example, Plaintiff alleges that Dycom's FY 2018 Q1 10-Q falsely disclosed that "***We expect to complete 49.0% of the October 28, 2017 total backlog during the next twelve months***."  SAC ¶ 242.

*Third*, in the November 2017, February 2018, and March 2018 Presentations, Dycom disclosed that "***Margin outlook reflects expected mix of work activity and improving performance as services for large customer programs begin to accelerate***."  SAC ¶¶ 230–231.

*Fourth*, Dycom's November 2017 quarterly report for the FY 2018 Q1 10-Q, the February 2018 and March 6 Presentations disclosed that "***Fiber deployments*** in contemplation of newly emerging wireless technologies ***have begun in many regions of the country.  A significant number of new project initiations will occur in the near term***."  *Id.* ¶¶ 218, 221.

*Finally*, Plaintiff asserts that Defendants' statements concerning its future construction and engineering projects were false and misleading.  For example, Plaintiff alleges that on the November 2017 Call, Nielsen falsely disclosed that "***Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018***."  SAC ¶ 227; *see also id.* ¶¶ 218, 221, 228, 231–232, and 234.

Under Eleventh Circuit law, all of these statements are forward-looking.  Not only do the statements use contingent words such as "expect," "outlook," and "will occur," but they were contained in (or related to) disclosures about expectations for future performance.[9]  Because all the statements in question are forward-looking, they are non-actionable if either of the PSLRA's safe harbors applies.  As to all of the statements, *both* safe harbors apply, and the claims based on the statements should be dismissed.

---

[8]  Text that is bolded, italicized and within quotes in this section denotes those statements Plaintiff alleges are "materially false and misleading."  SAC ¶ 191.

[9]  *See Plumbers & Pipefitters Local 51 Pension Fund v. Darden Rests., Inc.*, 2009 WL 10670452, at *6 & n.6 (M.D. Fla. July 2, 2009), *report and recommendation adopted in part*, 2009 WL 10670485 (M.D. Fla. Aug. 11, 2009).

1.   Defendants' Forward-Looking Statements Were Accompanied By
     Meaningful Cautionary Language

Dycom's forward-looking statements are protected by the PSLRA's first safe harbor because they were accompanied by meaningful cautionary language. Under the PSLRA, meaningful cautionary language is language identifying "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Cautionary language does not have to list all factors that might influence the company's financial future. *See Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). It is sufficiently meaningful if "the warnings actually given were not only of a similar significance to the risks actually realized, but were also closely related to the specific warning which [p]laintiffs assert should have been given." *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001).

The cautionary language that accompanied Dycom's forward-looking statements easily meets the "meaningful" standard. Dycom's extensive risk factors—which were referenced in every earnings call and filing[10]—expressly warned investors that customers could withhold work or cancel contracts for *any reason whatsoever*, "regardless of whether or not [Dycom is] in default." *See, e.g.*, Decl. Exs. 3 at 9, 10 at 10, 15 at 34. Accordingly, a reasonable investor was advised to expect that Dycom's customers could take work away at any time, which is what Plaintiff alleges certain customers did with regard to specific contracts. Dycom warned investors that its backlog could be affected by delays "due to various factors, including, but not limited to, commercial issues such as permitting." *Id.* Exs. 3 at 11, 10 at 12, 15 at 34. This warning addresses the exact issue that Plaintiff alleges to have been the cause of Dycom's delays in working through its backlog.

Because Dycom's forward-looking statements were accompanied by meaningful cautionary language, they are non-actionable under the PSLRA's first safe harbor.

2.   Plaintiff Fails To Plead That Defendants Had Actual Knowledge That The
     Forward-Looking Statements Were False

Even if the cautionary language accompanying Dycom's forward-looking statements was not meaningful, Defendants' forward-looking statements are non-actionable under the PSLRA's second safe harbor because Plaintiff fails to plead that Defendants had actual knowledge of their supposed falsity.

---

[10] *See* Decl. Ex. 4 at 2, Ex. 5 at 2; Ex. 6 at 23, 36; Ex. 7 at 2 (all referencing *id.* Ex. 3). *See also, id.* Ex. 9 at 3; Ex. 11 at 2–3; Ex. 12 at 2.

a.     Plaintiff Fails To Allege That The Individual Defendants Had
A Motive To Commit Securities Fraud

Plaintiff cannot muster any allegations that the Individual Defendants had a motive to commit the supposed fraud.  Securities class action plaintiffs frequently try to establish motive through insider stock sales during the putative class period.  *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"); *Mizzaro*, 544 F.3d at 1253 ("[s]tock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter").  Here, Plaintiff does not—and cannot—plead that either Individual Defendant sold stock during the Class Period.  To infer the Individual Defendants did what Plaintiff alleges—*i.e.*, with "actual knowledge" artificially inflated the stock price for a few months, then let the truth emerge—one would have to believe that they acted contrary to their own interests by *failing* to sell any part of their substantial stock holdings.  These facts create a "contrary inference" of lack of scienter.  *See Mizzaro*, 544 F.3d at 1253 (absence of stock trade allegations "weighs against inferring scienter"); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1328 (M.D. Fla. 2002) (fact that defendant "did not sell any stock during the class period" created a "contrary inference" that "militate[d] in favor of finding a lack of scienter.").

