**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 19-cv-81448-SINGHAL/Matthewman**

JENNIFER TUNG, individually and on behalf
of all others similarly situated,

    Plaintiff,

v.

DYCOM INDUSTRIES, INC., STEVEN E.
NIELSEN, and ANDREW DEFERRARI

    Defendant.
_____/

## ORDER DENYING MOTION TO DISMISS

This is a class action against Dycom Industries, Inc. ("Dycom"), its chief executive officer Steven Nielsen ("CEO"), and its chief financial officer Andrew DeFarrari ("CFO") (collectively, "Defendants"), for securities fraud under Sections 10(b) and 20(a) of the Exchange Act of 1934 and Rule 10b-5. The class members all purchased or otherwise acquired Dycom common stock between November 20, 2017 and August 10, 2018 ("Class Period"). Jennifer Tung, one such purchaser, first filed this action on October 25, 2018. *See generally* Compl. ¶ 5 (DE [1]). No more than a few days later, a second putative class filed an identical complaint against Defendants. *See generally Possick v. Dycom Indus., Inc.*, No. 18-cv-81480-RLR (S.D. Fla. Oct. 30, 2018). The two actions were consolidated and Boston Retirement System was appointed lead plaintiff. *See* Order Appointing Lead Plaintiff (DE [29]).

As a general overview, Plaintiffs allege Dycom, through CEO and CFO, both intentionally misled the public and intentionally failed to fully inform the market about its

financial strength. Plaintiffs point specifically to approximately sixty statements (spanning almost 100 paragraphs in the complaints) Defendants made as intentionally misleading.

The current operative pleading is the Second Amended Complaint ("SAC") (DE [71]), with the cause before the Court, Dycom's Motion to Dismiss ("Motion to Dismiss") (DE [74]). The Court has reviewed the Motion to Dismiss, the Response in Opposition (DE [76]), the Reply in Support (DE [78]), as well as several affidavits, declarations, and exhibits attached to all the relevant pleadings and briefing (DE [74-1], [74-2], [74-3], [74-4], [75]). For the reasons further explained below, the Court finds Plaintiffs have pled facts sufficient to withstand a Rule 12(b)(6) motion to dismiss. In coming to this conclusion, the Court has thoroughly analyzed the panoply of statements on which Plaintiffs base their claims. While (unsurprisingly) each side takes divergent positions—Plaintiffs argue all sixty statements are actionable; Defendants insist none are—the answer is more nuanced; some are. However, given the sheer amount, it would be neither sound nor sensible for the Court to parse each and every statement at this juncture. Suffice it to say, at this stage of the proceeding, Plaintiffs have stated a cause of action for securities fraud. At a later time, it can be determined which statements are allowed to be tried before the factfinder. With that established, the Motion to Dismiss is **DENIED**. This order follows.

I.  **BACKGROUND**

   A.  **Dycom's Business Model**

Dycom provides specialty contracting services to telecommunications providers—services like engineering, construction, maintenance, and installation. SAC ¶ 1 (DE [71]). Over 75% of its revenue comes from business with some of the most well-known

companies in the United States, including AT&T, CenturyLink, Charter Communications, Comcast, and Verizon. *Id.* ¶¶ 1, 52–54. Over the past few years with the increasing ubiquity of cellular data and smartphones, Dycom's work with these telecommunications companies has seen unprecedent growth. *Id.* ¶ 2.

Dycom and these partner companies enter into "master service agreements" ("MSAs"). *Id.* ¶ 52–56. One issue with these contracts is that they do not guarantee a specific amount of volume of work or services, and can be cancelled by the partner company at any time without penalty. *Id.* ¶ 57. Dycom refers to the estimated value for the work generated by entering into an MSA as its "backlog." *See* Mot. to Dismiss 5–6 (DE [74]). During the Class Period, Dycom states its backlog was worth approximately $6 billion. *Id.* at 6.

