**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JENNIFER TUNG, Individually and on Behalf of All Others Similarly Situated, | Case No. 9:18-cv-81448-RAS |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | Judge Raag Singhal |
| DYCOM INDUSTRIES, INC., STEVEN E. NIELSEN and ANDREW DEFERRARI, | |
| Defendants. | |

**LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF**
**<u>CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 4

I.      The Proposed Settlement Warrants Final Approval. ........................................................ 4

      A.      Lead Plaintiff and Lead Counsel have adequately represented the Settlement
           Class. ........................................................................................................... 5

      B.      The Settlement was reached following arms-length negotiations with an
           experienced Mediator ................................................................................... 6

      C.      The relief that the Settlement provides for the Settlement Class is adequate in
           light of the costs and risks of further litigation. ...................................................... 7

           1.      The risks of establishing liability and damages support approval of the
                 Settlement. ............................................................................................ 8

                 a.      Risks to Proving Liability .............................................................. 8

                 b.      Risks to Proving Damages and Loss Causation ........................... 10

           2.      The Settlement represents a favorable percentage of likely
                 recoverable damages. ........................................................................... 11

            3.      The Costs and Delays of Continued Litigation Support Approval of
                 the Settlement ..................................................................................... 12

           4.      All other Rule 23(e)(2)(c) factors support approval of the Settlement. ..... 13

      D.      The Settlement Treats Class Members Equitably Relative to Each Other. .......... 15

      E.      Other Factors Considered by the Eleventh Circuit Support Approval of the
           Settlement. ................................................................................................. 16

II.     The Plan of Allocation Is Fair and Reasonable ............................................................ 16

III.    The Settlement Class Should be Certified .................................................................... 18

IV.     Notice Satisfies Rule 23 and Due Process .................................................................... 18

CONCLUSION ..................................................................................................................... 19

## **TABLE OF AUTHORITIES**

CASES                                                                      PAGE(S)

*Bennett* v. *Behring Corp*., 737 F.2d 982 (11th Cir. 1984);
    *accord Faught* v. *Am. Home Shield Corp*., 668 F.3d 1233 (11th Cir. 2012)............ *passim*

*Cabot E. Broward 2 LLC* v. *Cabot*, 2018 WL 5905415 (S.D. Fla. Nov. 9, 2018) ...................... 12

*Camden I Condo. Ass'n, Inc.* v. *Dunkle*, 946 F.2d 768 (11th Cir. 1991)..................................... 14

*Canupp* v. *Sheldon*, 2009 WL 4042928 (M.D. Fla. Nov. 23, 2009)................................................ 6

*Carpenters Health & Welfare Fund* v. *Coca-Cola Co*.,
    2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) ............................................................... 11

*Dukes* v. *Air Canada*, 2020 WL 496144 (M.D. Fla. Jan. 30, 2020) ........................................... 15

*Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336 (2005) ................................................................... 10

*Francisco* v. *Numismatic Guar. Corp.*, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008) .................. 16

*Hanley* v. *Tampa Bay Sports & Entm't LLC*, 2020 WL 2517766 (M.D. Fla. Apr. 23, 2020)...... 15

*In re Am. Bank Note Holographies, Inc., Sec. Litig.*, 127 F. Supp. 2d 418 (S.D.N.Y. 2001)....... 11

*In re Beazer Homes USA, Inc. ERISA Litig.*, 2010 WL 11512206 (N.D. Ga. Aug. 11, 2010)..... 13

*In re Celera Corp. Sec. Litig.*, 2015 WL 1482303 (N.D. Cal. Mar. 31, 2015)............................ 12

*In re Checking Account Overdraft Litig.*,
    2012 U.S. Dist. LEXIS 56115 (S.D. Fla. Apr. 20, 2012) .................................................. 7

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ........................ 6

*In re China Sunergy Sec. Litig.*, 2011 WL 1899715 (S.D.N.Y. May 13, 2011)........................... 12

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    2020 WL 256132 (N.D. Ga. Mar. 17, 2020).......................................................... 5, 7, 15

*In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854 (11th Cir. 2009) ........................................... 4

*In re Immucor Sec. Litig.,* 2007 U.S. Dist. LEXIS 111135 (N.D. Ga. Sep. 26, 2007) ................ 14