b.     Plaintiff's Allegations That The Individual Defendants "Must
Have Known" That The Challenged Statements Were False
Are Insufficient As A Matter Of Law

The Complaint contains no factual allegations establishing that the Individual Defendants had information that Dycom's guidance could not be met, or that any permitting, personnel, or contract issues were worse than had been reported to the market.  Instead, Plaintiff is reduced to arguing that the Individual Defendants *must have known* that the Company's forward-looking statements were false, because they attended meetings and received reports on the financial performance of Dycom's subsidiaries and customer projects.[11]   *See* SAC ¶ 321.  These allegations do not establish actual knowledge.

Putting aside that there is no factual allegation that the information at issue from

---

[11] To the extent that Plaintiff alleges that Defendants had "actual knowledge" of the falsity of their forward-looking statements because Dycom's core business was telecommunications (*see, e.g.*, SAC ¶ 321), the "core operations" theory is disfavored in the Eleventh Circuit and has been rejected on motions to dismiss.  *See, e.g., In re KLX Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017).  Plaintiff's allegations that the Individual Defendants acted with scienter because Dycom controls its subsidiaries (*see, e.g.*, SAC ¶ 321) also are insufficient because they do not establish that the Individual Defendants had actual knowledge of the relevant facts.

subsidiaries was material to Dycom's consolidated results, an allegation of *access* to information is not sufficient to show *actual knowledge* of that information. *See, e.g.*, *Cole v. Health Mgmt. Assocs., Inc.*, 2009 WL 2713178, at *9–*10 (M.D. Fla. July 17, 2009) (rejecting argument that defendants had access to inside information and therefore "must have known" of the alleged falsity of the statements).   For example, Plaintiff alleges that Dycom's subsidiaries tracked projects using various software, spreadsheets, and reports.   *See, e.g.*, SAC ¶¶ 150–51.   But Plaintiff only alleges that the Individual Defendants had *access* to this information, not what the information actually was or whether the Individual Defendants ever reviewed it.

Nor does it suffice to allege that there were calls regarding the subsidiaries that Plaintiff asserts were attended by Nielsen, Dycom's Chief Operating Officer Tim Estes, and the president of each Dycom subsidiary.   *See* SAC ¶¶ 176, 323.   Plaintiff does not provide any particularized allegations about any of these purported calls—*e.g.*, what specific delays, permitting issues, or staffing issues were allegedly discussed, which (or how many) subsidiaries were experiencing these alleged issues, or even the dates on which these alleged calls occurred.   Indeed, Plaintiff does not allege that *any* of its twelve CWs attended even one of these supposed calls.

Accordingly, the Complaint does not establish a strong inference of actual knowledge of those issues (much less that the Individual Defendants had knowledge, at the time Dycom issued its guidance, that the guidance could not be met a result of these issues).   *See Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1219 (M.D. Fla. 2014) (actual knowledge not adequately plead without "what exactly was said during these conference calls, by whom these unspecified statements were said, to whom they were said, on which approximate date they were said, or in what context they were said").

c.   <u>Plaintiff's "Confidential Witness" Allegations Do Not Support<br>A Strong Inference That The Individual Defendants Made Any<br>Statements With Actual Knowledge That They Were False</u>

The Eleventh Circuit has cautioned that "courts may be skeptical of confidential sources cited in a securities fraud complaint," and that, as a threshold matter, the complaint must "unambiguously provide[ ] in a cognizable and detailed way the basis of the [confidential source's] knowledge."   *Mizzaro*, 544 F.3d at 1239–40.   Here, there are abundant reasons to be skeptical of the allegations attributed to Plaintiff's twelve CWs,  and Plaintiff does not plead "in a detailed way" on what basis any of them would have first-hand "knowledge" of what the

Individual Defendants knew or when they knew it.[12]

Eleven of Plaintiff's twelve CWs were not in a position to shed light on whether the Individual Defendants made statements with actual knowledge that those statements were false: these CWs are alleged to have been employees of a handful of Dycom's 48 subsidiaries, were not in senior roles, and are not alleged to have *ever met or communicated with* the Individual Defendants.  Plaintiff thus fails to establish how any of these employees at one of Dycom's 48 subsidiaries would have a basis to know about events at the corporate parent entity or their potential impact on Dycom's consolidated financial results.  The Court may discount the statements of these CWs on this ground alone.  *See, e.g.*, *Mizzaro*, 544 F.3d at 1248 (discounting allegations because "none of the confidential witnesses even claims to know or have so much as ever met any of the . . . individual defendants"); *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *18 (S.D. Fla. Apr. 19, 2013) (discounting allegations because no witness "recount[ed] any interaction with the individual Defendants").