As Plaintiffs recognize, because Dycom's revenue is highly concentrated to only five partner companies, the loss of just one could have a serious impact on Dycom's operations and revenue. SAC ¶ 58. And this cautious outlook proved prescient. Despite several multimillion-dollar contracts with these partner companies over the past few years, Dycom faced difficulty in maintaining MSAs, lost customers and money, and experienced substantial delays in deploying the projects. *Id.* ¶ 4. Forming the basis of this class action, Plaintiffs contend Dycom hid these workload and financial problems from the market. *Id.* According to Plaintiffs, because of difficulty in obtaining permits and issues completing contracted projects within the allotted time, Dycom suffered loss of MSAs, resulting in under-absorption of labor costs, and insufficient amount of work. *Id.* ¶¶ 70–71. By way of example, Dycom was experiencing substantial delays in deploying Verizon's One Fiber Project and AT&T's FTTX Project due to its failure to

secure utility and work permits. *Id.* ¶ 4. Consequently, Verizon and AT&T, among several other customers, repudiated millions of dollars' worth of contracts, costing Dycom lost revenue and business-relationship goodwill. *Id.* ¶¶ 4, 129–35, 159

### B. False and Misleading Statements

According to Plaintiffs, Dycom hid from the market and its investors, all of the foregoing issues with obtaining permits and maintaining its relationships with partner companies. SAC ¶ 4. Beginning on November 20, 2017—the opening bookmark date of the Class Period—CEO and CFO began what Plaintiffs describe as a coordinated campaign to make false statements, mislead the market and investors, and hide Dycom's issues. *E.g.*, *id.* ¶ 189. Specifically, again, Plaintiffs identify nearly sixty. As stated above, the Court finds it unnecessary and imprudent to repeat and analyze each and every statement identified by Plaintiffs.

On November 20, 2017, Dycom held an earnings call to discuss its financial and operating results for the fiscal quarter ending in October 2017 ("November 2017 Call"). *Id.* ¶ 192. It was during this call that CEO and CFO, according to Plaintiffs, made the first of many false or misleading statements about Dycom's financial situation. *Id.* They point to the following statement made by CEO as the first:

> As with prior initiations of large-scale network deployments, ***we expect some normal timing volatility*** and customer spending modulations as network deployment strategies evolve and tactical considerations, ***primarily permitting impact timing***.

*Id.* (emphasis in original). A few months later, during an investor call on February 28, 2018 ("February 2018 Call"), CEO repeated this outlook of "expect[ing] some normal timing volatility." *Id.* ¶ 194. Doubling down on this theme, on the November 2017 Call, CEO addressed the permitting issues accordingly:

4

> [W]hen you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. It is not anything unusual . . . . So I think it'll get better, it always does.

*Id.* ¶ 196. Plaintiffs further allege CEO and CFO misled the public in Dycom's Form 10-Q for the period ending in October 2017 by representing Dycom was "not experiencing any material project delays or other circumstances that would impact the realizability of the [costs and estimated earnings in excess of billings] balance as of October 28, 2017 or July 29, 2017." *Id.* ¶ 197.

According to Plaintiffs, the November 2017 Call and February 2018 Call demonstrate the materially false and misleading statements because the permit delays were not "normal," but rather the result of issues specific to Dycom. *Id.* ¶ 200. Basically, Defendants failed to disclose that Dycom was already experiencing substantial and material nationwide permit delays as a direct result of its failure to: file necessary permits in advance of commencing customer projects; provide municipalities with information that was specifically requested in order for the permits to be completed, processed and approved; obtain the requisite workers compensation insurance for its subcontractors in order to satisfy rudimentary permit requirements; and hire sufficient and competent staff to file and obtain project permits. *Id.*

Plaintiffs allege Defendants also made false and misleading statements about the progress made on its projects and demand by its partner companies. *Id.* ¶ 205. During the November 2017 Call, CEO stated Dycom was experiencing "an *increase* in demand from three key customers as we deployed 1 gigabit wireline networks." *Id.* ¶ 206. However, according to Plaintiffs, this was materially false and misleading because the 1 gigabit deployment actually were not being actively deployed, and Dycom would not begin

5

new projects because it failed to obtain the required permits to commence and complete such jobs. *Id.* ¶ 212. This was just one of many such related statements. *See id.* ¶¶ 213–25.