*In re Netbank, Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 162835 (N.D. Ga. Nov. 9, 2011) .......... 16

*In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................. 6

*In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852 (M.D. Fla. Oct. 5, 2017)............................... 16

*In re Terazosin Hydrochloride Antitrust Litig.*,
    2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) ................................................. 17

*Ingram* v. *The Coca-Cola Co*., 200 F.R.D. 685 (N.D. Ga. 2001)................................................... 7

*Kirkpatrick* v. *J.C. Bradford Co*., 827 F.2d 718 (11th Cir. 1987) ................................................. 5

*Lake* v. *First Nationwide Bank*, 900 F. Supp. 726 (E.D. Pa. 1995)................................................ 6

*Thorpe* v. *Walter Investment Management Corp*.,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)................................................................... 12

*Vinh Nguyen* v. *Radient Pharms. Corp.*, 2014 WL 1802293 (C.D. Cal. May 6, 2014) .............. 17

*Wal-Mart Stores, Inc.* v. *Visa U.S.A.*, 396 F.3d 96 (2d Cir. 2005) ............................................... 18

*Yang* v. *Focus Media Holding, Ltd.*, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)..................... 17

## RULES

FED. R. CIV. P. 23 ......................................................................................................... *passim*

## STATUTES

15 U.S.C. § 78u-4(a)(7) ............................................................................................................ 18

## OTHER AUTHORITIES

Laarni T. Bulan and Laura E. Simmons, SECURITIES CLASS ACTION SETTLEMENTS, 2019
    REVIEW AND ANALYSIS (Cornerstone Research) (2020)......................................... 8, 11, 12

Pursuant to Federal Rule of Civil Procedure 23(e), Lead Plaintiff Boston Retirement System, on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for: (i) final approval of the proposed Settlement resolving all claims in the Action, and related claims, for the payment of $9,500,000 in cash for the benefit of the Settlement Class; and (ii) approval of the proposed Plan of Allocation for the distribution of the proceeds of the Settlement to eligible claimants.[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in the Action, and related claims, in exchange for a cash payment of $9,500,000, which has been deposited into an escrow account. Lead Plaintiff respectfully submits that the proposed Settlement is an excellent result for the Settlement Class and satisfies the standards for final approval under Rule 23(e)(2). As detailed in the accompanying Buell Declaration and summarized herein, the Settlement was reached after a mediation process overseen by retired United States District Judge Layn R. Phillips, a highly experienced and well-respected mediator, and represents a favorable percentage of the likely potential damages that could be established at trial.

The Settlement is particularly favorable considering the significant risks of continued litigation. This was not a case with clearly false or restated financial statements or a parallel government enforcement action to support Lead Plaintiff's claims. On the contrary, and as discussed below and in the Buell declaration, there was significant risk with respect to establishing both liability and damages at trial. For example, Defendants would have argued that certain alleged

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated June 25, 2020 (ECF No. 85-2) or in the Declaration of Guillaume Buell in support of (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Buell Declaration"), filed herewith. Citations to "¶___" refer to paragraphs in the Buell Declaration and citations to "Ex. ___" refer to exhibits in the Buell Declaration. Unless otherwise indicated, all emphasis is added and internal citations are omitted.

misstatements were: (i) non-actionable forward-looking statements protected by the Safe Harbor of the Private Securities Litigation Reform Act ("PSLRA"), (ii) non-actionable corporate puffery, and (iii) that other statements constituted "opinion" statements that could not be shown to be false or misleading. ¶39. Defendants would have further argued that Lead Plaintiff would not be able to prove that Defendants acted with scienter, especially where Dycom's quarterly revenue exceeded its guidance the next quarter after the close of the Class Period, and where Defendants warned investors of the risk that Dycom might not achieve its revenue projections. ¶38.

Lead Plaintiff also would have encountered substantial challenges in proving loss causation. Among other things, Defendants would continue to argue that Lead Plaintiff could not establish loss causation with respect to the alleged corrective disclosures as those disclosures concerned lowered or missed financial guidance, while Defendants' alleged misstatements concerned Dycom's permitting issues. ¶48-50.