The allegations attributed to CW9—the only CW who worked at Dycom and not a subsidiary—do not support an inference of actual knowledge either, and underscore why courts must be wary when evaluating purported allegations from CWs.  Plaintiff does not allege that CW9 ever discussed any permitting, personnel, or contract issues with the Individual Defendants.  Plaintiff merely alleges that CW9 said, "Defendant Nielson [*sic*] held monthly calls with the president of each subsidiary" and those calls "focused on finances, collecting money owed to the subsidiaries, how certain jobs were progressing, and updates of any significant changes that occurred in the past thirty days, including lost customer contracts and permitting

---

[12]  Indeed, the CWs purportedly made statements that are implausible or unreliable on their face.  For example, the Complaint alleges that "[w]hen CW6 left *the Company* in February of 2018, he noted that *the Company* was 'bleeding' and 'operating in the red' because it was not hitting its target dates and experiencing significant project delays."  SAC ¶ 119.  "The Company" is a defined term in the SAC that specifically refers to "Dycom Industries, Inc."  *Id.* at 1.  Yet the SAC does not, and could not, allege that that CW6, who was a District Manager at Ivy H. Smith Co., one of Dycom's forty-eight subsidiaries (*id.* ¶ 36), had any basis to know that Dycom, the *parent company*, was "bleeding" or "operating in the red."

Another example is the twice-repeated allegation attributed to CW12 that he "recalled that there were also times where *Dycom* would '*pop into meetings*' on the phone or *show up* at Tesinc's office from time to time.  When they *showed up* at the office, they would be *walking with* President Bill Ptak and Vice President Tommy Farmer."  *Id.* ¶¶ 182, 332.  Obviously, it is a physical impossibility for "Dycom" to have "pop[ped] into" meetings, "show[ed] up" at an office, or "walk[ed] with" anyone.  Moreover, to support the requisite strong inference that the Individual Defendants had scienter, it is not adequate to allege that *unnamed* persons from Dycom participated in meetings with these subsidiary personnel.

issues." SAC ¶¶ 176–177.  But Plaintiff does not and could not allege that CW9 was on the calls he described.  Instead, "CW9 was aware of these calls because of his conversations with some of the presidents of Dycom's subsidiaries."  SAC ¶ 177.  CW9 had no personal knowledge that the calls took place, what was said on the calls, or whether anything that was said on the calls actually contradicted Dycom's public statements.  CW9's purported statements are exactly the type of unreliable CW statements that courts routinely reject.[13]

The court in *Royal Caribbean* addressed identical scienter allegations and rejected them as insufficient.  *See* 2013 WL 3295951, at *18.  There, plaintiffs argued "that the confidential witnesses' testimony would show that Defendants attended meetings in which the Company's revenues and bookings were discussed on a weekly or monthly basis, and thus Defendants knew that the booking schedulings were not as strong as the public statements claimed."  *Id.*  The court found that the plaintiffs had fatally failed to demonstrate (a) that the defendants "were in meetings with these confidential witnesses," and (b) any "specific facts as to what was discussed, when it was discussed and by whom (let alone specific facts showing that what was discussed was in direct contrast with what was publicly disclosed)."  *Id.*  And the fact that confidential witnesses provided examples of booking issues did not contribute to an inference of scienter because there were no allegations establishing that the identified issues "were significant in the context of the larger company."  *Id.*  For these reasons, Plaintiff's CW9's purported statements do not create any inference of scienter, much less the required "strong inference."

Moreover, neither the eleven CWs who worked at Dycom's subsidiaries nor the one (CW9) who worked at Dycom provide any support for an inference of scienter because Plaintiff does not connect any of the CWs' allegations to the Individual Defendants.  As one example, the Complaint alleges that "CW 10 stated that he was brought in to help guide and speed up the permitting process because Ervin [a Dycom subsidiary] was 'not in touch' with how permitting was handled in Texas, which was different from other states. . . .  According to CW10, Ervin was

---

[13] *See, e.g., Mogensen*, 15 F. Supp. 3d at 1220–21 (no "strong inference" of scienter where CWs did not provide "specific details of first-hand interactions with a defendant"); *Kinnett v. Strayer Educ., Inc.*, 2012 WL 933285, at *7 (M.D. Fla. Jan. 3, 2012) (confidential witness statements could not support inference of scienter where plaintiffs failed "to detail each [CW's] personal knowledge for the assertions each makes"); *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1296–97 (N.D. Ga. 2011) (statements by confidential witness could not support an inference of scienter because they were based on "speculation or hearsay" rather than "reliable first-hand knowledge").

'off by months' on their project timelines as a result of permit delays and it 'drove a log of project timelines down.'" *See* SAC ¶¶ 106–107, 127–128.