Defendants also made statements and omissions regarding how quickly its projects were being accelerated. *Id.* ¶ 226. For instance, during the February 2018 Call, CEO stated: "We expect accelerating fiber deployments for emerging wireless technologies, increasing wireless services and solid demand from several large customers reflecting 1 gigabit deployments and fiber-deep cable capacity projects." *Id.* ¶ 234. Then there are the statements regarding its ability to complete its backlog of projects. *Id.* ¶¶ 241–52. There are also statements concerning its "strong" relationships with the partner companies. *Id.* ¶¶ 253–63. Finally, Plaintiffs allege Defendants made statements regarding its operations, revenue growth, and profit margins. *Id.* ¶¶ 264–86. In total, Plaintiffs have identified and alleged over 100 paragraphs' worth of representations and omissions by Defendants that, according to Plaintiffs, were intentionally false and calculated to mislead the market.

### C. Two Partial Disclosures Showing Financial Distress

On May 22, 2018, Dycom reported its 2019 first quarter financials. SAC ¶ 287. In this press release, Dycom acknowledged the project delays and, due to these delays, revised its guidance downward. *Id.* In an investor call later that day, Defendants attributed the negative outlook to a "substantial buildup in activities from the permitting authorities." *Id.* ¶ 289. In complete and obvious contrast to their previous positive statements, Defendants' reason for its revised downward guidance was that it "did not have enough work in hand to absorb the costs it had already incurred on large projects."

6

*Id.* ¶ 289. That same day, Dycom held an earnings call. *Id.* ¶ 288. Offering the now-grim outlook, CEO stated: "We just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management, as well as be efficient in the field as we get more permitted backlog that we can really go to work on. And it's getting better every day." *Id.* ¶ 289. Dycom's stock dropped 20.27% in one day. *Id.* ¶ 292.

On August 13, 2018, before market open, Dycom issued a press release and another earnings call and, again, revised its guidance downward. *Id.* ¶¶ 311–12. This time, CEO stated bluntly: "[W]e're not as busy as we had expected to be. And so that created an absorption question." *Id.* ¶ 313. Dycom's stock freefell again, dropping about 24.10%. *Id.* ¶ 317.

### D. The Second Amended Complaint and Confidential Witnesses

Plaintiffs filed a first amended complaint (DE [43]) on April 19, 2019. While Defendants' motion to dismiss (DE [55]) was pending, Plaintiffs then filed a motion titled "Motion to File Corrected Complaint" (DE [65]). The motion sought to "correct" the complaint by way of "minor clarifications and errors" that Plaintiff's counsel had "since become aware of" since filing the complaint. *Id.* These proposed corrections were seven specific assertions attributed to confidential witnesses ("CWs"). *Id.* The district judge to whom this case was previously assigned permitted Plaintiffs to file the proposed "corrected" complaint as a second amended complaint and allowed Defendants to move to dismiss the new pleading. *See* Order (DE [68]).

Plaintiffs bring two causes of action against Defendants: securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5; and derivative personal liability

7

against CEO and CFO under Section 20(a) of the Exchange Act. Defendants move to dismiss both counts.

## II. APPLICABLE LAW

### A. Securities-Fraud Claim Under Section 10(b) of the Exchange Act

A plaintiff must plead six elements to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Because securities-fraud claims are "like other types of fraud claims," plaintiffs are required to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Mizzaro*, 544 F.3d at 1238. This requires the plaintiff "to state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, Plaintiffs are required to state "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Mizzaro*, 544 F.3d at 1237.

## B. Derivative Personal Liability Under Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act "imposes derivative liability on persons that control primary violators of the [Exchange] Act." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). To state a claim, Plaintiffs must allege three elements: (1) Dycom committed a primary violation of the securities law; (2) that CEO and CFO had the power to control the general business affairs of Dycom; and (3) that they "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Mizzaro*, 544 F.3d at 1237. The Court cannot proceed to a Section 20(a) violation if the plaintiff fails first to establish a Section 10(b) violation. *See id.* The Court briefly notes here that, because Plaintiffs have stated a claim for securities fraud under Section 10(b) and Rule 10b-5 (as discussed below), dismissal of the Section 20(a) claim would be improper.

## C. The Private Securities Litigation Reform Act of 1995

Congress passed the Private Securities Litigation Reform Act of 1995 ("PSLRA") "to curb abusive securities litigation [by] permit[ting] the dismissal of frivolous cases at the earliest feasible stage of the litigation." *In re Noven Pharm., Inc. Sec. Litig.*, 238 F. Supp. 2d 1315, 1319 (S.D. Fla. 2002) (alterations in original). In addition to the heightened pleading standard established in Rule 9(b), the PSLRA sets forth the following additional requirements for plaintiffs to plead a securities-fraud claim:

> (1) [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed . . . .

9

(2) [T]he complaint shall with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1), (2).

### D. Standard for Dismissal for Failure to State a Claim

"'When evaluating a motion to dismiss under Rule 12(b)(6), the question is whether the complaint contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); s*ee also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Worthy*, 930 F.3d at 1217. The Court is guided by the well-known principle that, on a motion to dismiss for failure to state a claim, the Court assumes all well-pleaded allegations in the Complaint are true and views them in the light most favorable to the plaintiff. *Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1534 (11th Cir. 1994).

### E. Considering Extrinsic Documents Provided by Defendants

The Court "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). The general rule limits the Court to the four corners of the complaint and such sources incorporated by reference. *See, e.g.*, *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). The Eleventh Circuit, however, "has recognized an important qualification to this rule where certain documents and their contents are undisputed: 'In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its

10

authenticity is not challenged.'" *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010) (quoting *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337, 1337 (11th Cir. 2010)). In other words, "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute." *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).

## III. DISCUSSION

The Court now turns to Defendants' arguments in moving to dismiss. They focus on three elements: that Plaintiffs have not pled sufficient allegations as to (1) material misrepresentations or omissions, (2) scienter, and (3) loss causation. *See* Mot. to Dismiss 9 (DE [74]). Each will be discussed in turn.

### A. Material Misrepresentation or Omission

"A particular statement is a 'misrepresentation' . . . if in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *Carvelli v. Ocwen Fin. Corp.*, 2018 WL 4941110, at *4 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir. 2019) (alterations in original (internal quotation omitted). As the basis of their claims, Plaintiffs enumerate myriad statements, spanning 100 SAC paragraphs' worth of alleged misrepresentations by Defendants during the Class Period. *See* SAC ¶¶ 189–286. Defendants categorize the statements into four types all excluded by law. Mot. to Dismiss 9–10 (DE [74]). The four categories are as follows: those that are forward looking; those that were factually true; those that constituted opinion; and those that were mere puffery. *Id.*; *see also* Exs. A–D to Mot. to Dismiss (DE [74-1], [74-2], [74-3], [74-4]). Because none of these categories

of statements is actionable for securities fraud under the law, Defendants argue Plaintiffs have failed to state a claim.

### 1. Non-Actionable Forward-Looking Statements

First, Defendants argue a safe-harbor provision in the PSLRA excluding from liability "forward-looking statements" applies to some of the statements alleged by Plaintiffs and immunizes them from liability. "A forward-looking statement is what it sounds like—a prediction, projection, or plan." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1324 (11th Cir. 2019).

Case law offers the following examples: "(1) a statement containing a projection of revenues; (2) a statement of the plans and objections of management for future operations, including plans or objectives relating to the products or services of the issuer; (3) a statement of future economic performance; and (4) any statements of the assumptions underlying or relating to the aforementioned statements." *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1368 (S.D. Fla. 2001). "When determining whether a statement is forward-looking, the Court must consider the statements at issue in the context of the entire document." *In re Noven*, 238 F. Supp. 2d at 1320.

Of the sixty statements identified by Plaintiffs, Defendants argue twenty-four fall into one of these two safe-harbor exceptions. *See* Ex. A to Mot. to Dismiss (DE [74-1]). Examples include:

- "Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018." SAC ¶ 227.

- "We don't have any major programs coming to an end. Generally, they're going to accelerate through the year." *Id.* ¶ 233.

Of course, these are just two of two dozen examples. In total, the Court counts over ten statements where Defendants began with the words "we expect" or "we anticipate." *See* Ex. A to Mot. to Dismiss (DE [74-1]). Based on this, and upon a thorough review of the statements, the Court finds they are forward-looking and presumptively covered by the safe harbor. The statements discuss Dycom's "plans, expectations, and optimism." *In re Noven*, 238 F. Supp. 2d at 1320.

However, the analysis cannot end there. Under the safe-harbor provision of the PSLRA, a forward-looking statement is not actionable only if:

> (A) the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> . . . .
> (B) the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading
> . . . .

15 U.S.C. § 78u-5(c)(1)(A), (B). For clarity, the Court will refer to the first exception as the "cautionary statement exception" and the second exception as the "actual knowledge exception."[1] The Court finds Plaintiffs' allegations of Defendants' forward-looking statements overcome both of these exceptions.