In short, there were a number of significant risks that could have resulted in the Settlement Class obtaining no recovery or a lesser recovery as a result of continued litigation.  In light of these risks, Lead Plaintiff and Lead Counsel believe that the recovery of $9,500,000 for the Class is an excellent result. The Settlement represents a favorable percentage of the damages that could be proven at trial. More specifically, if liability were established with respect to all of the claims, including for the two alleged corrective disclosures, the Lead Plaintiff's damages expert has estimated that the most reasonable estimate of aggregate damages recoverable at trial was $165.8 million, which takes into account the exclusion of gains on pre-Class Period purchases. Accordingly, the Settlement recovers approximately 5.7% of aggregate damages likely recoverable at trial, which is consistent with typical recoveries in comparable securities actions.

In addition, at the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action. Before the Settlement was agreed to, Lead Counsel had: (i) reviewed and analyzed documents filed publicly by the Company with the SEC; (ii) reviewed and analyzed publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company; (iii) reviewed and analyzed research reports issued by financial analysts concerning the Company; (iv) reviewed and analyzed other publicly available information and data concerning the Company and its subsidiaries, including information concerning Dycom's customers and contracts; (v) interviewed or spoke with former employees of Dycom and its subsidiaries; (vi) engaged in due diligence discovery, which included obtaining and reviewing documents produced by Defendants after the Mediation; (vii) reviewed and analyzed the applicable law governing the claims and potential defenses; and (viii) consulted with experts on damages and loss causation issues. ¶76.

Absent the Settlement, the Parties faced the prospect of protracted litigation through the remainder of fact discovery; costly expert discovery; additional contested motions; summary judgement; a trial; post-trial motion practice; individual class member loss causation and damages; and likely ensuing appeals. ¶86. The Settlement avoids these risks and delays while providing a substantial, certain, and immediate benefit to the Settlement Class in the form of a $9,500,000 cash payment.

In light of these considerations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiff requests that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Class Members. The Plan of Allocation, developed by Lead

Plaintiff's damages expert in consultation with Lead Counsel, provides a reasonable method for allocating the Net Settlement Fund among Class Members who submit valid claims based on damages they suffered that were attributable to the alleged fraud.

## ARGUMENT

### I.  The Proposed Settlement Warrants Final Approval.

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims. A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Eleventh Circuit has recognized that public policy favors settlement of disputed claims among private litigants, particularly in class actions. *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial settlement of class action lawsuits.").

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

The Eleventh Circuit has held that district courts should also consider following factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett* v. *Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *accord Faught* v. *Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2012).

4

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments. Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Bennett* factors. *See In re Equifax Inc. Customer Data Sec. Breach Litig*., 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020) (reviewing final approval of class action settlement under both the Rule 23(e)(2) factors and *Bennett* factors).

All of the applicable factors strongly support approval of the Settlement.

### A.    Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class.

When evaluating a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." FED. R. CIV. P. 23(e)(2)(A). The Eleventh Circuit considers whether: (1) class representatives have interests antagonistic to the interests of other class members; and (2) class counsel has the necessary qualifications and experience to lead the litigation. *See Kirkpatrick* v. *J.C. Bradford Co*., 827 F.2d 718, 726 (11th Cir. 1987); *Equifax*, 2020 WL 256132, at *5.

Here, Lead Plaintiff and Lead Counsel have adequately represented the Class in their vigorous prosecution of the Action for nearly two years and in the arms-length negotiation of the Settlement. Lead Plaintiff is a sophisticated institutional investor with substantial experience leading numerous securities class actions. Throughout the Action, Lead Plaintiff benefited from the advice of knowledgeable counsel well-versed in shareholder and securities fraud litigation.

5

Lead Plaintiff also has claims that are typical of and coextensive with those of other Class Members and has no interests antagonistic to the interests of other members of the Class.

In addition, Lead Counsel are highly qualified and experienced in securities litigation (*See* Buell Decl. Exhibits 9-10 (Thornton & LK firm resumes)) and was able to successfully conduct the litigation, in the face of strong opposition, and obtain a favorable settlement. Based on their knowledge of the facts and legal issues, Lead Counsel believe that this is a fair and reasonable settlement.  The opinion of Lead Counsel should be given significant weight. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1351 (S.D. Fla. 2011) ("The Court gives great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation") (internal quotations omitted); *In re NVIDIA Corp. Derivative Litig*., 2008 WL 5382544, at *4 (N.D. Cal. Dec. 22, 2008) ("[S]ignificant weight should be attributed to counsel's belief that settlement is in the best interest of those affected by the settlement."); *Lake* v. *First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.").