To support an inference of actual knowledge, Plaintiff would need particularized factual allegations establishing that (i) the Individual Defendants knew, at the relevant times during the purported Class Period, about the alleged Ervin permitting issue cited by CW10, (ii) these particular events had the effect of rendering the Company's consolidated financial guidance, or related statements, false or misleading in light of the Company's repeated disclosures to its investors of the relevant risks, and (iii) the Individual Defendants *actually knew*, at the relevant time during the purported Class Period, that the events in question would have these effects. Nothing in the Complaint provides these necessary particularized factual allegations with respect to the specific issues alleged by CW10, or as to any other issues identified by any of the CWs. *See, e.g., Royal Caribbean*, 2013 WL 3295951, at *18 ("nothing in the Complaint that g[ave] the Court context as to what kind of impact the alleged shortfalls of the one or two ships discussed would have had on the world's third largest cruise company" and there was no evidence that "the booking shortfalls on certain ships were significant in the context of the larger company.").[14]

Plaintiff does not provide any basis to support a conclusion that the volume or significance of the alleged incidents identified by the CWs is unusual or meaningful for a company of Dycom's size.[15]   None of the CWs purports to have knowledge of the overall

---

[14] In a further effort to establish an inference of scienter, Plaintiff attributes allegations to CW1 that "CPS . . . was an accrued revenue system used to track day-to-day transactions and the progress of all projects . . . the talk within Star was that the purpose of CPS was to limit the control at the local level and assume more of it at *the corporate level. This would include the Individual Defendants*." SAC ¶¶ 150, 152.  But by indicating that the "corporate level" was not limited to the Individual Defendants, but only "included" them—and thus included *other* personnel as well—it does not follow from these allegations that the Individual Defendants necessarily accessed CPS, but only that someone within Dycom's "corporate level" may have.

[15] Indeed, Plaintiff attributes allegations to certain CWs regarding incidents or issues that are dubious on their face.  For example, the SAC repeatedly attributes an allegation to CW8 regarding an incident in which "Texstar lost a *huge* Verizon contract for 500-900 miles in Austin, Texas in early 2018."  *See* SAC ¶¶ 159, 172, 185, 214, 239, 251, 262, 271, 324, 338.  But in the Plaintiff's prior complaint—which plaintiff just recently further amended—Plaintiff attributed to CW8 that this same purportedly "huge" contract involved *500,000 miles*. *See, e.g.*, Amended Complaint ¶ 159.  Preposterously, the SAC continues to describe this contract as "huge," even though the allegation (as corrected by Plaintiff) now concerns a contract 1/1000th the size originally alleged (and that is not "huge" by any stretch).  Similarly, Plaintiff attributes an allegation to CW2—repeated 21 times in 13 separate paragraphs in the SAC— that a Dycom subsidiary named Star had a contract with a telecommunications company named "One Stream" (*see* SAC ¶¶ 6, 123–125, 154, 202, 213, 238, 250, 261, 270, 324, 335), but no company by that name exists.

17

significance of any of the alleged permitting, personnel, or contract issues for Dycom, or knowledge regarding whether these alleged issues were normal (or not) for Dycom, or for any other company that provides the same services as Dycom.  Plaintiff also fails to provide any other factual allegations suggesting that it was unusual.  For example, Plaintiff alleges that across its 48 subsidiaries, Dycom lost a number of contracts in 2017 and 2018.  SAC ¶ 324.  The Court is then asked to infer that these alleged issues are unusual in number or significance, and compelled the Company to make further disclosures (or different disclosures) during the purported Class Period.  But how many alleged contract delays or cancellations occurred in any earlier two-year period?  And what would be the financial impact of these alleged delays or cancellations on Dycom, a company with more than $3 billion in annual revenues, and $6 billion in backlog (throughout the Class Period)?  Plaintiff does not say.  Thus, it would be unreasonable to infer the Individual Defendants had actual knowledge that their forward-looking statements were false.

Plaintiff improperly asks the Court to infer scienter based on other inferences.  Under settled law, "[a] plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard."  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).  Here, Plaintiff asks the Court to aggregate allegations about delays and cancellations from a small number of Dycom's subsidiaries, *infer* that these alleged delays and cancellations are meaningful to Dycom's consolidated results, *further infer* that the Individual Defendants knew about them, and then *infer from those inferences* that the Defendants knew, at the time they made their forward-looking statements about the Company's overall financial performance, that those statements were false.[16]

> d.  <u>The Strongest Inference To Be Drawn From The Facts, By Far, Is That The Individual Defendants Had No Scienter</u>

Viewed holistically, the Complaint fails to allege facts supporting a strong inference of "actual knowledge" because Plaintiff's allegations are not at least as compelling as an inference of an "innocent explanation for the alleged behavior."  *See Kadel v. Flood*, 427 F. App'x 778, 780 (11th Cir. 2011) (internal quotation omitted).  Defendants had no motive for the supposed fraud, repeatedly warned the Company's investors about the potential negative impact of permitting, personnel, and contract issues, and provided early disclosures that the Company's

---

[16] *See* SAC ¶¶ 202–03; 213–15; 225; 238–40; 250–52; 261–63; 270–72; 283; 298–99; 325; 338.

previously issued financial guidance would not be met.  *See In re KLX*, 232 F. Supp. 3d at 1282.