Under the cautionary statement exception, "meaningful cautionary language must be more than mere boilerplate language." *In re Columbia Labs.*, 144 F. Supp. 2d at 1368–

---

[1] The Court recognizes that the statute provides a third exception under this safe-harbor provision: that the statements were immaterial. 15 U.S.C. § 78u-5(c)(1)(A)(ii); *see also Carvelli*, 934 F.3d at 1326. Defendants do not raise this as a defense, however.

13

69. While Plaintiffs contend "Defendants' statements were not accompanied by *meaningful* cautionary language," Resp. in Opp'n to Mot. to Dismiss 15 (DE [76]) (emphasis added), the Court concludes the statements actually came with *no* cautionary language whatsoever, much less *meaningful* cautionary language. Even under what the Court considers a hyper-liberal interpretation of Defendants' statements, supplements like "the permitting process experience 'normal timing volatility,'" *see id.*, are not cautionary language. Neither is a proviso "that customer contracts could be canceled 'for any reason.'" *Id.*

The Court finds Plaintiffs have satisfied the standard for the actual knowledge exception, as well. The allegations of false and misleading statements that pervade the Second Amended Complaint are buttressed by allegations that CEO and CFO knew they were false. *See, e.g.*, SAC ¶¶ 23, 24, 136–88, 323. Accepted as true for this motion to dismiss, the Court finds these allegations more than sufficient to withstand dismissal.

### 2. Non-Actionable Statements That Are Factually True

Clearly, if a statement is factually true, it is not actionable under Section 10(b) or Rule 10b-5, which both provide a cause of action against a defendant who makes a materially *false* statement. Defendants provide twenty-two statements that they claim are factually true and, therefore, non-actionable. *See* Ex. B to Mot. to Dismiss (DE [74-2]). The Court agrees with Defendants that several of these statements would not be actionable under Section 10(b) of Rule 10b-5 if they are proven to be factually true. For example:

- "These services are being provided across the country in dozens of metropolitan areas to a number of customers." SAC ¶ 208.

- "This quarter reflected an increase in demand from three key customers as we deployed 1 gigabit wireline networks." *Id.* ¶ 206.

The Court defers on making the determination at this moment as to whether each of these twenty-two sentences is factually true.

### 3. Non-Actionable Statements of Opinion

Defendants also argue that nearly a dozen of the statements forming Plaintiffs' claims are non-actionable statements of opinion. "A statement of opinion is actionable under 10b-5 only if: (1) the opinion expressed was not sincerely held or (2) the statement included an embedded statement or statements of untrue facts." *Carvelli*, 2018 WL 4941110, at *6 (internal quotation omitted). Thus, if the statement at issue is objectively one of opinion, rather than factual, the burden shifts to the plaintiff to prove either the speaker did not sincerely hold that opinion or it was embedded in some sort of untrue facts.

First, a number of those statements identified by Defendants are simply not opinions. For example, the Court disagrees that the following are opinions:

- "Wireless constructions activity in support of expanded coverage and capacity is poised to accelerate." SAC ¶¶ 196, 377.

- "Our ability to provide integrated planning, engineering and design, procurement, and construction and maintenance services is of particular value to several industry participants." *Id.* ¶ 300.

An opinion is "[a] person's thought, belief, or inference." *Opinion,* Black's Law Dictionary (11th ed. 2019). These statements convey facts; that is, the speaker affirmatively represents the expanded coverage and capacity is poised to accelerate. This does not

imply CEO thinks, believes, or infers it; CEO is making a bold assertion that it will occur.[2] At a minimum, the characterization of such a statement as opinion is not for the Court to make at this stage of the case.

### 4. Non-Actionable Puffery

Puffery is "generalized, non-verifiable, vaguely optimistic statements." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014). Because it is more akin to exaggeration and ballyhoo, "[r]easonable investors do not base their investing decisions on corporate puffery." *Id.* Until very recently, the Eleventh Circuit had not accepted puffery as a defense to securities-fraud claims. It finally did so in *Carvelli*. *See* 934 F.3d at 1319–20 ("[T]he defense seems a particularly good fit in the securities context.").

The statements Defendants have identified as non-actionable puffery include the following examples:

- "[W]orking aggressively with our customers to help them gear up." SAC ¶ 196.