Accordingly, Lead Plaintiff and Lead Counsel have adequately represented the Class.

**B.     The Settlement was reached following arms-length negotiations with an experienced Mediator.**

In weighing the approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length." FED. R. CIV. P. 23(e)(2)(B). This inquiry is comparable to the Eleventh Circuit's traditional threshold examination of whether a proposed settlement is the product of fraud or collusion between the parties. *See Canupp* v. *Sheldon*, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009) ("In determining whether there was fraud or collusion, the court examines whether the settlement was achieved in good faith through arms-length negotiations, whether it was the product of collusion between the parties and/or their

attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel.").

Here, the Settlement was reached after arms-length negotiations between experienced counsel, which included a full-day mediation session before retired United States District Court Judge Layn Phillips, Esq., an experienced and highly respected mediator who frequently mediates complex litigations. ¶8. *See Equifax*, 2020 WL 256132, at *6 ("readily conclud[ing]" that a settlement was negotiated at arm's length without collusion where case settled after mediation with Layn Phillips who had a "wealth of experience in major complex litigation"); *In re Checking Account Overdraft Litig.*, 2012 U.S. Dist. LEXIS 56115, at *52 (S.D. Fla. Apr. 20, 2012) ("the Settlement was reached in the absence of collusion, [was] the product of informed, good-faith, arms-length negotiations between the Parties and their capable and experienced counsel, and was reached with the assistance of [Layn Phillips], a well-qualified and experienced mediator"); *Ingram* v. *The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (presence of "highly experienced mediator" pointed to the "absence of collusion").

**C.    The relief that the Settlement provides for the Settlement Class is adequate in light of the costs and risks of further litigation.**

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account… the costs, risks, and delay of trial and appeal," as well as other relevant factors. FED. R. CIV. P. 23(e)(2)(C). Typically, this factor is considered the most important factor for the Court to consider when evaluating the proposed settlement.[2]

---

[2] Indeed, this factor encompasses four of the six factors used in the traditional *Bennett* analysis: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; [and] (4) the complexity, expense and duration of litigation." 737 F.2d at 986.

As discussed in detail in the Buell Declaration and below, continued litigation of the Action presented a number of risks, including that Lead Plaintiff might have been unable to establish liability and damages. ¶32. Additionally, continuing this litigation through trial and appeals would impose substantial additional costs on the Settlement Class and would result in extended delays before any recovery could be achieved. The Settlement, which provides a $9,500,000 cash payment for the benefit of the Settlement Class, avoids these further costs and delays. The Settlement also represents a reasonable recovery when compared to the median settlement value in securities class action settlements and provides a favorable recovery as a percentage of the damages likely recoverable at trial. The $9,500,000 Settlement exceeds the Eleventh Circuit inflation-adjusted median of $6.3 million in securities class action settlements in the Eleventh Circuit from 2010 through 2019, representing an average recovery of 5.2% of estimated damages. See Cornerstone Research, SECURITIES CLASS ACTION SETTLEMENTS, 2019 REVIEW AND ANALYSIS, at 20 (2020). All of these factors strongly support approval of the Settlement.

1. **The risks of establishing liability and damages support approval of the Settlement.**

Although Lead Plaintiff and Lead Counsel believe the claims asserted against Defendants are meritorious, they recognize that this Action presented a number of significant risks to establishing both liability and damages.

a. **Risks to Proving Liability**

As set forth below, Lead Plaintiff would have faced substantial challenges in proving that Defendants' statements and omissions were materially false and misleading when made and that the statements were made with intent to defraud investors.

Defendants would have argued that the alleged false and misleading statements were non-actionable, forward-looking statements protected by the Safe Harbor of the PSLRA, and that others

were statements of "opinion" or corporate puffery that could not be shown to be false or misleading. ¶39. In further support of their position, Defendants would have claimed that a number of the statements were not false in any respect because there was no severe or widespread pattern of permitting delays or customer cancellations. ¶¶38-39, 41. There was a significant risk that, had the litigation continued to trial, a jury could have found these statements from Dycom to be vague or general and not triggering liability for fraud.