Defendants believed that Dycom would make up for any margin pressure from project delays or

cancelled contracts, and Dycom's backlog showed that Dycom's customers were giving the

Company *more* work, not less.  Dycom's backlog (*i.e.*, the estimated uncompleted portion of

services to be performed under agreements with customers) had surged *34%*, from $5.9 billion to

$7.9 billion between Q1 2019 and Q2 2019, and revenues from three of Dycom's five largest

customers had increased in Q1 2019 over the prior quarter.[17]  Indeed, Dycom's revenues surged

in Q3 2019, to $848 million, a 6% increase over Q2 2019 and a 12% increase over the same

period the prior year.  *See* Decl. Exs. 17 at 5, 18 at 4.  In other words, the Individual Defendants

correctly anticipated that Dycom's revenues would increase, they just were not able to accurately

predict *when*.

By far, the more compelling inference is that to the extent that Defendants learned about

the timing of revenue (and any adverse financial effect of the permitting, personnel, and contract

issues), Defendants appropriately reduced Dycom's annual revenue and earnings guidance (in

two steps, as they obtained information).  *See, e.g., Michigan Carpenters' Pension Fund v.

Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at *28 (M.D. Fla. Mar. 29, 2019) (more

compelling inference is defendants held an excessively optimistic view and "honestly but

mistakenly believed that" fortunes would improve).  Plaintiff fails to come close to adequately

alleging actual knowledge of falsity under the PSLRA's second safe harbor, and any claims

based on forward-looking statements must be dismissed.

**B.      Defendants' *Non*-Forward-Looking Statements Are Non-Actionable**

Plaintiff similarly fails to plead that Defendants made any actionable non-forward-

---

[17]   In the first quarter of 2019, Dycom's revenues from AT&T increased from $146.6 million to
$177 million, revenues from Comcast increased from $139.4 million to $159.2 million, and
revenues from Verizon increased from $88.2 million to $122.1 million. *See* Decl. Exs. 11 at 2;
16 at 2. In addition, Dycom's revenues from Comcast and Verizon increased still further in
the second quarter of 2019, to $171.2 million and $147.3 million, respectively. *See id.* Ex. 18
at 24. While Plaintiff harps on the alleged cancellation of contracts related to Verizon's One
Fiber Project and alleges that "[t]he loss of Verizon's business, alone, is material," (SAC ¶ 5),
Plaintiff conveniently overlooks that Dycom's quarterly revenue from Verizon *more than
doubled* from FY 2018 to FY 2019. In Q1 2018, Dycom reported $80.6 million in revenue
from Verizon. *See id.* Ex. 19 at 24. Dycom's Verizon revenue then shot up every quarter until
Q3 2019, when it reached $174.1 million. *See id.* In short, Dycom was not losing Verizon
business, it was gaining it.

looking statements, *i.e.*, Plaintiff fails to adequately plead that these statements were materially false when made.

        1.    <u>Defendants' Non-Forward-Looking Statements Are Non-Actionable Statements About Historical Financial Performance And Operations, Statements Of Opinion, And Statements Of Corporate Optimism</u>

        a.    <u>Defendants' Statements About Dycom's Historical Financial Performance And Operations Are Non-Actionable</u>

Plaintiff challenges a number of statements about Dycom's historical financial performance or operations (listed in Exhibit B), but Plaintiff fails to adequately allege facts demonstrating that any of the statements are false or misleading. In other words, Plaintiff fails "to state with particularity" the specific facts constituting fraud. *Mizzaro*, 544 F.3d at 1237.

For example, Plaintiff alleges that Nielsen falsely represented during the November 2017 Call that "***This quarter reflected an increase in demand from three key customers*** . . . ." SAC ¶ 206. The November 2017 Presentation, however, showed that Dycom's year-over-year revenues for first quarter FY 2018 had increased for three of its five largest customers: Comcast revenues increased 26.5%, CenturyLink revenues increased 13.9%, and Verizon revenues increased 6.7%.[18] Plaintiff does not and cannot allege that these figures were false. Accordingly, Nielsen's statement cannot form the basis for a fraud claim. Plaintiff similarly fails to make the required factual allegations with regard to all of the other statements listed in Exhibit B. The claims based on these statements therefore should be dismissed.

        b.    <u>Defendants' Statements Of Opinion Are Non-Actionable</u>

Plaintiff's claims based on statements about what Dycom's management "thinks" or its "'feel[ings],' 'belie[fs],' 'hope[s],' and 'want[s],'" are non-actionable statements of opinion. *See Mogensen*, 15 F. Supp. 3d at 1213 (citation omitted). For an opinion to be actionable under Section 10(b), a plaintiff must allege with particularity facts demonstrating that the speaker either did not sincerely hold the stated opinion or "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187–194 (2015).