- "Both backlog calculations reflect strong performance as we booked new work and renewed existing work." *Id.* ¶ 242.

- "We have established relationships with many leading telecommunications providers." *Id.* ¶ 256.

---

[2] The Court would be remiss not to note that this statement very well may be a forward-looking statement and, thus, non-actionable under that exception. Defendants, however, do not identify this statement as such and do not list it in docket entry [74-1]).

- "[W]e are increasingly providing integrated planning, engineering and design, procurement and construction and maintenance services, creating more visibility around future revenue streams." *Id.* ¶¶ 266–67.

Again, as with the other three exceptions, this list is illustrative, not exhaustive.

Based on the foregoing examples, the Court cannot agree that these statements are mere puffery. Rather, these statements in particular represent tangible, verifiable actions Dycom assured its investors it was taking such as: establishing relationships with leading telecommunications providers and increasingly providing integrated planning, engineering and design, procurement and construction and maintenance services. Even these statements that can be considered a close call are not like those found to be puffery by other courts. For example, in *Carvelli*, the statements found to be puffery included: "We take all compliance examinations and findings seriously, and we are committed to correcting any deficiencies remediating any borrower harm and improving our compliance management systems and customer service." 2018 WL 4941110, at *4. The Court finds the statements here more concrete affirmations of verifiable actions.

### B. Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976). It runs the continuum from intentional to recklessness. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). This "cannot be decided in a vacuum." *Id.* at 324. "To determine whether the plaintiff has alleged facts that give rise

to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.*

To support their claims, Plaintiffs point to the information provided by the ten CWs and argue their statements provide sufficient basis for a strong inference of scienter. The Court agrees. The allegations are replete of assertions that Dycom, at the very least, intended to hide and conceal the financial issues it faced during the Class Period.

Defendants also attack the strength of Plaintiffs' allegations on the basis that several come from the CWs—confidential, unidentified, and anonymous individuals. But the fact that these allegations come from confidential sources is not per-se disqualifying. *See Mizzaro*, 544 F.3d at 1240 (recognizing skepticism for confidential statements in securities-fraud claims, but rejecting a per-se bar). Simply, "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made." *Id.* Indeed, circuit courts have recognized information from multiple confidential sources can be meaningful when corroborated by one another and "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008), *on remand from Tellabs, Inc.*, 551 U.S. 308 (2007).

Here, Plaintiffs provide sufficient information in forming the foundation and basis of the CWs' knowledge. In just one of several examples, Plaintiffs explain in great detail the basis of knowledge for "CW9" (who Plaintiffs allege is Dycom's former vice president of internal audit from November 2007 to December 2017 and who reported directly to CEO). CW9 sat in on monthly phone calls with CEO and the president of Dycom's subsidiaries. SAC ¶¶ 39, 176, 323. These calls focused on a number of topics, including

18

any significant changes that occurred in the past thirty days such as lost customer contracts and permitting issues, in addition to a number of other topics such as finances, collecting money owed to the subsidiaries, and how certain jobs were progressing. *Id.* ¶ 177. CW9 states that there were roughly twenty to twenty-five calls a month to cover the roughly forty subsidiaries, and that each call lasted about thirty minutes. *Id.* Critically, this is corroborated by Dycom's SEC filings. *Id.*

### C. Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss [incurred]." *Dura Pharm.*, 544 U.S. at 342. Plaintiffs must show that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement[s] or omission[s] concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293–94 (M.D. Fla. 2008). A plaintiff "need not rely on a single, complete, corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013).

Defendants' argument on this element is simply untenable. They take the position that Plaintiffs have not pled a *direct connection* between the financial guidance from the two partial disclosures and the stock price drop. Mot to Dismiss 25 (DE [74]). The Court disagrees. Read in a light most favorable to Plaintiffs, the Court finds more than sufficient allegations to allow the case to move forward at the Rule 12 (b)(6) stage.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs have pled sufficient allegations to withstand a motion to dismiss for claims under Sections 10(b) and 20(a) of the Exchange Act. The Motion to Dismiss (DE [74]) is **DENIED**. Defendants are directed to file an answer to the Second Amended Complaint within **FOURTEEN (14) DAYS** from the date of this order.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida this 14th day April 2020.

_____
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies to counsel via CM/ECF