Even if Lead Plaintiff succeeded in proving falsity, there would have been significant challenges to prove that Defendants acted with scienter. Defendants would argue that Lead Plaintiff could not prove that any Defendant knowingly made statements with the requisite intent to defraud or with severe recklessness, especially because Defendants argued that they believed they had adequately informed the market that the various projections they provided came with obvious and disclosed limitations. ¶45. Defendants would have further argued that the problems Dycom faced were issues concerning the timing of revenue recognition, and the fact that Dycom exceeded analyst estimates in the quarter following the close of the Class Period would arguably provide Defendants with an opposing inferences of scienter. *Id.* Further, Defendants would argue that the Individual Defendants had substantial stock holdings that they held throughout the Class Period, further undercutting an inference of scienter, according to Defendants. *Id.*

While Defendants unsuccessfully asserted certain of these arguments in their motion to dismiss, the Court was required to accept all allegations in the Complaint as true. There was a significant possibility that Defendants could have succeeded in these arguments at subsequent stages of the litigation when allegations in the Complaint would need to be supported by admissible evidence. ¶46. On all these issues, Lead Plaintiff would have to prevail at several stages—on a

motion for summary judgment and at trial, and if it prevailed on those, on the appeals that would likely follow—which would likely have taken years. ¶47.

### b.     Risks to Proving Damages and Loss Causation

Even assuming that Lead Plaintiff overcame the above risks and successfully established liability, Lead Plaintiff would have confronted considerable, additional challenges in establishing loss causation and damages. *See Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover."). While Defendants raised the obstacles posed by loss causation in their motion to dismiss and the Court rejected that argument, the threshold for alleging loss causation at the pleading stage was not onerous, and these arguments could have been presented with more force at summary judgment or at trial where Defendants' position would be supported by testimony, evidence, and affidavits opining that there was no loss causation, and limited or no damages. ¶48. Defendants would likely continue to argue that Lead Plaintiff could not show the false and misleading statements were financially guiding investors. Using specific dates in which new information about the statements alleged to be false and misleading was disclosed, Defendants would attempt to disprove the financial guidance aspect of loss causation.

Moreover, Defendants would contend that Lead Plaintiff bears the burden of proof in "disaggregating" the impact of confounding, non-fraud related information from any actionable disclosures and that Lead Plaintiff would not be able to so. ¶50. These disputed issues would have boiled down to a "battle of experts" at trial. Defendants would have undoubtedly presented a well-qualified expert who would opine that the Class's damages were small or nonexistent. As Courts have long recognized, the uncertainty as to which party's expert's view might be credited by the jury presents another substantial litigation risk in securities cases. *See Carpenters Health &*

*Welfare Fund* v. *Coca-Cola Co.*, 2008 WL 11336122, at *8 (N.D. Ga. Oct. 20, 2008) ("The reaction of a jury to such expert testimony is highly unpredictable and [as a result of this unpredictability] 'a jury could be swayed by experts for Defendants', and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs contended.") (*quoting In re Am. Bank Note Holographies, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-427 (S.D.N.Y. 2001)). Thus, proving loss causation and damages at summary judgment or at trial would have significant risks making the Settlement the most beneficial outcome for the Class.

### 2.    The Settlement represents a favorable percentage of likely recoverable damages.

The Settlement Amount is nearly three times the size of the median settlement for securities cases that are less than two years old ($3.3 million), and higher than the median amount for cases between two and three years old ($7.9 million). *See* Bulan and Simmons, Secs. Class Action Settlements – 2019 Review & Analysis at 1 (Cornerstone Research 2020), attached as Exhibit 1 to the Buell Declaration. The $9,500,000 Settlement is also favorable when compared to the median settlement value in securities class action settlements in 2019, which was reported by Cornerstone Research to be $11.5 million. *Id.* The Settlement Amount is also higher than the median settlement amount for cases where the court has ruled on the motion to dismiss (which is $5.4 million). *Id.*