---

[18] *See* Decl. Ex. 4 at 6. Plaintiff alleges that these customers were "key." *See* SAC ¶ 52 ("[O]nly five [Dycom] customers account[] for over 75% of the Company's overall revenue: Comcast, AT&T, CenturyLink, Verizon and Charter").

For example, Plaintiff alleges that Nielsen made a misleading statement of opinion when he said on the November 2017 Call: "*when you show up . . . with large programs, it always takes the permitting authorities a little bit of time to gear up* . . . *It is not anything unusual*." SAC ¶ 196.  Plaintiff does not satisfy its pleading standard under *Omnicare* with regard to this opinion.  Nielsen's opinion that permitting delays were "not anything unusual," is unaffected by the supposed omissions because Plaintiff does not allege any facts demonstrating that the permitting delays *were* unusual.  Plaintiff claims that these permitting delays were "unique to Dycom" (SAC ¶ 13), but fails to allege with particularity any factual support for this statement. *See Omnicare* 575 U.S. at 194.  Plaintiff similarly fails to allege the required factual support with regard to all of the other statements listed in Exhibit C.  The claims based on all of these statements therefore should be dismissed.

<blockquote>c.    <u>Defendants' Statements Of Corporate Optimism Are Non-Actionable</u></blockquote>

Plaintiff's claims arising out of Defendants' general statements concerning customer relationships and service offerings fail because those statements—set forth in Exhibit D—are mere statements of corporate optimism (sometimes referred to as "puffery").  It is well-established that corporate puffery is non-actionable.  *See Miyahira v. Vitacost.com, Inc.,* 2012 WL 12895513, at *7 (S.D. Fla. June 28, 2012).

The statements that Plaintiff challenges use expressions like "working aggressively," "strong performance," "strong customer relationships," "durable customer relationships," "at the forefront," "solid demand," "well positioned," and "meaningful."  All these expressions—and similar expressions used in the other statements in Exhibit D—fall squarely within the realm of corporate puffery, as they are not empirically verifiable statements that can be affirmatively disproven.  *See, e.g.*, *Next Century Commc'n Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2013) (descriptions of performance as "strong" are puffery).  The claims based on these statements thus should be dismissed.

<blockquote>2.    <u>Plaintiff Fails To Plead Any Material Omissions</u></blockquote>

Although the Complaint makes repeated references to supposed "omissions," Plaintiff's invocation of the word "omission" cannot transform non-actionable forward-looking statements into actionable statements.  Plaintiff's "omission" claims fail for three independent reasons.

*First*, Plaintiff's "omissions" allegations cannot, as a matter of law, render any of Defendants' forward-looking statements and statements of puffery actionable.  All forward-looking statements are subject to the safe harbor provisions, including those that are the subject of omissions claims pursuant to the second clause of S.E.C. Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) ("Rule 10b-5(b)").  *See* 15 U.S.C. § 78u-5(c)(1); *Harris*, 182 F.3d at 806.  Likewise, a plaintiff cannot render puffery actionable by alleging that it "omit[s] facts."  *See, e.g., IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016).

*Second*, Plaintiff's effort to state an "omission" claim fails because Plaintiff does not satisfy its heightened pleading burden under Rule 10b-5(b) and the PSLRA.  Rule 10b-5(b) proscribes the omission of any "material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).  The PSLRA imposes a specific pleading requirement for omissions claims under Rule 10b-5(b):  "the complaint shall specify each statement alleged to have been misleading [and] *the reason or reasons why the statement is misleading* . . . ."  15 U.S.C. § 78u-4(b)(1).  To satisfy this pleading burden, a plaintiff must explain specifically how a statement misled investors in light of the allegedly omitted material facts, and "reasons that are vague and not particularized" warrant dismissal.  *See ADT Corp.*, 660 F. App'x at 858 (internal quotation marks omitted).  Plaintiff has not met its pleading burden with regard to *any* of Defendants' alleged omissions.

*Finally,* the alleged "omissions" regarding permitting, personnel, and contract issues only concern the handful of subsidiaries (seven out of a total of 48) at which the confidential witnesses were employed.  The confidential witnesses say nothing about whether the issues they identify were present at Dycom's 41 other subsidiaries, what portion of Dycom's overall work was affected by them, or whether (and, if so, when) they individually, or as a group, had any material effect on Dycom's financial performance.   Plaintiff thus fails to adequately plead that the alleged omissions were "*material* facts" that "made" Defendants' statements about Dycom's *overall* financial results "misleading."  17 C.F.R. § 240.10b-5(b).

### 3. Plaintiff Fails To Plead Scienter For Any Alleged Non-Forward-Looking Misstatements.

To the extent Plaintiff has identified any material false statement or omission that is not protected by the PSLRA's safe harbor, the claim still fails because Plaintiff fails to allege scienter.  A plaintiff must plead scienter to a "stringent standard" to survive a motion to dismiss.

*Mizzaro*, 544 F.3d at 1238.  Plaintiff has the burden of "plead[ing] with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements."  *See id.*[19]  A "strong inference" of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 309.  In short, when evaluating a complaint that alleges securities fraud, "a court must ask itself: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re KLX*, 232 F. Supp. 3d at 1275 (quoting *Mizzaro*, 544 F.3d at 1239).