Moreover, the Settlement Amount presents a favorable recovery when considering the aggregate damages that could have been established at trial. Assuming that Lead Plaintiff prevailed on all liability issues at trial (which was far from certain), Lead Plaintiff's expert has estimated that the most reasonable aggregate damages recoverable at trial was $165.8 million, taking into account the exclusion of pre-Class Period gains, which Defendants were likely to argue was required. Accordingly, the Settlement recovers approximately 5.7% of the aggregate damages

likely recoverable at trial, assuming that Lead Plaintiff was successful in proving liability at trial. If Defendants' arguments prevailed at summary judgment or trial, the Settlement Class would have recovered nothing or significantly less money.

This recovery aligns with other court-approved settlements, where the recovery was a similar or a smaller percentage of the damages. *See, e.g.*, *Thorpe* v. *Walter In*v. *Mgmt.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving settlement of 5.5% of maximum possible recovery); *Cabot E. Broward 2 LLC* v. *Cabot*, 2018 WL 5905415, at *5 (S.D. Fla. Nov. 9, 2018) (citing a study finding securities class actions "recover[] between 5.5% and 6.2% of the class members" total estimated losses); *In re Celera Corp. Sec. Litig.*, 2015 WL 1482303, at *6 (N.D. Cal. Mar. 31, 2015) (granting preliminary approval in securities class action litigation); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that the average settlement  in securities class actions ranges from 3% to 7% of the class' total estimated losses). A study from 2010 to 2019 found that in all securities class actions where damages were estimated to be in the range of triple-digit millions, the median settlement recovery was only 3.7% of damages. *See* Cornerstone, 2019 Review, at 6 (2020). Therefore, the Settlement is a favorable outcome for the Class.

### 3. The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays required before any recovery could be obtained through litigation also strongly support approval of the Settlement.

While this case settled after Lead Plaintiff engaged in a substantial investigation and defeated two motions to dismiss, obtaining a litigated verdict in the Action would have required significant additional time and expenses. In the absence of the Settlement, achieving recovery would have required: (i) lengthy and expensive fact discovery, including numerous depositions;

12

(ii) briefing a motion for class certification; (iii) conducting complex and expensive expert discovery; (iv) briefing an expected motion for summary judgment and pre-trial motions; (v) a trial involving substantial fact and expert testimony; and (vi) post-trial motions. In addition, no matter what the outcome was at trial, it is almost certain that appeals would be taken from any verdict. Even if Lead Plaintiff succeeded at these multiple stages, there would have been substantial expense and delay for a recovery for the Class.

The Settlement of $9,500,000 avoids the cost, length, and uncertainty of continued litigation, while providing an immediate, significant, and certain recovery for the Class.

### 4. All other Rule 23(e)(2)(c) factors support approval of the Settlement.

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Each of these factors supports approval of the Settlement here.

*First*, the procedures for processing the Settlement Class members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation. Here, the potential class members will submit, by mail or online using the Settlement website, the Court-approved Claim Form. Based on the trade information provided by the claimants, the Claims Administrator, A.B. Data Ltd., will determine each claimant's eligibility to participate and calculate their Recognized Claims based on the Court-approved Plan of Allocation. *In re Beazer Homes USA, Inc. ERISA Litig.*, 2010 WL 11512206, at *4 (N.D. Ga. Aug. 11, 2010) (finding A.B. Data as experienced in class action settlements). Claimants will be notified of any defects or conditions of ineligibility and be given

the chance to contest rejection. Any claim disputes that cannot be resolved will be presented to the Court for determination.

All Authorized Claimants will then be issued checks and each Authorized Claimant, including Lead Plaintiff, will receive a *pro rata* share of the recovery. After an initial distribution of the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of initial distribution of the Net Settlement Fund, Lead Counsel shall, if feasible and economical after payment of Notice and Administration Expenses, Taxes, and attorneys' fees and expense, if any, redistribute such balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion. Once it is no longer feasible or economical to make further distributions, any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of outstanding Notice and Administration Expenses, Taxes and attorneys' fees and expenses, if any, shall be contributed to the American Red Cross, a non-sectarian, not-for-profit charitable organization serving the public interest designated by Lead Plaintiff and approved by the Court. This is a standard method in securities class actions and has long been found to be effective. *See In re Immucor Sec. Litig.,* 2007 U.S. Dist. LEXIS 111135 (N.D. Ga. Sep. 26, 2007) (concluding "that the pro-rata nature of the Plan of Allocation is fair to the Class as a whole").