Plaintiff alleges that the Individual Defendants intended to defraud or acted with severe recklessness because (i) they operate Dycom, which controls its subsidiaries, whose employees knew about the permitting, personnel, and contract issues that the Individual Defendants allegedly failed to disclose; (ii) these issues affected Dycom's "core business" and "project delays pertained to key customers"; (iii) the Individual Defendants allegedly could access tracking reports concerning Dycom's projects; and (iv) one of the Individual Defendants allegedly attended meetings and calls where these issues were discussed.  *See* SAC ¶ 321.  These allegations are insufficient to plead a strong inference of scienter for the following reasons, many of which are discussed in more detail in Section I.A.2 *supra*.

*First*, Plaintiff's allegation that the Individual Defendants controlled Dycom is nothing more than an allegation that knowledge should be imputed to the Individual Defendants by virtue of their corporate positions, which is insufficient to support an inference of scienter.  *See Brophy v. Jiangbo Pharma., Inc.*, 781 F.3d 1296, 1302–03 (11th Cir. 2015).  *Second*, Plaintiff's allegation that the alleged misstatements related to a "core business"—telecommunications— does not support any inference of scienter.  *See In re KLX*, 232 F. Supp. 3d at 1282.  *Third*, Plaintiff's approach of asking the Court to infer scienter based on other inferences, *i.e.*, "inference stacking," by aggregating allegations from various confidential witnesses about certain issues occurring at the subsidiary level, is not sufficient to satisfy the PSLRA's exacting

---

[19] "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264 (11th Cir. 2006).

pleading standard.  *See supra* p. 18.  *Finally*, the CWs do not provide any alleged facts suggesting that at the relevant times during the purported Class Period, the Individual Defendants either knew, or were severely reckless in not knowing, that there was an unusual amount of permitting, personnel, and contract issues that would have a material effect on Dycom's consolidated financial performance, and failed to take that into account in preparing the Company's guidance, and knew at the time the guidance was issued (or were "severely reckless" in not knowing) that it could not be achieved.[20]

Not only does the Complaint fall well short of establishing a strong inference of scienter, but there are multiple indicia of *non*-fraudulent conduct.  Plaintiff does not allege any stock sales by the Individual Defendants—nor any other personal motive for fraud—which strongly suggests the absence of scienter.  *See In re KLX*, 232 F. Supp. 3d at 1282.

Defendants' demonstrated readiness to disclose unfavorable news and reduce the Company's guidance during the Class Period is also evidence that they lacked any fraudulent intent.  *See id.* ("repeated disclosure of negative information about ESG throughout the Class Period contradicts the SAC's theory that Defendants sought to conceal the down-market impact on KLX"); *see also Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1251–52 (M.D. Fla. 2002) (defendants' disclosure of certain unfavorable information about a merger undercut inference of scienter as to defendants' non-disclosure of certain other unfavorable information).  During the relevant time period, Dycom disclosed (year-over-year) revenue declines on three occasions (November 20, 2017, February 12, 2018 and May 22, 2018), lowered guidance for a quarter on one occasion (Q1 FY 2019, on February 12, 2018), and lowered guidance for FY 2019 on two occasions (May 22, 2018 and August 13, 2018).  *See* Decl. Exs. 4 at 1, 8 at 1, 13 at 1, 17 at 1. Indeed, Defendants' February 12, 2018 disclosures (and also its August 13, 2018 disclosures) were made in advance of when the Company would normally have disclosed its full financial results for the periods in question, further undercutting any inference of scienter.  *See id.* Exs. 8 at 1, 17 at 1.

At worst, these facts suggest that, with the benefit of hindsight, Defendants were overly optimistic in believing that Dycom would meet its financial projections.  Plaintiff's allegations

---

[20] To the extent that Plaintiff seeks to allege that the Company's revenue and earnings guidance itself was false, the guidance figures are classic forward-looking statements protected by the two safe harbor provisions.  *See supra* Section I.A.

thus fail to create the required "strong inference" of scienter that must be "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314, 321.

### C. Plaintiff Fails To Plead Loss Causation

Plaintiff's claims should also be dismissed because the Complaint fails to plead "loss causation." Plaintiff must show that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement[s] or omission[s] concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293–94 (M.D. Fla. 2008). Here, Plaintiff alleges that investors suffered losses as a result of the stock price drops that occurred on May 22, 2018 and August 13, 2018. Before the market opened on those days, the Company disclosed that it was lowering its previous financial guidance for FY 2019, and before the market opened on August 13, the Company also disclosed that it had missed its prior financial guidance for the second quarter of FY 2019.