*Second*, the relief provided for the Class in the Settlement is also adequate when the Court factors in the terms of the proposed award of attorneys' fees. As discussed in the accompanying motion requesting attorneys' fees and expenses, the requested fee of 29% of the Settlement Fund and litigation expenses of $104,028.19, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation. *See Camden I Condo. Ass'n, Inc.* v. *Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991) ("[t]he majority of common fund fee awards fall

14

between 20% to 30% of the fund," which "may be adjusted in accordance with the individual circumstances of each case."). Courts regularly approve awards of attorneys' fees that are higher. *See, e.g.*, *Dukes* v. *Air Canada*, 2020 WL 496144, at *1 (M.D. Fla. Jan. 30, 2020) (approving attorneys' fees and costs representing 33.3% of settlement fund); *Hanley* v. *Tampa Bay Sports & Entm't*, 2020 WL 2517766, at *6 (M.D. Fla. Apr. 23, 2020) (awarding fee larger than 1/3 of the common settlement fund and noting that "district courts in the Eleventh Circuit routinely approve fee awards of one-third of the common settlement fund") (collecting cases).

*Third*, Rule 23 asks the Court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* FED. R. CIV. P. 23(e)(2)(C)(iv). Here, as explained in Lead Plaintiff's motion for preliminary approval, the only such agreement is the Parties' confidential Supplemental Agreement defining Dycom's right to terminate the Settlement if the number of Class Members who request exclusion from the Settlement Class exceeds a certain threshold. This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement. *See Equifax*, 2020 WL 256132, at *8 (specific terms creating a termination right is an acceptable agreement and "weighs in favor of approval").

### D.   The Settlement Treats Class Members Equitably Relative to Each Other.

The proposed Settlement also treats members of the Class equitably relative to one another. As discussed above in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment will receive their *pro rata* share of the recovery based on their transactions in Dycom stock. Lead Plaintiff will receive the same level of *pro rata* recovery (based on its Recognized Claim as calculated under the Plan of Allocation) as all other Class Members. This allocation ensures equitable treatment among the Settlement Class.

### E.   Other Factors Considered by the Eleventh Circuit Support Approval of the Settlement.

Other factors considered by the Eleventh Circuit support approval of the Settlement, including the reaction of the Settlement Class to the Settlement and the stage of proceedings at which the Settlement was achieved. *Bennett*, 737 F.2d at 986. Under the Preliminary Approval Order, the deadline for Class Members to exclude themselves from the Settlement Class or object to the Settlement is September 22, 2020. To date, no objections to the proposed Settlement have been received. One request for exclusion from the Settlement has been received from a putative class member, but it does not meet the requirements for exclusion set forth in the Notice because it does not provide any information about the person's purchases or sales of Dycom stock. ¶88. Lead Plaintiff will file a reply by October 6, 2020 addressing all requests for exclusion and objections received. This reaction from the Settlement Class supports approval for the Settlement. *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *3 (M.D. Fla. Oct. 5, 2017).

Further, the stage of proceedings at which the Settlement was achieved also supports its approval. Here, as discussed above and in the Buell Declaration, the Settlement was reached after nearly two years of hard-fought litigation. ¶¶6-7, 16-29. As a result, Lead Counsel "had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation." *Francisco* v. *Numismatic Guar. Corp.*, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008). In sum, all the factors that are to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

## II.   The Plan of Allocation Is Fair and Reasonable

The standard of review of a proposed Plan of Allocation for distribution of the Settlement Fund is the same as that for approving a settlement: it must be "fair, adequate and reasonable" and not collusive. *In re Netbank, Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 162835, at *7 (N.D. Ga. Nov.