The problem for Plaintiff is that although the Complaint attempts (unsuccessfully) to plead that Defendants made false statements about permitting, personnel, and contract issues, the Complaint contains no allegations that the Company's *financial guidance* (that was later lowered or missed) was fraudulently misstated (*i.e.*, that Defendants somehow knew, at the time the Company issued the guidance, that it could not be achieved).[21] As such, Plaintiff lacks an essential element of a viable loss causation theory regarding Dycom's guidance: well-plead fraudulent statements or omissions about guidance that led to the stock price drops at issue. *See, e.g., In re Paincare Holdings*, 541 F. Supp. 2d at 1293–94. Plaintiff thus fails to plead loss causation. *Id.*

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Second Amended Complaint with prejudice.

---

[21] The Complaint itself belies any suggestion by Plaintiff that Defendants' alleged misstatements regarding permitting, personnel, and contract issues—rather than the Company's lowered financial guidance—are what caused the Company's stock price to drop on May 22, 2018 and August 13, 2018. For instance, the analyst reports that Plaintiff cites in the Complaint clearly state that the May 22, 2018 stock price decline was only the result of the Company lowering its previous financial guidance for FY 2019. *See* SAC ¶¶ 308–309; Decl. Exs. 1 at 1; 2 at 1.

## <u>REQUEST FOR HEARING</u>

Pursuant to Local Rule 7.1(b)(2), Defendants request oral argument on their Motion to Dismiss.  Defendants believe, given the complex nature of the relevant federal securities laws (including the PSLRA's "safe harbor" provisions), the PSLRA's special pleading requirements, the nature of the relevant facts, and the procedural history of the case, that oral argument is likely to assist the Court in deciding the Motion.  Defendants estimate that forty-five minutes would be sufficient for oral argument on the Motion.


Dated:  January 22, 2020

                                        Respectfully submitted,


                                        /s/  Joanne M. O'Connor
                                        Scott G. Hawkins
                                        Joanne M. O'Connor
                                        **JONES FOSTER P.A.**
                                        505 South Flagler Drive
                                        Suite 1100
                                        West Palm Beach, FL 33401
                                        Telephone: (561) 659-3000
                                        shawkins@jonesfoster.com
                                        joconnor@jonesfoster.com


                                        Alan S. Goudiss
                                        Brian H. Polovoy
                                        (admitted *pro hac vice*)
                                        **SHEARMAN & STERLING LLP**
                                        599 Lexington Avenue
                                        New York, NY 10022
                                        Telephone: (212) 848-4000
                                        agoudiss@shearman.com
                                        bpolovoy@shearman.com

                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of January, 2020, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record identified on the attached Service List

in the manner specified, either via transmission of Notices of Electronic Filing generated by

CM/ECF or in some other authorized manner for those counsel or parties who are not authorized

to receive electronically Notices of Electronic Filing.

Jones Foster P.A.
*Attorneys for Defendants*
505 South Flagler Drive, Suite 1100
West Palm Beach, Florida 33401
Tel: (561) 659-3000
Fax: (561) 650-5300

By: /s/ Joanne M. O'Connor
Scott G. Hawkins, Esq.
Florida Bar No. 0460117
Email: shawkins@jonesfoster.com
Joanne M. O'Connor, Esq.
Florida Bar No. 0498807
Email: joconnor@jonesfoster.com

Alan S. Goudiss
Brian H. Polovoy
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 848-4000
Fax: (212) 848-7179
Email: agoudiss@shearman.com
Email: bpolovoy@shearman.com

**SERVICE LIST**
**CASE NO: 9:18-cv-81448- SINGHAL/MATTHEWMAN**

Shannon L. Hopkins
Nancy A. Kulesa
Stephanie Bartone
LEVI & KORSINSKY, LLP
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: nkulesa@zlk.com
Email: sbartone@zlk.com
*Co-lead counsel for Lead Plaintiff and the Class*

Guillaume Buell
THORNTON LAW FIRM LLP
1 Lincoln Street, 25th Floor
Boston, MA 02111
Tel: (617) 720-1333
Fax: (617) 720-2445
Email: gbuell@tenlaw.com
*Co-lead counsel for Lead Plaintiff and the Class*

Cullin Avram O'Brien
CULLIN O'BRIEN LAW, P.A.
6541 Ne 21st Way
Ft. Lauderdale , FL 33308
Tel.: (561) 676-6370
Fax: (561) 320-0285
Email: cullin@cullinobrienlaw.com
*Liaison counsel for Lead Plaintiff*

Jonathan Gardner, Esquire
Christine M. Fox, Esquire
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email: jgardner@labaton.com
Email: cfox@labaton.com
*Additional counsel for Lead Plaintiff*

Scott G. Hawkins
Joanne M. O'Connor
JONES FOSTER P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, Florida 33401
Tel: (561) 659-3000
Fax: (561) 650-5300
Email: shawkins@jonesfoster.com
Email: joconnor@jonesfoster.com
*Attorneys for Defendants*

Alan S. Goudiss
Brian H. Polovoy
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 848-4000
Fax: (212) 848-7179
Email: agoudiss@shearman.com
Email: bpolovoy@shearman.com
*Attorneys for Defendants*