16

9, 2011). A plan of allocation need not be precise, but "is [] sufficient where … there is 'a rough correlation' between the settlement distribution and the relative amounts of damages recoverable by Class Members." *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 U.S. Dist. LEXIS 43082, at *16 (S.D. Fla. Apr. 19, 2005) (alterations in original); *see also Vinh Nguyen* v. *Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[a]n allocation formula need only have a reasonable, rational basis") (alterations in original). Courts give great weight to the opinion of experienced counsel in evaluating plans of allocation. *See Yang* v. *Focus Media Holding, Ltd.*, 2014 WL 4401280, at *9 (S.D.N.Y. Sept. 4, 2014) ("[w]hen evaluating the fairness of a Plan of Allocation, courts give weight to the opinion of qualified counsel.").

The proposed Plan of Allocation here was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, and it provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members. In developing the Plan, Lead Plaintiff's damages expert calculated the amount of estimated artificial inflation in the price of Dycom's common stock, which allegedly was proximately caused by Defendants' misleading statements, by considering the price changes in Dycom's common stock in reaction to the alleged corrective disclosures, and adjusting for price changes attributable to market and industry factors. Notice ¶54.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each documented purchase or acquisition of Dycom common stock during the Class Period listed in the Claim Form. Notice ¶¶52-54. In general, the Recognized Loss Amount will be the lesser of the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase and sale price of the stock. Notice ¶54.

17

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as a result of the alleged misconduct. To date, no objections to the proposed Plan of Allocation have been received. Nordskog Decl. ¶12.

## III.     The Settlement Class Should be Certified

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class. As detailed in Lead Plaintiff's brief in support of preliminary approval, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* Dkt. 85 at 11-14. None of the facts regarding certification of the Settlement Class have changed since Lead Plaintiff submitted its motion for preliminary approval, and there has been no objection to certification. Accordingly, Lead Plaintiff respectfully requests that the Court certify the Settlement Class under Rules 23(a) and (b)(3).

## IV.     Notice Satisfies Rule 23 and Due Process

The Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfies Rule 23(e)(1), requiring that it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc.* v. *Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005).

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards. The Court-approved Notice includes all the information required by the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, A.B. Data began mailing copies of the Notice and Claim Form to potential Class Members on July 23, 2020. Nordskog Decl. ¶¶3-8. As

of September 7, 2020, A.B. Data had disseminated 36,029 copies of the Notice Packet to potential

Class Members and banks, brokers and other "nominees." *Id.* ¶8. In addition, Lead Counsel caused

the Summary Notice to be published in the *Investor's Business Daily* and transmitted over

*AccessWire* on *Id.* ¶9. This combination of individual mail to all Class Members who could be

identified with reasonable effort, supplemented by publication in a widely circulated newspaper

and over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ.

P. 23(c)(2)(B).

## CONCLUSION

Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and

Plan of Allocation as fair, reasonable, and adequate.  Proposed orders will be submitted after the

deadlines for objecting and seeking exclusion from the Settlement Class have passed.

Date: September 8, 2020                                        Respectfully Submitted,

/s/ *Cullin O'Brien*
Cullin O'Brien
Florida Bar No. 0597341
CULLIN O'BRIEN LAW, P.A.
6541 NE 21st Way
Fort Lauderdale, Florida 33308
Tel: (561) 676-6370
Fax: (561) 320-0285
Email: cullin@cullinobrienlaw.com

*Liaison Counsel*

Guillaume Buell (pro hac vice)
THORNTON LAW FIRM LLP
1 Lincoln Street
Boston, Massachusetts 02111
Tel: (617) 720-1333
Fax: (617) 720-2445
Email: gbuell@tenlaw.com

Shannon L. Hopkins (pro hac vice)
Stephanie Bartone (pro hac vice)

19

LEVI & KORSINSKY, LLP
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (866) 367-6510
Email: shopkins@zlk.com
Email: sbartone@zlk.com

*Class Counsel for the Settlement Class*

LABATON SUCHAROW LLP
Jonathan Gardner (pro hac vice)
Christine M. Fox (pro hac vice)
140 Broadway
New York, New York 10005
Tel: 212-907-0700
jgardner@labaton.com
cfox@labaton.com

*Additional Counsel for Lead Plaintiff*

## **LOCAL RULE 7.1 CERTIFICATION**

Counsel for Lead Plaintiff conferred with Defendants on this request, and Defendants do not oppose the relief sought.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 8, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Cullin O'Brien*
Cullin O'Brien